# EXHIBIT F

IN THE HIGH COURT OF JUSTICE   No 1088
QUEEN'S BENCH DIVISION

Court No 1

COMMERCIAL COURT
St Dunstan's House
133-137 Fetter Lane
London EC4A 1HD

16th April 2003
APPROVED JUDGMENT

Before:

THE HONOURABLE MR JUSTICE TOMLINSON

---

BETWEEN:

Kensington International Limited

Claimant

-v-

Republic of the Congo

Respondent

---

Mr Ewan McQuater (instructed by Jones Day Gouldens)
appeared on behalf of the Claimant.

Mr Khawar Qureshi as Advocate to the Court (appointed by
the Attorney General)

---

1

1

```
 1                          Wednesday, 16 April 2003
 2     (2.00pm)
 3                Judgment of MR JUSTICE TOMLINSON
 4           MR JUSTICE TOMLINSON:  The claimant is a
 5     company incorporated in the Cayman Islands.  It
 6     deals in secondary debt.  It trades securities
 7     on inter-dealer markets.  It does so with the
 8     benefit of a line of credit guaranteed by its
 9     parent.  Apparently the identity of the parent,
10     by whom the claimant is wholly owned, is
11     commercially sensitive.  It has been redacted
12     from the independent auditor's report dated
13     21st March 2003, placed before the court.
14           The claimant sues as assignee of all
15     right, title and interest in $11,999,999.80 due
16     under a Loan Agreement dated 18th April 1984,
17     pursuant to which the defendant state, to which
18     I shall refer as "Congo, "was the borrower.
19     The lenders were 11 banks.  They are B.A.I.I.
20     plc, International Westminster Bank plc,
21     Standard Chartered Bank plc, Banque Paribas
22     (London),  Al Saudi Banque (London),  Société
23     Générale (London branch),  Williams and Glyn's
24     bank plc, Middle East Bank Limited, Banque
25     Belge Limited, Banque Belgo-Zairoise du Zaire
```

2

1    S.A, and Algemene Bank Nederland N.V.
2        The Loan Agreement was in respect of
3    a loan of up to $13.5 million.  I do not know
4    if the entire facility was drawn down.
5        The first repayment of principal,
6    one-ninth of the whole, was due six months
7    after the date of the agreement.  I am told
8    that some interest may have been paid in 1984
9    but no principal has apparently ever been
10   repaid and no interest paid, certainly, since
11   1985.
12       The claimant acquired its interest
13   pursuant to four assignments.  The first in
14   time is dated 29th December 2000, the assignor
15   was Westgate International LP and the amount
16   assigned was $6,876,622.30, together with all
17   accrued and unpaid interest.
18       The second assignment in time was
19   22nd March 2001.  The assignor was the
20   International Bank of Miami NA.  The amount
21   assigned was $1,623,377.50, together with all
22   unpaid and accrued interest.
23       The third assignment is dated
24   11th April 2001.  The assignor was Salomon
25   Brothers Holdings Company Inc.  The amount

3

1   assigned was $1 million, together with all
2   unpaid and accrued interest.
3       The fourth assignment is dated
4   19th April 2001.  The assignor was FH
5   International Financial Services, Inc.  The
6   amount assigned was $2.5 million, together with
7   all unpaid and accrued interest.
8       It is to be observed that none of those
9   assignors is an original party to the Loan
10  Agreement.  Each of the assignments is subject
11  to the standard terms for assignments of loan
12  assets as amended from time to time of the
13  Emerging Markets Traders Association, the terms
14  of which are incorporated by reference into the
15  assignments.  I have not been shown those
16  terms.  I do not know through how many hands
17  these loan assets passed before finding their
18  way to the claimant.  Equally, I do not know
19  what was the consideration furnished by the
20  claimant for each of the assignments.
21  Apparently that, too, is commercially
22  sensitive.  At any rate, I have not been told
23  about it, notwithstanding that I had expressed
24  the view that it might be relevant to the
25  exercise of my discretion, since I am asked to

4

1    balance relevant hardship in the event that I
2    do or do not grant the relief claimed.
3        This action was begun on
4    14th October 2002.  The defendant has neither
5    acknowledged service nor taken any part in the
6    proceedings.  Steps have been taken to ensure
7    that the defendant is aware of the proceedings
8    and of the applications that have been made,
9    first, before Cresswell J on
10   20th December 2002, and now before me on 14th
11   and 15th April 2003.  I should be very
12   surprised if the defendant is not aware of the
13   proceedings and of the applications, or rather
14   of the trial, since that is what has now
15   occurred before me.
16       On 20th December, 2002, the matter came
17   before Cresswell J on an application for
18   summary judgment.  The claimant sought an order
19   to the following effect:
20       1.  The defendant to pay the claimant the
21   sum of $56,047,443.31 together with the further
22   sum of $538,137.12 in respect of interest from
23   13th September 2002 to 12th November 2002,
24   and interest thereafter as per the terms of
25   paragraph 7D of the particulars of claim.

5

2.   Save as provided for in paragraph 3 below, the defendant be restrained, whether acting by itself, its servants or agents, including but not limited to SMPC or any other Congolese public entity or otherwise howsoever, from making or causing or procuring to be made any payments to creditors other than the claimant.

3.   The defendant be permitted to make payments or to cause or procure payments to be made to creditors other than the claimant, provided that, at the same time as any such payment is made, the defendant makes or causes to be made a pro rata payment to the claimant.

4.   The defendant be restrained, whether acting by itself, its servants or agents including but not limited to SNPC or any other Congolese public entity or otherwise howsoever, from creating any mortgage, pledge or other security or other preferential arrangement over any of the assets or revenues of the defendant or of any Congolese public entity including but not limited to SNPC in favour of any creditor.

The claimant further sought a declaration that, 5, in carrying out the acts identified in

6

1    paragraphs 11 to 27 of the particulars of
2    claim, the defendant has acted in breach of the
3    provisions of clause 9(d) of the April 1984
4    Loan Agreement.
5         The order sought went on to contain
6    a definition section for the purposes of the
7    order pursuant to which, for example,
8    a definition was given of what was meant by
9    a pro rata payment.
10        That was a somewhat optimistic
11   application, bearing in mind that it was
12   estimated that the hearing would take only
13   an hour or an hour and a half.  Cresswell J,
14   whose experience in these matters is very
15   great, plainly regarded the injunctive relief
16   sought as novel and unprecedented.  He plainly
17   also regarded as striking the seeking of such
18   relief in December 2002 by an assignee, not
19   an original party, in circumstances where the
20   first event of default under the Loan Agreement
21   occurred in 1984, and the claimant had not
22   acquired any interest until the very end of the
23   year 2000.  To that I might add that the loan
24   should have been fully repaid by the end of
25   1988.

1      Cresswell J granted summary judgment on
2  the money claim.  He directed a speedy trial of
3  the remaining issues, principally the question
4  whether the claimant is entitled to the
5  injunctive relief claimed.  That depends, in
6  part, upon the meaning and effect of
7  Clause 9(d) in the Loan Agreement "to procure that
8  an undertaking by the borrower "to procure that
9  the claims of all other parties under this
10 agreement will rank as general obligations of
11 the People's Republic of the Congo, at least
12 pari passu in right and priority of payment
13 with the claims of all other creditors of the
14 People's Republic of the Congo, and not to
15 create or allow to subsist any mortgage pledge
16 or other security or other preferential
17 arrangement over any of the assets or revenues
18 of the People's Republic of the Congo, or of
19 any Congolese public entity in favour of any
20 creditor."
21     As to this, Cresswell J said:
22     "As to the second and third claims, both
23 by way of negative injunction, the claims
24 relying on the negative pledge clause and the
25 pari passu clause, I suggested to Mr McQuater,

8

1  on behalf of the claimant, that in view of the
2  importance and nature of these claims, the
3  court would be assisted by the appointment of
4  an amicus.  Mr McQuater has very sensibly taken
5  instructions from his client and the claimant
6  now accepts that the second and third claims
7  should proceed to trial."
8      Her Majesty's Attorney General has
9  appointed Mr Qureshi to assist the court.  I am
10 extremely grateful to him for the assistance he
11 has rendered.
12     I must refer briefly to certain other
13 passages in the judgment of Cresswell J given
14 on that occasion.  He began his judgment in
15 this way:
16     "This is the hearing of an application by
17 the claimant, Kensington International Limited,
18 for summary judgment under CPR part 24.
19 Kensington is the assignee of all right, title
20 and interest in sums totalling $11,999,999.80,
21 said to be due and owing from the defendant,
22 the Republic of the Congo, under the terms of
23 a Loan Agreement dated 18th April 1984.  These
24 amounts, together with interest, have been
25 outstanding for a long time and remain unpaid.

```
1           "2.   Under Clause 19.1-4 of the Loan
2      Agreement, the Republic of the Congo submitted
3      to the jurisdiction of this court and waived
4      immunity from suit and from execution against
5      its property.  I refer to the full terms of
6      Clause 19.  The Republic of the Congo has,
7      according to the first witness statement of
8      Mr Stephen Pearson, been duly served in
9      accordance with the provisions of clause 19.2
10     of the Loan Agreement, and I so find.  The
11     Republic of the Congo has not acknowledged
12     service.
13          "3.   On 4th November this year, I gave the
14     claimant permission to proceed by way of
15     summary judgment under CPR part 24, not
16     withstanding the defendant's failure to
17     acknowledge service."
18          At paragraph 7, the judge continued:
19          "The claimant's assignments have been
20     recorded by the agent under the Loan Agreement
21     BNP Paribas, which has also reconciled the
22     amounts due to the claimant as being
23     a principal sum of $12 million together with
24     interest of £44,047,443.31, making a total due
25     as at that 12 December 2002, $56,047,443.31.
```

10

1    The claimant seeks judgment for this sum,
2  together with further contractual interest up
3  to 19th December 2002, in the sum of
4  $864,548.16, calculated as set out in the
5  particulars of claim.  Thus, the total sum
6  claimed is $56,911,991.47.  BNP Paribas is also
7  acting as reconciliation agent for the
8  defendant in relation to the Loan Agreement and
9  in that capacity, has fully reconciled
10  Kensington's interest.
11    "8. Kensington claims the sum is due to it
12  under the Loan Agreement in debt.  The debt has
13  been outstanding for a very considerable period
14  of time and has been repeatedly tolled.  The
15  most tolling agreement is dated
16  22nd September 1997.  That agreement expressly
17  renounces any right to invoke any statute of
18  limitation.
19    "9.  The defendant has not appeared by
20  solicitors or counsel today, although it has
21  received a notice of this hearing.
22    "10.  In my judgment, having considered
23  the materials before the court, the defendant
24  has no real prospects of successfully defending
25  the claim.  Accordingly I give judgment in

11

```
1    favour of the claimant in the sum of
2    $56,911,991.47."
3          I have read those passages, not only to
4    set the scene, but also because it is said by
5    Mr McQuater for the claimant that the judge's
6    findings foreclose certain issues which the
7    amicus has raised.  The claimant has taken no
8    steps to attempt to enforce its judgment.  It
9    has taken the view that Section 12 (5) of the
10   State Immunity Act 1978 is applicable.  That
11   section provides:
12         "A copy of any judgment given against a
13   state in default of appearance shall be
14   transmitted through the Foreign and
15   Commonwealth office to the Ministry of Foreign
16   Affairs of that state, and any time for
17   applying to have the judgment set aside,
18   whether prescribed by rules of court or
19   otherwise, shall begin to run two months after
20   the date on which the copy of the judgment is
21   received at the ministry."
22         Also thought to be possibly relevant is
23   CPR 40.10.  That rule provides:
24         "Where the claimant obtains default
25   judgment under Part 12 on a claim against the
```

12

state where the defendant has failed to file an
acknowledgement of service, the judgment does
not take effect until two months after service
on the state of (a) a copy of the judgment and
(b) a copy of the evidence in support of the
application for permission to enter default
judgment, unless the evidence has already been
served on the state in accordance with an order
made under part 12."

    The claimant has taken the prescribed
steps, and the two month period is apparently
about to expire.  I rather doubt whether these
provisions are applicable, since I doubt
whether the summary judgment granted under Part
24 is properly to be regarded as a judgment in
default of appearance or a default judgment.
However, it was no doubt prudent for the
claimant to proceed in the manner which it did.

    There is no evidence before me and there
was no evidence before Cresswell J to explain
how the banks party to the Loan Agreement came
to divest themselves of their interest.  There
is no direct evidence to the effect that those
banks were unpaid.  However there is evidence
which supports the assertion that the debt

13

1   remains due, as Cresswell J has expressly
2   found.
3        On 26th February 1988, Congo entered into
4   a refinancing agreement.  Annex A lists 60
5   original contracts, of which this Loan
6   Agreement is number 33.  The tolling agreement
7   of 22nd September 1997, to which Cresswell J
8   refers in his judgment, is addressed to the
9   banks or financial institutions and their
10  successors in title to which debts are owed
11  under original contracts as defined in the
12  refinancing agreement.  I can probably infer
13  from the fact that the debts were being traded
14  that they remained unpaid when acquired by the
15  claimant, as Cresswell J has inferentially
16  found.  There is evidence that nothing has been
17  paid to the claimant.
18       I have already referred to clause 9(d) of
19  the Loan Agreement.  Pursuant thereto, the
20  claimant seeks (a) specific performance of
21  Congo's obligation under the April 1984 Loan
22  Agreement not to create any mortgage, pledge or
23  other security or other preferential
24  arrangement over any of its assets or revenues
25  in favour of any creditor, that to which it

14

1  refers as the negative pledge clause, and (b)
2  specific performance of Congo's obligation
3  under the Loan Agreement to pay its creditors
4  on a pari passu basis, pursuant to what is
5  called the pari passu clause.
6         The claimant seeks to enforce these
7  clauses by way of injunctions to prevent their
8  breach, and also seeks a declaration that, in
9  carrying out certain acts, Congo has acted in
10  breach of those clauses.
11        It will be recalled that in Clause 9(d),
12  there is reference to what is described as
13  a Congolese public entity.  This is defined in
14  Clause 1 of the Agreement as:  "An agency,
15  authority, department, ministry or other
16  instrumentality of Congo and any person
17  directly or indirectly controlled or wholly
18  owned by Congo or by a Congolese public
19  entity".
20        Mr McQuater submits that the meaning of
21  the prohibition in the negative pledge clause
22  is clear and unambiguous.  He submits that
23  Congo has demonstrated a history, including a
24  recent history, of non-compliance with the
25  clause, creating securities and other

15

1  preferential arrangements over its assets, and
2  thereby favouring selected creditors and
3  discriminating against others.  Unless
4  restrained, it is suggested, Congo will
5  continue so to do.
6       Mr McQuater goes on to submit that Congo
7  has demonstrated that it has no intention of
8  paying its ordinary creditors, such as those
9  under the April 1984 Loan Agreement.
10  Mr McQuater stresses that the claimant seeks
11  only to restrain future breaches of the clause,
12  rather than seeking to undo past breaches.
13  This approach, he submits, is just and
14  proportionate and creates no material or
15  disproportionate hardship to Congo or anyone
16  else involved.  Damages, he suggests, are
17  likely to be an inadequate remedy for breach of
18  the negative breach clause, since Congo plainly
19  will do everything it can not to pay those
20  damages.
21       I agree with Mr McQuater that the meaning
22  of the negative pledge clause is clear.  It is
23  designed to prevent the defendant from granting
24  security or other preferential interests over
25  its assets, thereby reducing the pool of assets

```
 1      available to creditors under the April 1984
 2      Loan Agreement.
 3          Mr McQuater submits that the evidence
 4      demonstrates that Congo has a long and
 5      demonstrable history of granting security and
 6      other preferential interests over its assets to
 7      favoured creditors.  Usually, he suggests,
 8      these favoured creditors are involved with the
 9      defendant in the exploitation of its vast oil
10      reserves.  Often, it is suggested, these
11      breaches of the negative pledge clause have
12      been carried out on Congo's behalf by Societe
13      de Nationale des Petrole du Congo, SNPC, the
14      state oil company.
15          Mr McQuater submits, and I accept, that
16      the evidence overwhelmingly shows that SNPC is
17      a Congolese public entity for the purposes of
18      Clause 1 of the April 1984 Loan Agreement.  As
19      Mr McQuater points out, for the purposes of
20      these claims, this is as far as the claimant
21      needs to go.  However, Mr McQuater submits, and
22      I agree, that the evidence in the case does, in
23      fact, go further and demonstrates that SNPC is
24      simply part of the Congolese state and has no
25      existence separate from the state.  That is
```

```
 1    demonstrated by the Congolese legislation,
 2    which establishes SNPC and demonstrates that
 3    its purposes are to undertake the exploitation
 4    of Congo's oil reserves on behalf of Congo, to
 5    hold the state's oil related assets on its
 6    behalf and to represent the state in oil
 7    related matters.  The by-laws of SNPC are to
 8    similar effect.  It is financed by the state.
 9    Its function is to act on behalf of the state,
10    it is under the financial and economic control
11    of the state and its officers are government
12    appointees.
13         In a recent decision of the French Court
14    of Appeal, in the matter of SNPC v. Walker
15    International Holdings Limited on
16    23rd January 2003, that court found in
17    contested proceedings that SNPC was simply the
18    alter ego of Congo, thereby affirming the
19    decision at first instance to the same effect.
20    On 29th January 2002, the Tribunal de Grand
21    Instance, Paris reached a similar conclusion in
22    favour of another creditor, Connecticut Bank of
23    Commerce.
24         Furthermore, in a decision in the Grand
25    Court of the Cayman Islands, in Walker v
```

18

1    Olearius, 13th August 2002, Graham J found it
2    to be at least arguable, for the purposes of
3    the freezing order which he was invited to
4    make, that SNPC was controlled by Congo.
5        Mr McQuater relies upon four particular
6    alleged breaches of the negative pledge clause.
7    Firstly, he relies upon a transaction described
8    as a hedged crude oil prepayment facility
9    entered into in May 2002.  Under this
10   arrangement, SNPC has entered into an agreement
11   for the forward sale of Congo's crude oil to
12   a special purpose vehicle called Olearius
13   Limited, which will make prepayments to SNPC of
14   some $210 million.
15       The prepayments are funded by a facility
16   from Standard Chartered Bank and other lenders,
17   which Olearius is to repay quarterly from
18   onward sales of crude oil.  SNPC is the
19   exclusive sales agent for 50 per cent of the
20   oil.  The remaining 50 per cent is on-sold to
21   Vitol S.A.  Shortfalls in repayments by
22   Olearius are to be made up by deliveries of
23   oil.  The arrangements are guaranteed by Congo,
24   which has granted the lenders a variety of
25   security rights over its assets, including

19

1      Congo's rights to significant quantities of its
2      crude oil.  The lenders have also been granted
3      security over the rights to receive the
4      proceeds of the former purchase arrangement and
5      over certain accounts used for the receipt of
6      funds.
7           Next, Mr McQuater points to an agreement
8      in May or June of 2002 whereby Congo and/or
9      SNPC agreed with Société Générale a new
10     pre-financing facility of some $250 million
11     secured against Congo's oil production.
12     Although details of that agreement are not
13     before the court, it seems almost certain from
14     the material which is that this is structured
15     in much the same way as the hedged crude oil
16     prepayment facility, to which I have already
17     referred.
18          Then Mr McQuater points to an agreement
19     made in June 1994 between Congo and the
20     Canadian Imperial Bank of Commerce, under which
21     various sums were to become due from Congo to
22     CIBC, including payments due in 2001 and 2002.
23     By a letter dated 29th June 1994, which
24     accompanied the facility, Congo gave
25     instructions for certain mining royalties to be

21

```
1    is not to be criticised for the delay which has
2    occurred in applying for this relief.  Against
3    that, it has to be pointed out that it seems
4    likely that Congo has been in continuous breach
5    of this provision for at least 12 years and
6    probably longer.  Furthermore, there is
7    the irony that the two substantial and recent
8    breaches are constituted by arrangements to
9    which Standard Chartered and Société Générale
10   are party.  They are both lenders under the
11   original Loan Agreement to the extent of
12   $2 million and $1 million respectively.  This
13   feature gives me serious pause for thought as
14   to the appropriateness of the relief which I am
15   asked to grant.  It is not easy to evaluate the
16   point without knowing the terms on which these
17   two and other banks divested themselves of
18   their interest and without knowing what
19   relationship the consideration paid by the
20   claimant bore to the size of the debt assigned.
21        Reverting to Mr McQuater's submissions, he
22   goes on to suggest that it is apparent that
23   Congo has no intention of paying ordinary
24   creditors, such as those under the April 1984
25   Loan Agreement.  He points to the fact that
```

22

```
 1        that agreement was signed almost 18 years ago
 2        and that apparently no payments have been made
 3        thereunder since 1985.
 4             In his decision in the Grand Court of the
 5        Cayman Islands, to which I have already
 6        referred, Graham J observed that Congo had paid
 7        not a cent to the judgment creditor in that
 8        case, who was another ordinary unsecured
 9        creditor of Congo, and furthermore, that it had
10        evinced an intention never to pay if it could
11        possibly avoid doing so.
12             Mr McQuater submits, on the basis of the
13        evidence before the court, that despite its
14        enormous oil wealth and relatively small
15        population, Congo has become notorious for
16        dishonouring debt obligations.  This has been
17        largely due, he suggests, to mismanagement and
18        diversion of its oil revenues and unrecorded
19        expenditure under political control.
20        Apparently, in 2001, Congo produced an average
21        of 262,000 barrels of oil per day, yielding
22        export revenues of approximately $2.5 billion
23        per annum.  This in a country with fewer than
24        3 million people.  Mr McQuater suggests,
25        therefore, that Congo has available to it
```

23

1       a very considerable cash income from its oil
2       production, but is plainly selective in how the
3       money is spent.
4           Mr McQuater goes on to suggest that it is
5       no coincidence that about half of Congo's debt
6       is secured by oil, and it is that half which
7       gets paid.  Indeed, he suggests that Congo's
8       practice of entering into pre-financing
9       arrangements in relation to its oil sales
10      appears to be cumbersome and uncommercial, with
11      the sole distinct advantage being that these
12      schemes place a priority lien on the country's
13      future commercial income and thus seek to place
14      it beyond the reach of existing creditors.
15          Furthermore, there is evidence before the
16      court, apparently publicly available also on
17      the Internet, to the effect that the legal
18      structure of the large hedged crude oil
19      prepayment facility, to which I have already
20      referred, was deliberately selected by Congo
21      and by its legal advisors in an attempt to
22      prevent Congo's creditors from seizing oil in
23      the hands of SNPC and to try to reduce the risk
24      of action by Congo's creditors.  This
25      information emerges from a memorandum

24

1  apparently prepared for Congo, or for SNPC, in
2  May of 2002 by Messrs Cleary, Gottlieb, Steen &
3  Hamilton.
4      Mr McQuater submits that where a contract
5  contains an express negative stipulation,
6  breach of it may be generally be restrained by
7  injunction, and in such cases, an injunction is
8  normally granted as a matter of course.  It is
9  not, he suggests, in such cases necessary to
10  show that damages would be an inadequate
11  remedy, although an injunction might be refused
12  if it would cause undue hardship or oppression.
13  He submits that the scope of the injunction
14  sought in this action in relation to the
15  negative pledge provision is manifestly fair
16  and proportionate in the circumstances, since
17  the claimant seeks only an order restraining
18  future breaches of the negative pledge clause,
19  rather than seeking an order which would
20  immediately force Congo to unscramble past
21  security arrangements made with its creditors.
22      Furthermore, Mr McQuater submits that,
23  although not a necessary requirement for relief
24  under the negative pledge clause, it does in
25  fact appear to be unlikely that damages for

25

1   breach of the clause would be an adequate
2   remedy.  This, he submits, is because of
3   Congo's attitude towards its ordinary unsecured
4   creditors and its obvious determination to
5   ensure that there are no funds against which
6   such claims can be enforced.
7        On the question whether the injunction
8   sought in relation to the negative pledge would
9   be of any practical benefit to the claimant,
10  Mr McQuater submits that there is good reason
11  to believe that service of notice thereof on
12  third parties might achieve the claimant's
13  purpose, which is, of course, payment to it of
14  the judgment debt.  In that regard, Mr McQuater
15  points out that SNPC has a wholly-owned English
16  subsidiary, Societe de Nationale des Petrole du
17  Congo UK Limited, SNPCUK, with a London office.
18  Congo and the SNPC plainly carry out a material
19  part of their financial activities in the
20  exploitation of their oil reserves in or
21  through London and may well hold funds here.
22  Standard Chartered Bank, the principal lender,
23  agent and security agent under the hedged crude
24  oil prepayment facility, is an English bank
25  based in London.

26

1       Congo and the SNPC, submits Mr McQuater,
2  have significant financial activities in other
3  European Union jurisdictions where this court's
4  judgments and orders should readily be
5  recognised.  The French decisions to which I
6  have already referred arose out of apparently
7  successful attempts by creditors of Congo to
8  attach the assets of SNPC in France.
9       Mr McQuater also points to the fact that
10  the parties to be notified under the security
11  assignment relating to the hedged crude oil
12  prepayment facilities are subsidiaries of major
13  European oil companies and that Vitol, which
14  purchases 50 per cent of the oil under the
15  facility, is itself a Swiss company which
16  trades in London through two English
17  subsidiaries.  Other lenders to Congo and the
18  SNPC are plainly domiciled in the European
19  Union, for example, Société Générale and
20  WestLB.  Mr McQuater submits that it is likely,
21  therefore, that the injunction sought will have
22  a serious effect on Congo's ability to continue
23  to ignore its obligations under the April 1984
24  Loan Agreement.
25       Turning to the pari passu clause,

1    Mr McQuater submits that such clauses are
2    common in unsecured term loan agreements.  They
3    generally state that the debt obligations of
4    the borrower under the loan agreement are to
5    rank pari passu and equally with all other
6    present and future obligations of the borrower.
7    The provision is, he suggests, a companion of
8    the negative pledge clause, which regulates the
9    future creation of security for the borrower's
10   debts.
11       Mr McQuater points out that the effect of
12   the pari passu clause, particularly in the
13   context of sovereign loan agreements, has been
14   the subject of considerable discussion and
15   limited authority.  There exists a debate as to
16   whether the pari passu clause is (a) a sharing
17   clause which compels the creditor to pay
18   creditors on a pari passu basis, or (b) simply
19   an agreement that the debtor will not create
20   a class of debt or unsecured debt which ranks
21   ahead of the debt created by the particular
22   loan agreement.  There is apparently no English
23   authority directly in point.
24       Mr McQuater submits that the pari passu
25   clause in the present agreement is plainly

1  a sharing clause, compelling Congo to pay the
2      claimant on a pro rata basis when it pays
3  other creditors.  In this regard, Mr McQuater
4  relies upon the following considerations:
5      First, there is little doubt about the
6  literal meaning of the words "pari passu" in
7  the clause.  The Latin means "by equal steps".
8  See also Webster's, "in or to an equal
9  proportion", and Black's Law dictionary, "by
10  an equal progress, equably, rateably, without
11  preference".
12      Secondly, Mr McQuater suggests that
13  insofar as English authority gives guidance,
14  the decision in Bowen v Brecon Railway Company,
15  1867, Law Reports 3, Equity 541, strongly
16  suggests that the pari passu clause means that
17  money to be distributed should be distributed
18  or paid on a pari passu basis.  In that case,
19  the statutes of a railway company provided that
20  unsecured bonds issued by the company should be
21  entitled to be:
22      "Paid without any preferences, one above
23  the other, by reason of priority of date of any
24  such bond or otherwise howsoever".
25      It was held that the relevant proceeds

1  were held in trust for the other debenture
2  holders, so that they were paid pari passu.
3      Thirdly, Mr McQuater submits that this
4  result is borne out by the particular and
5  strong wording of the clause in the present
6  case, which refers to the claims of the parties
7  under the Agreement ranking as general
8  obligations, at least pari passu in right and
9  priority of payment, and I emphasise "and
10  priority of payment" with the claims of all
11  other creditors of Congo.  Mr McQuater suggests
12  that it is difficult to accord any sensible
13  meaning to the emphasised words if payments are
14  not to be made pari passu.
15      Mr McQuater points out that whereas in the
16  context of corporate loans the competing
17  construction to the effect that the pari passu
18  clause only affects the ranking of debts may
19  make some sense, it makes little sense in
20  relation to a sovereign borrower.  In the first
21  case, the clause could preserve a creditor's
22  ranking in an insolvency and ensure that in a
23  liquidation or forced distribution of assets,
24  all creditors, or at least all unsecured
25  creditors, are treated equally.  However,

30

1    Mr McQuater submits, in relation to a sovereign
2    borrower, the clause must bear a different
3    meaning.  A state cannot be liquidated nor are
4    there procedures for proration of government
5    debts on a state bankruptcy.  The clause, when
6    it appears in a sovereign loan, must therefore
7    provide some further protection to creditors to
8    compensate for their inability to invoke
9    insolvency procedures against the state.  That
10   protection should, he suggests, be
11   an enforceable obligation on the state to pay
12   creditors on a pro rata basis.
13        Mr McQuater also referred me to some
14   authority which may have some indirect bearing
15   on the point.  There is an Australian
16   authority, Merchant Bills Corporation Limited v
17   Permanent Nominees Australia Limited, 1972 to
18   1973, Australian Law Reports 565, in which
19   Gibbs J in the Australian High Court construed
20   a pari passu obligation as requiring that
21   stockholders be treated equally and that all
22   should receive payment at the same rate of
23   monies owing to them.
24        There is a decision of the United States
25   District Court, Central Distinct of California,

31

1    in Red Mountain Finance v The Democratic
2    Republic of Congo, dated 30th May 2001, in
3    which Judge Real granted an injunction
4    preventing the payment of the Democratic
5    Republic's external debt unless the claimant
6    also received a proportionate payment of debts
7    owing to it at the same time.  He also granted
8    enforcement of the related negative pledge
9    provision.  I can, however, attach little
10    weight to this decision since not only have no
11    reasons for it been shown to me but it is also
12    a case in which evidently there was no
13    appearance by the state.  It should be
14    emphasised that the Democratic Republic of the
15    Congo is not the defendant in this case.
16          Next, Mr McQuater refers me to a decision
17    of the Court of Appeal in Brussels in September
18    2000 in the case of LP Elliott Associates,
19    relating to injunctive measures to enforce
20    payments of certain Peruvian foreign debt, in
21    the course of which the court held that the
22    pari passu clause required that the debt should
23    be paid equally towards all creditors in
24    proportion to their claim, and also that no
25    creditor could be excluded from the payment of

32

1   this proportional part of the interest payments
2   in issue.  Again, I can give little weight to
3   this latter decision, since it was made upon
4   an ex parte application and the order was
5   directed towards a bank and not towards the
6   Peruvian state.
7        Mr McQuater submits that if the pari passu
8   clause does bear the meaning contended for by
9   the claimant, then it follows, firstly, that
10  Congo has acted in breach of that clause in
11  making preferential payments to creditors in
12  each of the four transactions to which I have
13  already referred above, and secondly, that the
14  clause can and should be the subject of
15  specific enforcement by way of injunction.
16       Again, Mr McQuater submits that damages
17  for breach of this provision would clearly be
18  an inadequate remedy.  He submits, with some
19  force, that it would be difficult to calculate
20  the amount of the loss suffered by any one
21  particular creditor of Congo by reason of the
22  various payments which Congo has made in breach
23  of the pari passu clause and, in any event, he
24  suggests, the issue might prove to the
25  academic, given the obvious determination of

33

1    Congo not to pay its debts.
2          Finally, he suggests that there would be
3    no hardship or oppression to Congo or, indeed,
4    to its other creditors, should they be required
5    to be treated equally with the creditors under
6    the 1984 Loan Agreement.
7          I should perhaps note in passing that, in
8    relation to the pari passu provision,
9    Mr McQuater derives no assistance from the
10   current Encyclopaedia of Banking Law, in which,
11   at paragraph 3418, there is a discussion
12   concerning pari passu clauses in sovereign loan
13   agreements.  Here, the editors make the
14   following observation:
15          "It should also be observed that the pari
16   passu clause has nothing to do with the time of
17   payment of unsecured indebtedness, since this
18   depends upon contractual maturities.  The
19   undertaking is not broken merely because one
20   creditor is, in fact, paid before another.  In
21   the case of a state borrower, the pari passu
22   clause must bear a different construction,
23   since a government cannot be liquidated, nor
24   are there procedures for the pro ration of
25   governmental debt on a state bankruptcy

34

1   equivalent to those contained in corporate
2   bankruptcies.  Hence, a statutorily enforced
3   hierarchy on forced dissolution is not in
4   point.  It is suggested that a pari passu
5   clause in state creditors is primarily intended
6   to prevent the legislative ear-marking of
7   revenues of the government, or the legislative
8   allocation of inadequate foreign currency
9   reserves to a single creditor and is generally
10  directed against legal measures which have the
11  effect of preferring one set of creditors over
12  the others or discriminating between creditors
13  at a time when the state is unable to pay its
14  debts as they fall due.
15       "It is thought that mere contractual
16  arrangements, as opposed to legislation, should
17  not conflict with the pari passu clause of the
18  type specified above.  The question depends on
19  the circumstances and the matter does not
20  appear to have received judicial attention in
21  England.  Areas where contracts may be
22  sufficient to come within the clause might
23  include settlings and debt compromise
24  agreements involving more than one creditor and
25  entered into by a bankrupt state."

35

1   Recognising that that commentary is
2   unhelpful to him, Mr McQuater nonetheless
3   points out that the sample pari passu clause,
4   to which reference is made a little earlier in
5   the text than the passage which I have read,
6   does not contain the critical priority of
7   payment language upon which he here places such
8   reliance.
9   Mr Qureshi made observations under seven
10  broad heads.  Firstly, he reminded me of
11  Section 1 (2) of the State Immunity Act 1978,
12  which provides:
13  "A court shall give effect to the immunity
14  conferred by this section, even though the
15  state does not adhere in the proceedings in
16  question."
17  Mr Justice Mummery referred to and
18  considered this provision in United Arab
19  Emirates v Abdel Ghafar in 1995, Industrial
20  Court Reports, page 65.  At page 73, Mr Justice
21  Mummery said this:
22  "The decision of this Appeal Tribunal in
23  Senupta v Republic of India 183, Industrial
24  Court Reports, 221, illustrates how seriously
25  the court regards this obligation.  [I

36

```
 1          interpose to point out that that is the
 2          obligation under Section 1 (2) of the State
 3          Immunity Act.]   In that case, the foreign
 4          state did not appear to take the point on
 5          jurisdiction.  The court asked for
 6          the appointment of an amicus to assist it.  If
 7          the court has a duty under statute to give
 8          effect to the immunity conferred, even though
 9          the state does not appear to claim it, that
10          duty may be all the greater in the case where
11          the foreign state has, as here, expressly taken
12          the point of immunity.
13              The overriding duty of the court, of its
14          own notion, is to satisfy itself that effect
15          has been given to the immunity conferred by the
16          State Immunity Act 1978.  That duty binds all
17          tribunals and courts, not just the court or
18          tribunal which heard the original proceedings.
19          If the tribunal in the original proceedings has
20          not given effect to the immunity conferred by
21          the act, then it must be the duty of the appeal
22          tribunal to give effect to it by correcting the
23          error.
24              Although Mr Qureshi did not raise the
25          point, I am myself concerned as to the extent
```

1    to which it is legitimate to grant the relief
2    sought in the light of section 13 (2)(a) of the
3    State Immunity Act, which provides:
4        "Subject to subsection 3 and 4 below, (a)
5    relief shall not be given against a state by
6    way of injunction or order for specific
7    performance or for the recovery of land or
8    other property."
9        Subsection 3 provides:
10        "Subsection 2 above does not prevent the
11    giving of any relief or the issue of any
12    process with the written consent of the state
13    concerned, and any such consent which may be
14    contained in a prior agreement, may be
15    expressed so as to apply to a limited extent or
16    generally that a provision merely submitting to
17    the jurisdiction of the courts is not to be
18    regarded as consent for the purposes of this
19    subsection."
20        Mr McQuater suggests that the written
21    consent of Congo is to be found in Clause 19.3
22    of the Loan Agreement.  That provides:
23        "The borrower consents generally in
24    respect of any suit, action or proceedings
25    arising out of or in connection with this

38

```
 1      agreement to the giving of any relief or the
 2      issue of any process in connection with any
 3      such suit, action or proceedings, including,
 4      without limitation, the making, enforcement or
 5      execution against any property whatsoever,
 6      irrespective of its use or intended use of any
 7      order or judgment which may be made or given in
 8      such action or proceedings."
 9           Mr McQuater naturally relies upon the
10      apparent width of this clause, in particular
11      the reference to "any relief" and the words
12      "without limitation".  He may be right,
13      although my concern remains that enforcement of
14      the injunctive relief now sought could only be
15      achieved by criminal or quasi criminal
16      procedures, such as sequestration, to which,
17      most assuredly, Congo has not consented.  It
18      may be, however, that considerations such as
19      these should not preclude me from finding that
20      a sufficiently unequivocal consent has been
21      given to the granting of the injunctive relief.
22           Next, Mr Qureshi made observations
23      concerning the efficacy of the alleged service
24      of proceedings on Congo.  Mr McQuater contends
25      that my consideration of these points is
```

```
 1        precluded by reason of an issue estoppel in
 2        relation thereto generated by the judgment of
 3        Cresswell J.  I do not consider that that is
 4        the correct approach.  Estoppel by judgment is
 5        a rule of evidence, see Chitty on Contracts,
 6        28th Edition, Volume 1, at paragraph 26.10, and
 7        the cases there cited.  It is founded upon the
 8        public interest in the finality of litigation
 9        rather than the achievement of justice between
10        individual litigants.  It cannot preclude the
11        court having regard to a relevant consideration
12        when asked to grant discretionary relief,
13        particularly when the relief is highly unusual
14        and invasive injunctive relief which is
15        directed towards fettering the ability of a
16        foreign sovereign state to exploit its natural
17        resources.
18            Clause 19.2 of the Loan Agreement
19        provides:
20            "The borrower hereby and irrevocably
21        appoints the Law Debenture Trust Corporation
22        plc, Estates House, 66 Gresham Street, London,
23        EC2B 7HX, as its agent for service and process
24        in any such suit, action or proceedings in
25        England ... provided that if at any time the
```

40

```
 1       People's Republic of the Congo maintains an
 2       embassy or consulate in London ... any process
 3       relating to proceedings arising out of or in
 4       connection with this agreement may be validly
 5       served on the borrower if served on the
 6       ambassador or consul general for the time being
 7       of the People's Republic of the Congo in
 8       London."
 9            Also of relevance in this regard is
10       Clause 7 of the Agreement.  Clause 7 contains
11       conditions precedent to the obligation of the
12       banks to make the loan.
13            At 7(b)1, there is provision for the
14       furnishing, as a condition precedent, of
15       documents evidencing the appointment of the Law
16       Debenture Trust Corporation plc as process
17       agent in London for the purpose of the
18       Agreement, and the acceptance of such
19       appointment by the Law Debenture Trust
20       Corporation, substantially in the form of
21       Exhibit B.
22            Exhibit B contains a detailed letter in
23       draft form addressed to the Law Debenture Trust
24       Corporation, to be executed on behalf of the
25       Congo.  In particular, it contains instructions
```

41

```
 1     as to what is to be done by the Law Debenture
 2     Trust Corporation upon receipt of the letter,
 3     and it also refers to the terms upon which the
 4     Law Debenture Trust Corporation shall act as
 5     agent for the Congo in relation to the
 6     agreement.
 7          There is no evidence before the court
 8     either way as to whether this or, indeed, any
 9     other condition precedent was satisfied, but
10     the Law Debenture Trust Corporation has no
11     record of the Loan Agreement.  When served with
12     the documents in October 2002, the manager of
13     the Service of Process Department replied to
14     the claimant's solicitors:
15          "Thank you for your letter of yesterday's
16     sate and its enclosures.  We have no record of
17     the April 1984 Loan Agreement and we would
18     comment that it is not unusual for us to
19     discover that agreements refer to us as process
20     agent even though we were not contacted about
21     them at the at the time of the execution.  In
22     these circumstances, we are unable to do
23     anything with the documents sent with your
24     letter of 14th October 2002."
25          Mr McQuater submits that Clause 19.2 of
```

42

```
 1    the Loan Agreement is an independent,
 2    freestanding, irrevocable appointment of Law
 3    Debenture Trust Corporation as Congo's agent
 4    for service of process relating to the Loan
 5    Agreement.  He submits that the question is not
 6    one of authority as between Congo and Law
 7    Debenture Trust Corporation, but one of
 8    contract between Congo and the parties to the
 9    Loan Agreement relying upon a decision to that
10    effect of Moore-Bick J in AM International Bank
11    plc v Republic of Zambia & Others, decided on
12    23rd May 1997.  It is to be observed that in
13    that case Law Debenture Trust Corporation had
14    originally been duly appointed although Zambia
15    had allowed the relationship to lapse, and
16    furthermore that Law Debenture Trust
17    Corporation did, in fact, forward the documents
18    to Zambia upon receipt thereof.  However, I am
19    not sure that that affects Moore-Bick J's
20    reasoning.  I would be inclined to follow
21    Moore-Bick J's approach, although I do not
22    regard this point as determinative of the
23    matters which I have to decide.
24         I should make it clear that, if I had to
25    decide the point, I would certainly not regard
```

43

1  service upon an honorary consul, as opposed to
2  a consul general, as good service under Clause
3  19.2.  On the evidence before the court, Congo
4  does not maintain a Consulate in London.  The
5  distinction between career consular officers
6  and honorary consular officers is well
7  established.  Its significance is particularly
8  well illustrated by the response of the
9  honorary consul to the purported service upon
10  him in this case.  Thus, when served with the
11  original process in October 2002, the honorary
12  consul responded:
13      "The package received this morning
14  regarding Kensington International Limited
15  against the Republic of Congo should not have
16  come to this office as we are the honorary
17  consulate and do not have any political or
18  financial connection with the Republic of
19  Congo-Brazzaville.  We therefore ask you kindly
20  to collect the documents from us and forward
21  those to His Excellency, M. Henri Lopes,
22  Ambassade de La Republique Du
23  Congo-Brazzaville, Ambassador for France and
24  Great Britain, 37 Bis Rue Paul Valery, 75116,
25  Paris, France.  His Excellency Monsieur Henri

44

1　　Lopes is accredited at the Court of St James of
2　　her Majesty Queen Elizabeth II government but
3　　resident in Paris."
4　　　　In fact, as appears from the subsequent
5　　communication, the honorary consul did forward
6　　the package to the Congolese ambassador in
7　　Paris.  When sent the documents relevant to the
8　　summary judgment application before
9　　Cresswell J, the honorary consul responded:
10　　　　"The passage previously sent to the
11　　honorary consulate was in good faith sent by
12　　this office to the embassy in Paris.  Another
13　　package has now been received from you, which
14　　will be returned to you.  This is an honorary
15　　consulate, existing solely for the promotion of
16　　the Republic of Congo-Brazzaville in the UK.
17　　As an honorary office, there is no financial
18　　assistance received and no diplomatic bag.
19　　Consequently, there is no money available to
20　　pay for the transportation of your goods to
21　　Paris.  These documents should be forwarded to
22　　an ambassador at an embassy or consul general
23　　at a consulate of the Republic of Congo and not
24　　to an honorary consulate."
25　　　　The claimant has also sent documents by

```
 1      DHL to what appear to be two relevant addresses
 2      in Congo.  This is not contractual service, but
 3      it demonstrates that the claimant has taken
 4      steps to ensure that the defendant is aware of
 5      the proceedings, and I am satisfied that it
 6      almost certainly is so aware of the proceedings
 7      and of all the steps taken therein.  The fact
 8      remains, however, that in relation to the
 9      originating process, as opposed to the
10      judgment, the claimant did not use the
11      diplomatic channels accorded by Section 12 (1)
12      of the State Immunity Act 1978.
13          Thirdly, Mr Qureshi raised a question mark
14      whether the claimant should properly be
15      regarded as a lending institution to which
16      an assignment could properly be made pursuant
17      to Clause 16 of the Loan Agreement.  I have
18      some doubt as to what was intended to be
19      achieved by the apparent attempt to limit the
20      class of acceptable assignees to "any bank or
21      lending institution".  Plainly, the claimant is
22      not in the business of lending money in the
23      sense in which that expression is ordinarily
24      used.
25          I am not sure that I can derive too much
```

46

```
 1        assistance from the definition of lending in
 2        Annex 1 to the directive 2002/12/EC of the
 3        European Parliament and the Council of
 4        20th March 2000.  Under that instrument
 5        lending includes factoring which is , I think,
 6        an apt description of the claimant's business.
 7        If lending institution was intended to embrace
 8        any institution which engaged in factoring of
 9        debts, I cannot see what purpose was served by
10        adding lending institution to bank by way of
11        description of the permitted class of assignee.
12        I have a feeling that it may have been intended
13        to limit the class to regulated institutions.
14        Again, I do not need to address this point
15        further, and, of course, Cresswell J has
16        inferentially decided that the assignments are
17        valid.
18             Likewise, I do not need to address
19        Mr Qureshi's observation which concerns the
20        question whether the signatories of the Loan
21        Agreement purportedly on behalf of the
22        defendant had the authority to bind the state.
23        Clause 7 of the Loan Agreement creates
24        a condition precedent to the obligation of the
25        lending banks in this regard.  So far as
```

47

```
 1      relevant, it provides for service upon the
 2      banks of a copy certified as true and correct
 3      by the Minister of Finance of the People's
 4      Republic of the Congo or by a person duly
 5      authorised by him of (1) documents evidencing
 6      the authority of the person who has executed
 7      the agreement for the borrower, including
 8      without limitation an authorisation granted by
 9      the president of the People's Republic of the
10      Congo.  Furthermore, at subclause C of
11      Clause 7, there is a provision for the
12      furnishing to the lenders of an opinion of the
13      president of the Supreme Court of People's
14      Republic of the Congo in the form of a French
15      text corresponding substantially to an English
16      text set out in Exhibit C.  Exhibit C includes
17      the following paragraphs:
18           "2.  Mr Noté (several French words) is
19      fully empowered to sign the agreement, the
20      related agreement concerning management fee and
21      all other documents in connection with the
22      agreement on behalf of the People's Republic of
23      the Congo."
24           There is no evidence either way as to
25      whether this condition precedent was satisfied.
```

48

```
 1        Mr McQuater says that it was exclusively for
 2    the benefit of the banks and could be waived by
 3    them.  I think he is probably right, although I
 4    would regard it as very strange if compliance
 5    with this part of the clause was, in fact,
 6    waived.  I have, however, already referred to
 7    other evidence from which it is appropriate to
 8    infer that Congo recognises the Loan Agreement
 9    as containing obligations binding upon it.
10        Mr Qureshi's fifth point is that if the
11    injunction was granted, it might subsequently
12    be necessary to investigate whether any
13    creation by Congo of the status of preferential
14    creditor amounted to what would be recognised
15    in public international law as an act of state,
16    which would not be justiciable before the
17    domestic court.  I agree that that is
18    a possibility, although I note that Mr Qureshi
19    does not suggest that the pre-financing
20    agreements to which I have already referred or
21    similar such commercial agreements would
22    attract this treatment.
23        This point is, I think, closely allied to
24    the seventh point, which concerns the nature of
25    the relief sought generally, which is directed
```

49

```
 1        towards the coercion of third parties rather
 2        than securing immediate compliance by the
 3        defendant.  Because I regard this last point as
 4        determinative, I regard it as unnecessary to
 5        attempt any analysis of the pari passu clause.
 6        In any event, with all respect to Cresswell J,
 7        who did not have the advantage of the
 8        observations of the amicus which have been made
 9        to me, that question would be better addressed
10        in a debate as between the original parties to
11        an agreement in which the clause appears and,
12        moreover, in a case where the party seeking to
13        enforce the clause does not derive its title in
14        substantial part from original parties who have
15        already colluded in its apparent breach.
16             Mr McQuater submits that the purpose of
17        the injunctive relief is to ensure that Congo
18        performs its agreement.  I am simply unprepared
19        to grant such relief to a party who declines to
20        tell the court what is the consideration given
21        for the acquisition of the rights sought to be
22        enforced, particularly where those rights have
23        not been immediately acquired by the claimant
24        from those who were originally entitled
25        thereto, and where the relevant breaches of
```

1   agreement have, in all probability, been
2   continuing for at least 18 years, aided and
3   abetted by some of the original lenders and the
4   original assigners.  In these circumstances I
5   am simply unable to conclude that equity
6   requires the grant of such relief.  Insofar as
7   I am asked to balance hardship, I lack the
8   material on which to conduct the exercise.
9        However I should make it clear that even
10  had I been told of the consideration and, on
11  the assumption that it is more than derisory
12  and represents a substantial investment, I
13  should still have declined to grant the relief
14  claimed. The claimant already has a judgment in
15  respect of the amount due.  It is seeking
16  relief over and above the normal mechanisms of
17  execution.  Compliance by the defendant with
18  the injunctive relief sought can for all
19  practical purposes be achieved only by
20  distraint against assets of the defendant,
21  although for the reasons which I have already
22  given I am doubtful whether such measures could
23  be taken against this defendant.  If, however,
24  there are available assets of the defendant
25  against which such measures could be taken they

51

```
 1    can equally well, indeed more appropriately, be
 2    made the subject of execution of the judgment
 3    debt.
 4          Moreover the order which is sought,
 5    particularly paragraphs 2 and 3 thereof, would
 6    be likely to disrupt arrangements which the
 7    defendant has already made for the payment of
 8    creditors.  The task of supervising compliance
 9    with any such order would be both unmanageable
10    and invidious where the defendant against whom
11    it is made is a foreign sovereign State.  Many
12    of the world's banks maintain offices in
13    London.  The court would potentially be asked
14    to intervene in respect of transactions having
15    nothing whatever to do with this jurisdiction
16    simply upon the basis of the presence within
17    the jurisdiction of the entity contracting with
18    the defendant.
19          I do not accept that the sole
20    consideration in deciding whether to grant such
21    relief is the question whether compliance with
22    the order of the court will benefit the
23    claimant, or achieve the purpose for which it
24    is sought.
25          The court is also concerned with the
```

52

1    question whether damages or directly available
2    monetary relief is an adequate remedy and with
3    the question whether there is any realistic
4    prospect that the court can by direct action
5    against the party enjoined enforce compliance.
6    Mr McQuater rightly reminds me that it is not
7    uncommon for compliance with, for example,
8    freezing orders to be secured by service of
9    notice upon third parties such as banks.  That
10   is of course correct, but such orders are still
11   in a meaningful sense directed in the first
12   instance to the defendant and are only made in
13   cases where the court has jurisdiction over the
14   defendant.  I do not regard it as an
15   appropriate exercise of my discretion, at any
16   rate in the particular circumstances of this
17   case, to make an order compliance with which
18   can only realistically be achieved by coercion
19   of third parties.  I view with disquiet in the
20   circumstances of this case a situation in which
21   third parties are potentially exposed to penal
22   consequences which could never be visited upon
23   the defendant to whom the order is actually
24   directed.
25        For all these reasons therefore in the

53

```
 1    exercise of my discretion I decline to grant
 2    the injunctive relief sought.
 3         It remains to consider the declaratory
 4    relief.  As I indicated during the hearing I am
 5    entirely satisfied on the basis of the evidence
 6    before me that the defendant has adopted in
 7    relation to its oil exports cumbersome and
 8    apparently commercially disadvantageous and
 9    inflexible pre-financing structures with the
10    interposition of special purpose vehicles for
11    the very purpose of preventing its creditors
12    seizing its oil in execution of debts owed by
13    it.
14         In relation to the negative pledge the
15    claimant eschewed any intention to attempt to
16    unscramble past transactions.  Paragraphs 2 and
17    3 of the draft order before the Court do by
18    contrast attempt to prevent payments pursuant
19    to existing arrangements save on a pari passu
20    basis.  Since I have concluded that it is
21    inappropriate to grant that relief and since
22    the claimant would have no wish to attempt to
23    unscramble past security arrangements made by
24    the defendant with its creditors I have
25    concluded that the declaration sought would be
```

54

1   of no utility and that I ought in the exercise
2   of my discretion to decline to grant it.   If
3   anything the existence of such a declaration
4   could be positively productive of uncertainty
5   as to the propriety of third parties acting in
6   accordance with their existing contractual
7   obligations.
8        In any event the declaration sought is I
9   consider too unwieldy for the court to consider
10  granting it.  Simply by way of example it is
11  unsatisfactory for the court to make
12  declarations by reference to conduct which
13  cannot be described more precisely than appears
14  at paragraph 26 of the particulars of claim.
15  Since, however, I have concluded that the
16  declaratory relief would serve no useful
17  purpose over and above the money judgment which
18  the claimant has already obtained I decline to
19  grant it.
20
21
22
23
24
25