# EXHIBIT B

A MADAME OU MONSIEUR LE JUGE DE L'EXECUTION
DU TRIBUNAL DE GRANDE INSTANCE DE PARIS .

<u>Audience du 23 mai 2005 à 14 heures</u>

---

## CONCLUSIONS

---

<u>POUR :</u>        **La société KENSINGTON International Limited**
Dont le siège social est situé à HSBC Financial Services (Cayman)
Limited, PO Mary Street Grand Cayman (Iles Cayman)

*DEFENDERESSE*

AYANT POUR AVOCATS :   MAITRE KATHIE D. CLARET
MAITRE EMMANUELLE TROMBE
AVOCAT AU BARREAU DE PARIS
CABINET DECHERT
DEMEURANT : 55 AVENUE KLEBER 75116 PARIS
TEL. : 01.53.65.05.00 FAX : 01.53.65.05.05 VESTIAIRE : D 1816

MAITRE FREDERIC FOURNIER
AVOCAT AU BARREAU DE PARIS
DDG SELARL
DEMEURANT : 21, RUE CLEMENT MAROT 75008 PARIS
TEL. : 01.53.23.80.00-FAX : 01.53.23.75.90 VESTIAIRE : J 44

<u>CONTRE :</u>      **La Société Nationale des Pétroles du Congo (SNPC)**
Dont le siège social est situé BP 188, Brazzaville, République du Congo

*DEMANDERESSE*

AYANT POUR AVOCAT :   MAITRE THIERRY LAURIOL
AVOCAT AU BARREAU DE PARIS
CABINET JEANTET ASSOCIES
DEMEURANT : 87 AVENUE KLEBER 75784 PARIS CEDEX 16
TEL. 01.45.05.80.08. VESTIAIRE : T 04

## PLAISE A MADAME OU MONSIEUR LE JUGE DE L'EXECUTION

La Société Nationale des Pétroles du Congo (ci-après dénommée « SNPC ») a assigné le 24 février 2005 la société KENSINGTON International Limited (ci-après dénommée « Kensington ») en vue de faire juger nulles des saisies pratiquées à l'encontre de SNPC entre les mains de plusieurs banques et en conséquence notamment d'ordonner la mainlevée desdites saisies et de condamner Kensington à verser à SNPC 20.000 euros à titre de dommages et intérêts (outre les 100.000 euros réclamés par SNPC dans l'autre instance qu'elle a ouverte contre Kensington) et 10.000 euros au titre de l'article 700 du nouveau Code de procédure civile.

En effet, dans deux instances actuellement pendantes, dont la présente et une précédente résultant d'une assignation du 24 février 2005, SNPC fait valoir que le titre exécutoire détenu par Kensington à l'encontre la République du Congo ne saurait être opposé à SNPC, alors même qu'il a été jugé que SNPC est une émanation de la République du Congo, c'est à dire qu'elle a une personnalité juridique fictive qui se confond avec celle de la République du Congo.

A ces instances, s'ajoutent trois autres procédures menées par des émanations du Congo, les sociétés COTRADE, CORAF et FININCO.

Ces procédures diligentées par SNPC, ainsi que par les autres émanations de la République du Congo, ne sont rien d'autre qu'un coup de force destiné à impressionner un créancier de bonne foi de la République du Congo, qui devant le refus de la République du Congo d'honorer ses dettes, fait face aux montages juridiques mis en place par celle-ci afin d'échapper à ses créanciers.

La collusion entre la République du Congo, SNPC, COTRADE, CORAF et FININCO est également mise en évidence par le fait que ces quatre sociétés ont toutes saisi le même conseil et ont agi contre Kensington par actes introductifs d'instance strictement identiques et simultanés du 24 février 2005.

Kensington entend démontrer que les saisies pratiquées sont totalement fondées et conformes aux dispositions des articles 42 et 59 de la Loi du 9 juillet 1991, et que les procédures intentées par SNPC, ainsi que celles intentées par COTRADE, CORAF et FININCO, avec lesquelles il est demandé jonction, sont abusives.

## I.    FAITS ET PROCEDURE

**1.**    Kensington dispose d'un jugement définitif rendu le 20 décembre 2002 par la High Court of Justice de Londres, Queen's Bench Division Commercial Court, par Monsieur le Juge Cresswell, sous les références Folio 2002 N°1088,.

En vertu de ce jugement, la République du Congo a été condamnée au paiement de la somme de 56.911.991, 47 dollars américains à Kensington.

Par ordonnance du 13 mai 2003, le jugement précité a été déclaré exécutoire en France.

2.    Kensington a cherché en vain à exécuter son titre exécutoire à l'encontre de la République du Congo, mais s'est heurté aux montages juridiques mis en place par celle-ci pour échapper aux poursuites de ses créanciers, notamment en isolant ses revenus pétroliers qui sont considérables.

C'est ce que souligne notamment un article paru dans la Lettre du Continent de janvier 2003, intitulé « *Comment feinter ses créanciers ?* ». Cet article est basé sur un *memorandum* du Cabinet Cleary Gottlieb Steen, & Hamilton relatif au mode opératoire mis en place par la République du Congo visant explicitement à ce que « *les créanciers de la République du Congo et/ou de la SNPC* [soient] *empêchés de saisir le pétrole entre les mains de la SNPC.* »

3.    Dans ce contexte, Kensington a fait délivrer le 23 novembre 2004, cinq saisies-attributions et cinq saisies de droits d'associés ou valeurs mobilières aux établissements bancaires suivants :

- Natexis Banque Populaires, 45 rue Saint Dominique – 75007 Paris,
- Banque Belgolaise, 6 avenue Vélasquez – 75008 Paris,
- Banque Nationale de Paris, 34 avenue de l'Opéra – 75002 Paris,
- Société Générale, 29 boulevard Haussmann – 75009 Paris,
- Crédit Lyonnais, 40 rue René Boulanger – 75010 Paris.

Ces saisies ont été diligentées à l'encontre de la République du Congo et de ses émanations, et notamment de SNPC, COTRADE, CORAF et FININCO, et leurs ont été dénoncées.

4.    En réponse aux saisies pratiquées entre ses mains, la BNP Paribas déclarait le 24 novembre 2004, ne disposer d'aucune créance disponible, ni d'aucune part ou valeur mobilière pouvant faire l'objet d'une saisie, en faveur notamment de SNPC, et ce malgré les montants considérables liés aux opérations de la République du Congo et de SNPC qui transitent sur les comptes de la BNP.

Plus précisément, la BNP mentionne l'existence des obligations financières suivantes :

-    un contrat de prépaiement de 80.000.000 USD, permettant à SNPC d'encaisser le prix d'une marchandise future, et un contrat d'option de couverture de pétrole conclu avec SNPC le 9 septembre 2002 aux termes duquel « *dans l'hypothèse où les sommes reviendraient à SNPC au titre de l'exercice de l'option, ces sommes seraient affectées au remboursement des sommes dues par SNPC à BNP Paribas au titre du contrat d'option lui-même, et au titre du contrat de prépaiement précité, ainsi qu'au titre de tout contrat de prépaiement passé présent ou futur* », rendant la créance, à la date de la saisie insusceptible de revenir à SNPC au titre de l'exercice de l'option,

-    un acte de nantissement en faveur de la BNP Paribas des créances futures susceptibles de revenir à SNPC au titre de l'option,

3

—    un gage espèce, d'un montant de 4.000.000 USD à la date de la saisie, signé le 2 septembre 2002, en garantie de la bonne exécution des engagements de SNPC au regard des prépaiements précités et du contrat d'option.

Il convient de relever la complexité de ces montages juridiques qui aboutissent, selon les explications de la BNP, à ce que l'ensemble des sommes susceptibles de revenir à SNPC soient indisponibles.

Par lettre du 12 avril 2005, la BNP mentionnait en outre une litanie de saisies pour un montant total de près de 970 millions d'euros !

De son coté, Natexis indiquait, par lettre du 24 novembre 2004, détenir pour le compte de SNPC un compte présentant un solde positif de 1.833,14 euros.

Les autres banques indiquaient ne rien détenir ou ne détenir que des comptes présentant un solde débiteur pour SNPC, COTRADE, CORAF et FININCO.

Les mesures d'exécution pratiquées par Kensington sont donc restées en grande partie vaines.

5.    C'est dans ces conditions que près de trois mois après les premières saisies de Kensington du 23 novembre 2004, alors que les saisies pratiquées n'ont eu aucune incidence financière significative pour SNPC, que celle-ci sollicite du Juge de l'Exécution de céans la mainlevée des saisies et la condamnation de Kensington a des dommages et intérêts exorbitants

## II.    DISCUSSION

La concluante demandera tout d'abord la jonction entre la présente procédure et les procédures identiques intentées par COTRADE, CORAF et FININCO liées par un lien étroit tel qu'il est dans l'intérêt d'une bonne justice de les faire juger ensemble (A).

Cela étant précisé, la concluante détient un titre exécutoire opposable aux émanations de la République du Congo, à savoir SNPC, COTRADE, CORAF et FININCO. Les saisies réalisées sont donc valables (B). Kensingtion démontrera également que les saisies ne sont pas fautives (C), et, que SNPC, COTRADE, CORAF et FININCO ne peuvent justifier d'aucun préjudice (D).

Cependant, à titre reconventionnel, l'opacité des montages réalisés par SNCP et l'incohérence de son comportement à la lecture des mécanismes contractuels mis en place commande d'ordonner une expertise pour déterminer l'étendue des obligations saisissables par Kensington (E).

Kensington établira en outre que les procédures intentées par SNPC, COTRADE, CORAF et FININCO sont abusives (F).

## A)    Sur la demande de jonction

A la suite des cinq saisies bancaires pratiquées par Kensington le 23 novembre 2004 à l'encontre de la République de Congo et de ses émanations, notamment, SNPC, COTRADE, FININCO et CORAF, ces sociétés ont toutes agi à l'encontre de Kensington dans des termes strictement identiques, mais dans quatre instances différentes.

Or, il existe un lien étroit entre ces procédures tel qu'il est d'une bonne justice de les faire juger ensemble.

Elles résultent de saisies réalisées par Kensington sur la base du même titre exécutoire, à l'encontre d'entités toutes étroitement imbriquées avec la République du Congo ainsi qu'entre elles.

Ces quatre procédures ont été initiées le même jour, par un même conseil, et selon des termes strictement identiques : les quatre actes introductifs d'instances font état des mêmes faits, de la même discussion, et des mêmes demandes.

Il est donc opportun de joindre ces quatre procédures dans l'intérêt d'une bonne justice afin qu'elles puissent être instruites et jugées ensemble. Kensington a formulée cette requête par lettre du 18 mars 2005 au Tribunal de céans.

Par lettre du 17 mars 2005 au Juge de céans, SNPC a demandé la jonction de la présente procédure avec une autre procédure initiée par SNPC à l'encontre de Kensington par assignation du 18 mars 2005, et relative à la saisie pratiquée par cette dernière entre les mains de la société Perenco. Kensington n'a pas d'objection concernant cette demande, sous réserve que dans l'intérêt d'une bonne administration de la justice, ces procédures soient jointes aux procédures intentées par COTRADE, FININCO et CORAF qui reposent sur les mêmes fait et font l'objet de demandes strictement identiques.

## B)    L'existence d'un titre exécutoire valablement signifié

### 1.    Un titre exécutoire opposable aux émanations de la République du Congo

Contrairement à ce que prétend SNPC, Kensington possède un titre exécutoire pour effectuer les mesures d'exécution à son encontre, ainsi qu'à l'encontre de COTRADE, FININCO et CORAF.

Le jugement du 20 décembre 2002 de la High Court of Justice of Londres a fait l'objet d'une exequatur en France le 13 mai 2003.

Kensington est fondée à se prévaloir de ce titre exécutoire rendu à l'encontre de la République du Congo, à l'encontre de SNPC, COTRADE, FININCO et CORAF qui sont des émanations de celle-ci.

Une émanation est une entité qui constitue en réalité un prolongement de l'Etat, et qui donc doit être considérée comme n'ayant pas de personnalité juridique distincte de celle de l'Etat. Elle se caractérise par son absence d'autonomie par rapport à l'Etat, qui peut être mis en

évidence par un faisceau d'indices (actionnariat de la société, dirigeants communs, degré de contrôle et d'immixtion de l'Etat dans sa gestion, flux financiers anormaux etc.)

Il résulte de l'application du concept d'émanation par la jurisprudence que les titres exécutoires rendus à l'encontre de l'Etat peuvent être exécutés à l'encontre d'une émanation de cet Etat.

Les arguments de SNPC, COTRADE, FININCO et CORAF selon lesquels Kensington n'a pas de titre exécutoire à leur encontre sont donc infondés dans la mesure où Kensington a un titre exécutoire à l'encontre de la République du Congo et que SNPC ainsi que son groupe consolidé formé avec ses filiales, COTRADE, FININCO et CORAF sont, comme démontré ci-dessous, des émanations de la République du Congo.

a)    Société Nationale des Pétroles du Congo (SNPC)

SNPC est a été jugée comme étant une émanation de celle-ci par quatre arrêts rendus par la Cour d'appel de Paris du 23 janvier 2003 et du 3 juillet 2003.

Ces quatre décisions ont été rendues dans des litiges portant sur la validité de mesures d'exécution et opposant SNPC à certains de ses créanciers et à ceux de la République du Congo.

La Cour a été très explicite et a statué en disant que :

> « « *Considérant qu'il résulte de cette tutelle lourde* [de l'Etat] *que la SNPC n'est pas statutairement dans une indépendance fonctionnelle suffisante pour prendre des décisions autonomes, dans son intérêt propre, et pour être considérée comme bénéficiant d'une autonomie de droit et de fait à l'égard de l'Etat Congolais ; qu'elle n'est pas même maître de son avenir, par une politique d'investissements, ou de sa structure organisationnelle ; qu'il ne résulte pas clairement de sa comptabilité l'existence et l'importance d'une activité commerciale propre distincte de sa mission de service public ; (....) Considérant que si d'ordinaire la tutelle ou même le contrôle d'un Etat sur une personne morale, exercé au travers de ses dirigeants, et la mission de service public, qui lui est dévolue, ne suffisent pas pour la considérer comme une émanation de l'Etat impliquant son assimilation à celui-ci, en l'espèce, l'Etat congolais s'est réservé à l'égard de SNPC non pas un simple pouvoir de contrôle, mais un véritable pouvoir d'orientation et d'approbation constitutif d'une véritable ingérence lequel vide de toute réalité l'autonomie de SNPC qui pourrait résulter de son statut de son statut de société immatriculée au registre des opérateurs économiques ; qu'elle constitue une personne morale qui se révèle fictive et, par suite, une émanation de la République du Congo* »,*

Et de juger que :

> « *Déclare la Société nationale des pétroles du Congo, SNPC, émanation de la République du Congo, débitrice ;*
>
> *Dit régulière la signification du titre exécutoire (...)* ».

L'imbrication étroite entre la République du Congo et SNPC est donc loin d'être solutionnée, ce qui rend manifeste que SNPC est encore une émanation de la République du Congo.

**b)    Financière et Investissements du Congo (FININCO)**

De même, FININCO se caractérise par son absence d'autonomie par rapport à SNPC, et donc, par juxtaposition, par rapport à la République du Congo.

En effet, si FININCO est en principe la filiale financière du groupe SNPC, son financement dépend essentiellement de SNPC. Selon les comptes de FININCO pour 2002, le financement de FININCO dépend essentiellement du compte courant de SNPC, qui représente 979 millions de francs CFA, soit près de 20 fois le capital souscrit, qui ne représente que 50 millions de francs CFA, et la moitié du total du bilan, qui représente 2 milliard de francs CFA.

Il convient également de noter que le capital social de FININCO est détenu à 80% par SNPC et à 10% par le Fonds de dépôt de garantie (lui-même détenu et contrôlé par la République du Congo) et 10% par COSER (une joint-venture entre la SNPC et la République du Congo), qui est elle même détenue à 80% par SNPC. En outre, selon ses statuts, le siège de FININCO est situé à Brazzaville, 146 avenue Charles de Gaulle, BP 188, qui est le siège de SNPC.

**c)    Congolaise de Raffinage (CORAF)**

CORAF est la société de raffinage du Congo, détenue à 100% par SNPC.

Un arrêt de la 16ème Chambre de la Cour d'Appel de Versailles en date du 25 septembre 2003 retient que les éléments de preuve qui ont été alors apportés, à savoir que le fait que la SNPC soit détenue à 100% par l'Etat du Congo, et qu'elle soit actionnaire unique de la CORAF, ne sont pas suffisants pour établir que CORAF est une émanation de la République du Congo.

Or, depuis cette date, des éléments corroborent la forte immixtion de la République du Congo dans la gestion de CORAF et l'existence de flux financiers anormaux, ce qui démontre que CORAF est bien une émanation de la République du Congo.

A titre d'exemple, son principal bien d'exploitation, la raffinerie à Pointe-Noire, est détenue par la République du Congo et seulement mise à la disposition de CORAF, mais sans qu'aucun loyer, redevance ou autre contrepartie ne figure dans les comptes de CORAF (voir extraits, p. 34, de la présentation de KPMG).

En outre, le cabinet d'audit KPMG conclut qu'avec une situation nette négative de 25,7 millions de dollars US au 31 décembre 2001, CORAF serait normalement en faillite si elle avait été une véritable société commerciale autonome (voir extraits, p. 35, de la présentation de KPMG).

Enfin, le rapport du FMI pour 2004 conclut que CORAF fonctionne toujours sur le budget du gouvernement congolais.   Il note que le prix des produits de CORAF est fixé par le gouvernement et n'a pas été augmenté en raison de l'insatisfaction de la population (page 26). Il met également en évidence que CORAF n'a payé à SNPC que 88% du prix du pétrole

qu'elle utilise à SNPC (page 9), et que le fonctionnement de CORAF repose largement sur un recours à des subventions gouvernementales (page 26).

Les conclusions du rapport du FMI sont confirmées par le rapport de Global Witness précité :

> « *le revenu pétrolier du gouvernement était en baisse de 78 millions de dollars (42 milliards de francs CFA) par rapport aux projections. Ceci est largement dû aux mouvements de fonds dont le total est d'environ 44 millions de dollars (24 milliards de francs CFA) qui ont été transférés à la raffinerie CORAF, une filiale de la SNPC, tandis que la SNPC a manqué de transférer encore 11 millions de dollars (6 milliards de francs CFA) au ministère des Finances.* »

### d)  COTRADE

COTRADE est une filiale à 100% de SNPC, qui a repris une partie des activités de trading de cette dernière. COTRADE n'a fait que reprendre des activités de la SNPC et est en réalité un prolongement de celle-ci. Elle est donc une émanation de la République du Congo au même titre de SNPC.

COTRADE est elle aussi dirigée en toute opacité, par le fils de l'actuel Président de la République du Congo. Les auditeurs mandatés par la Banque mondiale se sont ainsi vu refuser l'accès à des informations la concernant. Ainsi, le rapport de Global Witness précité note : « *En juin 2003, un journal a rapporté que l'audit [de KPMG des comptes de SNPC] avait été brièvement suspendu par le gouvernement congolais car le gouvernement a déclaré que l'intérêt des auditeurs pour la façon dont la SNPC commercialise le pétrole (par l'intermédiaire de sa filiale de Londres, la SNPC UK, dirigée par le fils de M. Sassou-Nguesso, Christel-Denis) sortait du cadre de ses termes de référence.* »

Il résulte de ces éléments que SNPC, COTRADE, FININCO et CORAF sont des émanations de la République du Congo et que Kensington était fondée à se prévaloir de son titre exécutoire à leur encontre.

L'argumentation de SNPC selon laquelle Kensington n'a pas de titre exécutoire est donc dénuée de fondement. Elle l'est d'autant plus que pour seule preuve SNPC s'appuie sur des espèces totalement différentes :

-  exécution d'un jugement rendu à l'encontre d'une société contre les associés de celle-ci ;

-  exécution d'un jugement rendu à l'encontre d'un époux contre son conjoint.

Ces principes de droit des sociétés ou de droit de la famille sont hors de propos à l'égard des saisies pratiquées par Kensington, fondées sur le concept de l'émanation, comme le précisait sans équivoque les procès-verbaux de saisie.

## 2. Une signification dès lors opposable à ces sociétés virtuelles

L'argument de SNPC, COTRADE, FININCO et CORAF selon laquelle le titre exécutoire dont Kensington se prévaut à leur encontre ne leur pas été notifié devra être écarté dans la mesure où en application du concept d'émanation, toute notification effectuée à l'Etat est opposable aux émanations de cet Etat.

La Cour d'appel de Paris, dans les décisions du 23 janvier 2003 et du 3 juillet 2003 précitées, a ainsi énoncé que « que *dès lors que la SNPC serait déclarée émanation de la République du Congo, les significations d'actes faites à cette dernière deviendraient opposables à ladite société* ». Elle en conclut que la signification du jugement faite à la République du Congo vaut pour SNPC, son émanation.

La demande de nullité formée par SNPC est dénuée de fondement et sera rejetée.

La validité des saisies bancaires de Kensington du 23 novembre 2004 devra donc être affirmée par le Tribunal de céans.

## C) L'absence de faute

Avant d'alléguer l'existence d'un préjudice, SNPC ne peut de plus s'affranchir de prouver une faute de Kensington et un lien de causalité.

Cette faute ne peut être constituée qu'en présence de saisies abusives ou inutiles, au sens de l'article 22 de la Loi du 9 juillet 1991.

Or, la jurisprudence définit très précisément les critères de l'abus de saisie ouvrant droit à une indemnisation.

La saisie effectuée sans droit, sans cause ou au titre d'un droit incertain a ainsi été considérée abusive et fautive (Cass. Civ. 1ère, 19 juillet 1977 ; Cass. Civ. 2ème, 16 février 1972 : Bull civ. II, n° 47. Cependant en l'espèce, Kensington a un titre exécutoire certain et incontestable, opposable à SNPC, émanation de la République du Congo.

A également été considérée comme abusive bien que ayant un titre, le saisissant qui fait preuve d'une faute grossière ou négligence fautive ou d'une intention de nuire.

A cet effet, la faute grave ou la mauvaise foi sont alors assimilées à la faute intentionnelle et la gravité des mesures d'exécution est prise en considération (Cass. Civ. 2ème, 13 juin 1990, Cass. Civ.2ème, 10 janvier 1985 : Gaz. Pal. 1985, 1 pan. Jur. 113, obs Guinchard).

Il n'en est rien des saisies de Kensington dans la mesure où celle-ci a un titre exécutoire certain et incontestable, opposable à SNPC, COTRADE, FININCO et CORAF, toutes émanations de la République du Congo.

En outre, ces saisies ne sont pas des mesures d'exécution disproportionnées ou constitutives d'une faute grossière, d'une négligence fautive ou d'une intention de nuire.

En effet, Kensington n'a pas agi sans raison à l'encontre de SNPC, COTRADE, FININCO et CORAF, mais sur la base d'éléments lui permettant valablement de conclure que ces entités sont des émanations de la République du Congo.

Enfin, la République du Congo et ses émanations seraient mal placées pour critiquer des saisies prétendument abusives de leurs créanciers, quand elles ont elles-mêmes mis en place un dispositif visant à échapper aux poursuites de leurs créanciers (voir article de La Lettre du Continent précité : « Comment feinter ses créanciers »).

Aucune faute n'est donc susceptible d'être retenue à l'encontre de Kensington.

**D)    Sur l'absence de préjudice**

Rien dans l'assignation de SNPC, COTRADE, FININCO ou CORAF, n'est de nature à prouver d'une quelconque manière leur demande exorbitante de 100.000 euros chacune (outre 20.000 euros réclamés par SNPC dans sa seconde assignation), soit 420.000 euro au total !

Ces sociétés prétendent non sans cynisme, à lire la litanie des créanciers saisissants ayant précédé la concluante, que les saisies pratiquées par Kensington leur auraient causé un « grave préjudice » dont elles réclament l'indemnisation. Elles n'hésitent pas à prétendre que ces saisies les « mettent très sérieusement en péril ».

Ceci est fantaisiste lorsque l'on sait que les comptes de ces sociétés étaient tous débiteurs, indisponibles ou ridiculement approvisionnés. Elles ne peuvent donc se prévaloir d'aucun préjudice lié à l'immobilisation de leurs actifs.

En outre, ces sociétés se découvrent soucieuses de leur image de « bon payeur » sans pour autant emporter conviction quand on sait qu'elles ont structuré leurs activités pour échapper aux poursuites de leurs créanciers.

A cet égard, la BNP a adressé à l'huissier instrumentaire une lettre du 12 avril 2005, donnant une liste vertigineuse de saisies antérieures à celle pratiquée par Kensington. On relève pas moins de 19 saisies-attributions pour des montants allant de 159.000 euros à plus de 142.000.000 euros sur le compte de SNPC, la République du Congo ayant pour sa part plus de 25 saisies-attributions sur son compte pour des montants tout à fait similaires ! Ces saisies répétées établissent, en tant que de besoin, que l'image de « bon payeur » des demanderesses, si tant est qu'elles en aient eu une, étaient depuis longtemps écornée.

En conséquence, Kensington sollicite le débouté pur et simple de SNPC de ses demandes.

**E)    La nécessité d'une expertise pour déterminer l'étendue des obligations saisissables**

Le 24 novembre 2004, la BNP fait état d'un enchevêtrement singulier d'obligations financières profitant à SNPC :

-    un contrat de prépaiement de 80.000.000 USD, et un contrat d'option de couverture de pétrole conclu avec SNPC le 9 septembre 2002 aux termes duquel « dans l'hypothèse

*où les sommes reviendraient à SNPC au titre de l'exercice de l'option, ces sommes seraient affectées au remboursement des sommes dues par SNPC à BNP Paribas au titre du contrat d'option lui-même, et au titre du contrat de prépaiement précité, ainsi qu'au titre de tout contrat de prépaiement passé présent ou futur »*, rendant la créance, à la date de la saisie insusceptible de revenir à SNPC au titre de l'exercice de l'option. L'encours du contrat de prépaiement de 80.000.000 USD le 24 novembre 2004 est de 26.668.674,16 dollars US.

-   un acte de nantissement en faveur de la BNP Paribas des créances futures susceptibles de revenir à SNPC au titre de l'option,

-   un gage espèce, d'un montant de 4.000.000 USD à la date de la saisie, signé le 2 septembre 2002, en garantie de la bonne exécution des engagements de SNPC au regard des prépaiements précités et du contrat d'option.

La BNP conclut : *« vous comprendrez, en conséquence que notre banque ne dispose d'aucune créance disponible ni d'aucune part ou valeur mobilière en faveur la République du Congo, de SNPC, de FININCO, de la CORAF, de la SOCOTRAM ou de COTRADE, dont le montant pourrait être appréhendé par les saisies sus mentionnées. »*

Or, s'agissant du gage espèce mentionné par la BNP, celui-ci couvre *« tous les engagements et obligations présents et futurs de la SNPC envers BNP Paribas au titre des conditions générales, du contrat de prépaiement n°7 et du contrat de prépaiement n°8, et de tous autres contrats de prépaiement conclus en application des conditions générales »*.

Ce gage s'analyse en une créance de restitution conditionnée, à l'expiration des obligations garanties. Cette créance peut faire l'objet d'une saisie-attribution en application de l'article 13 de la loi du 9 juillet 1991 (Dalloz Action- Droit et pratique des voies d'exécution, Tony Moussa et Serge Guinchard, n°4917, p. 579).

Kensington dispose d'un droit sur cette créance conditionnelle pour 4 000 000 dollars..

Or, lesdites obligations garanties sont sur le point d'expirer. En effet, aux termes du contrat de prépaiement n°8, SNPC doit rembourser les montants prêtés d'ici le 30 septembre 2005, le contrat expirant le 31 décembre 2005. En outre, à la suite des controverses liées aux contrats de prépaiement, fondées sur la vente des ressources futures du Congo, SNPC s'est engagée auprès du FMI à plusieurs reprises à ne plus recourir à des contrats de prépaiement.

**Cependant, Kensington a appris de la BNP (courrier du 20 avril 2005) que le solde du gage espèce a été affecté à plusieurs règlements de 1.616.960 USD le 6 décembre 2004, 1.616.960 USD le 7 janvier 2005, et au règlement partiel d'une somme de 1.816.080 USD le 7 janvier 2005. Dans ce même courrier, la BNP indique que l'encours du contrat de prépaiement entre la SNPC et la BNP est de 26.668.674,16 USD.**

Ce n'est rien d'autre qu'une attribution de sommes à la BNP en violation des droits des créanciers puisqu'elle constitue une violation des contrats conclus entre BNP et SNPC.

En effet, alors que l'encours du contrat de prépaiement que le gage espèce a pour objet de garantir n'a pas varié entre le 24 novembre 2004 et le 20 avril 2005, des sommes ont été prélevées sur le montant gagé afin de ramener celui-ci à zéro (!).

De plus, le contrat de gage espèce stipule en son article 1.1, paragraphe 3, que le montant du gage espèce doit être au minimum égal à 3.000.000 USD tant que des obligations demeurent en vigueur aux termes d'un contrat de prépaiement.

La coïncidence est troublante, comme l'est l'ensemble de la nébuleuse et des montages réalisés par la République du Congo et SNPC.

L'étonnement n'est que plus grand lorsque l'on observe que la réalisation du gage-espèce est survenue seule, en dépit des garanties multiples bénéficiant à la BNP.

Dans ces conditions une expertise devra être ordonnée dans le cadre de la mission proposée ci-après pour faire la lumière sur la créance saisie.

**F)** **Au-delà sur le caractère abusif des procédures de SNPC, CORAF, COTRADE et FININCO**

Les demandes ont été effectuées par SNPC, CORAF, COTRADE et FININCO en toute mauvaise foi.

En effet, alors que le procès-verbal de la saisie visait clairement ces entités en leur qualité d'émanations de la République du Congo, elles prétendent ignorer le fondement juridique de la saisie.

En outre, l'existence même d'un préjudice est infondée dans la mesure où la plupart des comptes de ces entités étaient débiteurs ou rendus non disponibles par des montages juridiques. Le chiffrage de ce prétendu préjudice, que les demanderesses ne prennent pas la peine d'expliquer est complètement fantaisiste.

Force est de constater que les demandes de SNPC, ainsi que celles de CORAF, COTRADE et FININCO, n'ont pour intention que de nuire à Kensington, en la gênant dans l'exercice de ses droits de recouvrement d'un titre exécutoire.

En conséquence, Kensington sollicite des dommages et intérêts d'un montant de 20.000 €
pour chacune des demanderesses.

Il serait enfin inéquitable de laisser à la charge de Kensington les frais irrépétibles qu'elle a dû engager pour faire valoir ses droits dans le cadre de la présente instance. En conséquence, il est demandé à Madame ou Monsieur le Juge de l'Exécution de condamner SNPC, CORAF, COTRADE et FININCO, au paiement de la somme de 20.000 euros chacune au titre de l'article 700 du nouveau Code de procédure civile.

## PAR CES MOTIFS

Vu les articles 42 et suivants et 59 et suivants de la Loi du 9 juillet 1991, 55 et suivants et 178 et suivants du Décret du 31 juillet 1992,

Vu le jugement du 20 décembre 2002 de la High Court of Justice de Londres, Queen's Bench Division Commercial Court, exequaturé en France le 13 mai 2003,

Il est demandé à Madame ou Monsieur le Juge de l'Exécution de,

- **ORDONNER** la jonction entre les instances ouvertes par SNPC, CORAF, COTRADE et FININCO contre Kensington ;

- **CONSTATER** que Kensington dispose d'un titre exécutoire ;

En conséquence,

- **DIRE ET JUGER** que les saisies pratiquées par Kensington à l'encontre de SNPC, CORAF, COTRADE et FININCO valables ;

- **DIRE ET JUGER** que Kensington n'a commis aucune faute ;

- **DIRE ET JUGER** que SNPC, CORAF, COTRADE et FININCO n'ont subi aucun préjudice.

- **DEBOUTER** SNPC de l'ensemble de ses demandes ;

A titre reconventionnel,

- **DESIGNER** un expert afin de déterminer les obligations de SNPC saisissables entre les mains de la BNP au moment des saisies de Kensington, avec pour mission de :

  - entendre contradictoirement les parties, se déplacer sur place, au besoin se faire assister de la force publique ;
  - demander copie, se faire remettre et prendre connaissance de tous documents contractuels, juridiques ou commerciaux utiles détenues par SNPC, lesquels devront les lui communiquer conformément à l'article 243 du nouveau Code de procédure civile ;
  - rechercher si, à la date du 24 novembre 2004, la BNP détenait à quelque titre que ce soit, notamment à travers de comptes ouverts en son nom ou au nom de tiers, des sommes appartenant à la République du Congo ou ses émanations SNPC, CORAF, COTRADE et FININCO, ou devant leur revenir à terme ou sous condition, les montants et modalités de ces créances devant, le cas échéant, être précisées, ainsi qu'en fixer le quantum ;
  - répondre, dans la limite de ces chefs de missions, sous la forme d'un pré rapport à remettre dans un délai de trois mois à compter de la signification du jugement et déposer un rapport définitif dans un délai de six mois à compter de cette signification.

En tout état de cause,

- **DIRE ET JUGER** que les procédures intentées par SNPC, CORAF, COTRADE et FININCO à l'encontre de Kensington sont abusives et condamner chacune d'entre elles à indemniser Kensington de son préjudice, à hauteur de 20.000 € chacune ;

- **CONDAMNER** chacune des demanderesses solidairement à verser à la société Kensington la somme de 20.000 euros en application des dispositions de l'article 700 du Nouveau Code de Procédure Civile ;

- **CONDAMNER** SNPC aux entiers dépens de l'instance.

## LISTE DES PIECES

Pièce n°1 :    Lettres de réponse des Banques aux saisies pratiquées

Pièce n°2 :    Jugement du 20 décembre 2002 de la High Court of Justice de Londres

Pièce n°3 :    Ordonnance d'exequatur du 13 mai 2003

Pièce n°4 :    Quatre Arrêts de la Cour d'appel de Paris des 23 janvier et 3 juillet 2003

Pièce n°5 :    Article intitulé « Comment Feinter ses Créanciers ?» paru dans la Lettre du Continent de janvier 2003

Pièce n°6 :    Rapport de Global Witness de mars 2004

Pièce n°7 :    Rapport de la Fédération Internationale des Droits de l'Homme du 19 mai 2004

Pièce n°8 :    Rapport du FMI de 2004

Pièce n°9 :    Contrat de gage espèce entre SNPC et la BNP du 2 septembre 2002

Pièce n°10 :    Contrat de prépaiement no. 7

Pièce n°11 :    Contrat de prépaiement no. 8

Pièce n°12 :    Lettre du cabinet Dechert du 18 mars 2005 au Juge de l'Exécution

Pièce n°13 :    Lettre du cabinet KPMG du 1er août 2003

Pièce n°14 :    Extraits de la présentation du cabinet KPMG

Pièce n°15 :    Convention relative à la Détention et la Gestion par la Société Nationale des Pétroles du Congo des Droits, Actifs et Participations de l'Etat dans le Domaine des Hydrocarbures.

Pièce n°16 :    Mémorandum de Cleary Gottlieb du 16 mai 2002

Pièce n°17 :    Statuts en rapport d'audit concernant FININCO

Pièce n°18 :    CA Versailles 25/09/03

UNOFFICIAL TRANSLATION

To the Execution Magistrate
of the Court of First Instance of Paris

Hearing of May 23, 2005 at 2:00 pm

## BRIEF

### FOR:

**Kensington International Ltd,** whose registered offices are at HSBC Financial Services, (Cayman) Ltd, PO Mary Street Grand Cayman (Cayman Islands)

RESPONDENT

Represented by:
Kathie D. Claret, Esq.
Emmanuelle Trombe, Esq.
Members of the Paris Bar
Cabinet Dechert
Residing at 55, Avenue Kleber, 75116 Paris
Tel: 01.53.65.05.00 – Fax: 01.53.65.05.05 Attorney number: D 1816

Frederic Fournier, Esq.
Member of the Paris Bar
DDG Selarl
Residing at 21 rue Clément Marot, 75008 Paris
Tel: 01.53.23.80.00 – Fax: 01.53.23.75.90 Attorney number: J 44

### AGAINST:

**La Société Nationale des Pétroles du Congo** (SNPC)
whose registered offices are at BP 188, Brazzaville, Congo Republic

CLAIMANT

Represented by:
Thierry Lauriol
Member of the Paris Bar
Cabinet Jeantet Associés
Residing at 87, Avenue Kléber, 75784 Paris Cedex 16
Tel: 01.45.05.80.08 Attorney number: T 04

## MAY IT PLEASE THE EXECUTION MAGISTRATE

On February 24, 2005, the Société National des Pétroles du Congo (known hereinafter as "**SNPC**") summoned Kensington International Limited (known hereinafter as "**Kensington**"), to appear before court, in order to have ruled null and void the seizures of SNPC's assets held by several banks, which were performed against SNPC, and to have Kensington ordered to pay to SNPC 20,000 Euros in damages (in addition to the 100,000 Euros claimed by SNPC in the other suit it has filed against Kensington) and 10,000 Euros under Article 700 of the New Code of Civil Procedure.

In fact, in both of the ongoing procedures, including this procedure and a prior case arising from a writ of summons dated February 24, 2005, SNPC claims that the writ of execution stating the receivable of Kensington against the Congo Republic cannot be invoked against SNPC, although SNPC was ruled to be an emanation of the Congo Republic, in other words that it has a legal personality which is fictitious and can be confused with the legal personality of the Congo Republic.

In addition to these suits, three other procedures have been brought by other emanations of the Congo, the companies COTRADE, CORAF and FININCO.

These procedures, filed by SNPC and the other emanations of the Congo Republic, represent nothing less than a demonstration of force intended to impress a good-faith creditor of the Congo Republic who, confronted with the Congo Republic's refusal to honor its debts, is now facing legal stratagems put into place by the latter to escape its creditors.

The collusion between the Congo Republic, SNPC, COTRADE, CORAF and FININCO is also made obvious by the fact that these four companies have all hired the same counsel and brought suit against Kensington via writ of summons that are identical and concurrent, on February 24, 2005.

Kensington intends to demonstrate that such seizures are wholly founded and in conformity with the conditions set forth in Articles 42 and 59 of the Law of July 9, 1991, and that the suits filed by SNP and those filed collectively by COTRADE, CORAF and FININCO, with which SNPC has requested joinder, are excessive.

## I.    FACTS AND PROCEEDINGS

1. A final decision was rendered in favor of Kensington on December 20, 2002 by the High Court of Justice of London, Queen's Bench Division Commercial Court, by His Honor Judge Cresswell, reference Folio 2002 No 1088.

Under this decision, the Congo Republic was sentenced to pay USD 56,911,991.47 to Kensington.

By order of May 13, 2003, the above decision was declared enforceable in France.

2. Kensington vainly sought to enforce the writ of execution against the Congo Republic, but came up against the legal stratagems this latter had created in order to escape from its creditors' law suits, and in particular the stratagem of isolating its oil revenues, which are considerable.

An article appearing in *La Lettre du Continent* in January 2003 highlights this point.  The article, entitled *"How to Fool Your Creditors?"* (*"Comment feinter ses créanciers?"*), is based on a memorandum from Cleary Gottlieb Steen & Hamilton relating to the *modus operandi* set up by the Congo Republic, describing explicitly how the *"creditors of the Congo Republic and/or of the SNPC could be prevented from seizing oil controlled by SNPC"*.

3.  In this context, on November 23, 2004, Kensington had notified five seizures allocating the seized assets to the creditor requesting the seizure [saisies-attributions], and five seizures on shareholders' rights or securities with the following banks:

- Natexis Banque Populaires, 45 rue Saint Dominique, 75007 Paris
- Banque Belgolaise, 6 avenue Vélasquez, 75008 Paris
- Banque Nationale de Paris, 34, avenue de l'Opéra, 75002 Paris
- Société Générale, 29 boulevard Haussmann, 75009 Paris
- Crédit Lyonnais, 40 rue René Boulanger, 75010 Paris

These seizures were filed against the Congo Republic and its emanations, and in particular SNPC, COTRADE, CORAF and FININCO, which have been informed about such seizures.

4.  In response to the seizures notified with it, BNP Paribas stated on November 24, 2004 that it did not have any available receivables, or securities that could be seized, in particular in favor of SNPC, and this in spite of the significant amounts connected with transactions involving the Congo Republic and SNPC transferred through BNP accounts.

More specifically, BNP mentions the existence of the following financial obligations:

- a prepayment contract for USD 80,000,000, allowing SNPC to collect the price of a future cargo, and an oil guarantee option agreement made with SNPC on September 9, 2002 under which *"in the event that the monies return to SNPC under the exercise of this option, such monies shall be allocated to the reimbursement of amounts due by SNPC to BNP Paribas under the option agreement itself, and under the above-cited prepayment contract, as well as any prepayment contract to be made now or in the future"*, rendering the receivable at the date of the seizure invulnerable to return to SNPC under the exercise of the option,

- a pledge in favor of BNP of any future receivables that might be made to SNPC under the option,

- a cash pledge/lien for an amount of USD 4,000,000 at the date of the seizure, signed on September 2, 2002, as guarantee of the full execution of SNPC's undertakings under the above-cited prepayment and option agreements.

It is worthwhile noting the complexity of these legal stratagems which result in a situation wherein, according to BNP, the entirety of the amounts which might eventually be turned over to SNPC are not available.

By letter of April 12, 2005, BNP provided, in addition, litany of seizures for a total amount of almost 970 million euros!

As for Natexis, this bank indicated in a letter dated November 24, 2004, that it holds an account in SNPC's name with a positive current balance of 1,833.14 euros.

The other banks state that accounts with them in the names of SNPC, COTRADE, CORAF and FININCO are either in the red or do not exist.

The enforcement measures filed by Kensington are thus largely without effect.

5.  It is in these conditions, nearly three months after Kensington's first seizures dated November 23, 2004, in spite of the fact that such seizures have had no significant financial impact on SNPC, that SNPC has filed a motion with this Execution Magistrate to obtain the withdrawal of the seizures, and to order Kensington to pay exorbitant damages.

## II. ARGUMENTS

The respondent will first request the joinder of this procedure with the identical suits filed by COTRADE, CORAF and FININCO, which are so tightly related that it is in the interest of justice to rule on them collectively (A).

This said, the respondent holds an writ of execution which it can invoke against emanations from the Congo Republic, namely, SNPC, COTRADE, CORAF and FININCO.  The seizures which have been made are thus valid (B).  Kensington will also demonstrate that the seizures are not wrongful (C), and that SNPC, COTRADE, CORAF and FININCO cannot prove any damages (D).

However, as a counterclaim, the opacity of SNPC's stratagems and the incoherence of its behavior with regard to the contractual schemes in place call for the ordering of an expert investigation to determine the extent of the Kensington's debts which can be seized (E).

Kensington will in addition establish that the suits filed by SNPC, COTRADE, CORAF and FININCO are excessive (F)

## A) Concerning the Request for Joinder

Further to the five banking seizures carried out by Kensington on November 23, 2004 against the Congo Republic and its emanations, and in particular, SNPC, COTRADE, CORAF and FININCO, these companies all acted against Kensington in the same identical terms but in four distinct suits.

However, these suits are so tightly related that it is in the interest of justice to rule on them collectively.

They arise from seizures carried out by Kensington on the basis of the same writ of execution against entities that are all tightly knit into the Congo Republic and into each other.

These four suits were filed the same day by the same legal counsel and in the same identical terms:  the four writs of summons lay out the same facts, arguments and claims.

It is thus suitable and in the interest of justice to join the four suits in order to hear them and rule on them collectively.  Kensington made this request by letter to this Court on March 18, 2005.

By letter of March 17, 2005 to this Magistrate, SNPC requested the joinder of this suit with another suit filed by SNPC against Kensington by writ of summons dated March 18, 2005, and related to the seizure by the latter of assets held by Perenco.  Kensington has no objection

to this request, subject to the condition that, in the interest of justice, these suits be joined with the suits filed by COTRADE, CORAF and FININCO, which are based on the same facts and make exactly identical claims.

## B) The existence of a validly served writ of execution

### 1. A writ of execution that can be invoked against emanations of the Congo Republic

Contrary to SNPC's claim, Kensington possesses a writ of execution to carry out the enforcement measures against it, and against COTRADE, CORAF and FININCO.

The decision of December 20, 2002 by the High Court of Justice of London was ruled enforceable in France on May 13, 2003.

Kensington is thus justified in wishing to enforce its writ of execution against the Congo Republic and against SNPC, COTRADE, CORAF and FININCO which are emanations of the latter.

An emanation is an entity that in reality constitutes an extension of the State and that thus must be considered as not having a legal personality distinct from the State's legal personality. It is characterized by its absence of autonomy in relation to the State, which can be tested by a series of indicators (shareholders of the entity, common managers, degree of control and intervention by the State in management, unusual financial operations, etc.).

When the concept of emanation is applied by the jurisprudence, the result is that the writs of execution rendered against the State may also be enforced against emanations of this State.

The arguments of SNPC, COTRADE, CORAF and FININCO that Kensington has no writ of execution against them are thus without grounds in that Kensington has a writ of execution against the Congo Republic and that SNPC as well as the consolidated group it forms with its subsidiaries, COTRADE, CORAF and FININCO are, as demonstrated above, emanations of the Congo Republic.

### a) Société Nationale des Pétroles du Congo (SNPC)

SNPC was ruled to be an emanation of the latter by four decisions by the Paris Court of Appeals on January 23, 2003 and July 3, 2003.

These four decisions were made in disputes bearing on the validity of enforcement measures and opposing SNPC and some of its creditors and those of the Congo Republic.

The Court very explicitly stated and ruled:

*"Considering that, as the result of its deep control* [by the State], *SNPC is not statutorily operating as an independent entity to the point where it would make autonomous decisions, in its own interests, and could be considered as benefiting from a legal and real independence with regard to the Congolese State; it is not master of its future, by an investment policy, nor of its organizational structure; the existence and the importance of commercial activity distinct from its public service activity cannot be deduced from the examination of its accounts; (...) Considering that, if normally the complete control or even the oversight of a State over a legal entity, performed through its managers, and the mission of public service, which is vested in it, are not sufficient for it to be considered as an*

*emanation of the State implying its assimilation into such, <u>in this case, the Congolese State has maintained with regard to SNPC not only a simple control over, but also a veritable power of orientation and authorization constituting a veritable interference which destroys any pretense of independence by SNPC which could result in its status as the status of a company registered with economic operators; that it constitutes a fictitious legal entity and therefore that it is an emanation of the Congo Republic."</u>*

And to rule that:

*" <u>the Société Nationale des Pétroles du Congo, SNPC, emanation of the Congo Republic, debtor;</u>
<u>the serving of the writ of execution is in order (...)</u>*

Several reports confirm that SNPC possesses all the characteristics of an emanation.

First, the opacity of the management of SNPC's revenues led the IMF and the World Bank to call for an audit of its accounts, which audit was performed by KPMG.  KPMG made public in 2004 103 recommendations evidencing specifically the opacity of financial transactions between the State and SNPC (see the letter on this subject from KPMG dated August 1, 2003).

Although the KPMG audit covered the period 1999-2001 and although the Congo Republic stated, in response to this audit, its intention to increase transparency in both the management of the State's budget and the management of SNPC's, this transparency is far from being a reality in fact.

KPMG's alarming findings can only be the tip of the iceberg, since KPMG has access to only part of the information on SNPC due precisely to that fact that SNPC is so tightly integrated into the Congolese State.  Thus, the auditors did not have access to documents bearing on *"all expenses made directly by SNPC on behalf of the State.  **Consequently, we do not have access to either the bank accounts or the bank books of original entry, nor to SNPC/State accounts.**"* (see the report by the International Human Rights Foundation dated May 19, 2004, p 87).

Likewise, the report by the organization Global Witness, a renowned association whose purpose is to fight corruption, dated March 2004, states that *"<u>**the auditors complained as to the lack of complete and rapid access to the information, in contradiction with the contractual conditions for the audit.  Importantly, access to SNPC's bank accounts was refused to them: "Mr. Itoua** [then the president of the SNPC].... **explained that SNPC's bank accounts contained transfers of funds relating to transactions made on behalf of the State**</u>, and consequently, SNPC would need official written authorization from the Ministry of Finance allowing him to give access to the account statements in question to KPMG"*.  There is an obvious contradiction: the SNPC claims that it is autonomous with regard to the state on the financial and operational level when in litigation with its creditors, yet seems to claim financial interdependence on the State when it comes to stumbling blocks with auditors appointed by the World Bank."*

The Global Witness report cited above concludes that: *"Given its enormous debts, one can understand that the Congo fervently wishes to adhere to the Highly Indebted Poor Countries Initiative (IPPTE) of the International Monetary Fund.  <u>However, oil revenues continue to be managed in a very non-transparent way and outside of the budget, especially in the</u>*

*transactions involving the national oil company, the Société Nationale des Pétroles du Congo (SNPC). The latter seems to drain all promises of improvement regarding transparency made by the government to the IMF and others."*

Finally, it should be noted that on its own admission, SNPC acted on behalf of the Congo Republic. Thus, according to the report by the International Human Rights Foundation cited above, an article appearing in Express on February 20, 2003 on SNPC, which stated that *"SNPC is mandated to represent the State in its contractual relationships with foreign partners (...)"* (see also on the same subject article 1 of the Agreement on the Holding and Management by SNPC of Rights, Assets and Holdings of the State in the Hydrocarbon Industry).

The tight relationship between the Congo Republic and SNPC is thus far from being resolved, making it even more obvious that SNPC is still an emanation of the Congo Republic.

**b) Financière et Investissements du Congo (FININCO)**

Likewise, FININCO is characterized by its absence of independence from the SNPC, and therefore, by association, from the Congo Republic.

In fact, if FININCO is in theory the financial subsidiary of the SNPC group, its financing depends essentially on SNPC. According to FININCO's accounts for 2002, FININCO's financing depends essentially on a checking account in SNPC's name, representing 979 million francs CFA, i.e. almost 20 times the called-up capital, (only 50 million francs CFA), and half of the total of the balance sheet (2 billion francs CFA).

It should also be noted that 80% of the capital of FININCO is held by SNPC and 10% by the Guarantee Fund [Fonds de dépôt de garantie] (itself held and controlled by the Congo Republic) and 10% by COSER (a joint venture between SNPC and the Congo Republic), itself held 80% by SNPC. In addition, according to its by-laws, the registered office of FININCO is in Brazzaville, 146 avenue de Charles de Gaulle, BP 188, which is the registered office of SNPC.

**c) Congolaise de Raffinage (CORAF)**

CORAF is the Congolese refinery company, which is held 100% by SNPC.

A decision of the 16th Chamber of the Court of Appeals of Versailles dated September 25, 2003 holds that the evidence brought before this court, i.e. the fact that the Congo State holds 100% of SNPC, and that it is the sole shareholder of CORAF, are not sufficient for establishing that CORAF is an emanation of the Congo Republic.

Yet, since this date, various elements confirm the considerable intervention of the Congo Republic in CORAF's management and the existence of abnormal financial transactions, which demonstrate that CORAF is in fact an emanation of the Congo Republic.

For example, its primary operational asset, the refinery at Pointe Noire, is held by the Congo Republic and only made available to CORAF, yet no rent, royalty or other counterpart appears on CORAF's books (see excerpts, p 34, of KPMG's presentation).

In addition, the audit firm KPMG concluded that with a negative net balance of USD 25.7 million as of December 31, 2001, CORAF would be bankrupt if it were a genuinely independent commercial entity (see excerpts, p 35, of KPMG's presentation).

Finally, the IMF report for 2004 concludes that CORAF is still operating on the Congolese government's budget. It notes that the price of CORAF's products is set by the government and has not increased due to the dissatisfaction of the general population (p 26). It also states that CORAF has paid SNPC only 88% of the price of the oil it uses (p 9) and that CORAF's operations depend largely on government subsidies (p 26).

The conclusions in the IMF report are confirmed by the Global Witness report cited above:

"*the government's oil revenues are down by 78 million dollars (42 billion francs CFA) compared with projections. This is largely due to transfers of funds totaling approximately 44 million dollars (24 billion francs CFA) which were transferred to the CORAF refinery, a subsidiary of SNPC, while SNPC neglected to transfer another 11 million dollars (6 billion francs CFA) to the ministry of Finances.*"

### d) COTRADE

COTRADE is a subsidiary that is wholly owned by SNPC. COTRADE took over part of SNPC's trading activity. COTRADE merely took over SNPC's activities and is in fact an extension of SNPC. It is thus an emanation of the Congo Republic in the same way that SNPC is.

COTRADE is also managed with no transparency, by the son of the current president of the Congo Republic. Auditors mandated by the World Bank were also refused access to information concerning it. Thus the Global Witness report cited above states: "*In June of 2003, a newspaper reported that the audit* [KPMG audit of SNPC's accounts] *was briefly suspended by the Congolese government because the government had declared that the auditors interest in the manner that SNPC commercializes oil (through the intermediary of its London subsidiary, SNPC UK, directed by the son of Mr. Sassou-Nguesso, Christel-Denis) was beyond the framework of the terms of reference.*"

Consequently, SNPC, COTRADE, FININCO and CORAF are emanations of the Congo Republic and Kensington is perfectly justified in enforcing its writ of execution against them.

SNPC's argument that Kensington has no writ of execution is thus without grounds. It is so furthermore because the sole proof that SNCP brings to the argument rests on totally unrelated jurisprudence:

- Execution of a decision rendered against a company, against its partners;

- execution of a decision rendered against a spouse, against the other spouse.

These principles of corporate law, or family law, are not applicable to the seizures carried out by Kensington, based on the concept of emanation, as stated unambiguously in the seizure affidavits.

## 2. A service which can therefore be invoked against these virtual companies

The argument raised by SNPC, COTRADE, FININCO and CORAF under which the writ of execution that Kensington invokes against them was not properly served upon them, must be put aside because, under application of the concept of emanation, any service made to the State can be invoked against all emanations of this State.

The Paris Court of Appeals, in its decisions of January 23, 2003 and July 3, 2003 cited above, thus stated that "once the SNPC is declared an emanation of the Congo Republic, service of briefs and documents upon this latter could be invoked against the said company."   It finds that the service of the decision upon the Congo Republic was also valid for SNPC, its emanation.

The request for nullity made by SNPC is thus groundless and to be rejected.

The validity of Kensington's banking seizures dated November 23, 2004 must thus be confirmed by this Court.

### C) Absence of fault

Before putting forward the existence of a damage, SNPC cannot in addition attempt to avoid proving a fault by Kensington and a causal connection.

This fault cannot be constituted except in the presence of excessive or useless seizures as defined in Article 22 of the Law of July 9, 1991.

Case law very clearly defines the criteria for seizure abuse resulting in indemnification.

A seizure made without grounds, without reasons or in connection with an uncertain right has been judged excessive and wrongful (French Supreme Court [Cour de cassation], 1st Civil Chamber, July 19, 1977;  2nd Civil Chamber, Feb. 16, 1972: Bull Civ. II, no 47.) However, in this case, Kensington has a specific and uncontestable writ of execution that can be invoked against SNPC, an emanation of the Congo Republic.

The seizer, who has shown gross fault or wrongful negligence or intent to harm is also considered to have abused his right, in spite of having a title.

In these cases, the serious misconduct or bad faith amounts to intentional harm, and the gravity of the enforcement measures is taken into account. (French Supreme Court, 2nd Civil Chamber, June 13, 1990; January 10, 1985: Gaz. Pal. 1985, 1 pan. Jur. 113, obs Guinchard).

Kensington's seizures have nothing in common with such cases, since Kensington has a specific and incontestable writ of execution, which can be invoked against SNPC, COTRADE, FININCO and CORAF, all emanations of the Congo Republic.

In addition, these seizures are not enforcement measures which are disproportionate or which constitute serious misconduct, wrongful negligence or intent to harm.

In fact, Kensington has not acted without reason against SNPC, COTRADE, FININCO and CORAF, but on the basis of elements that have allowed it to validly conclude that such entities are emanations of the Congo Republic.

Finally, the Congo Republic and its emanations would be hard put to criticize seizures by creditors that they claim are abusive when these entities have themselves put into place obstacles to their creditors' suits (see the above-cited article in *La Lettre du Continent* entitled "How to Fool Your Creditors?" ("*Comment feinter ses créanciers?*")).

No fault is thus likely to be stated against Kensington.

## D) On the Absence of Damages

Nothing in the writ of summons served by SNPC, COTRADE, FININCO or CORAF supports in any way their exorbitant claim of 100,000 Euros each (in addition to the 20,000 euros claimed by SNPC in its second summons), i.e. 420,000 Euros in all!

These companies claim, not without cynicism, as can be seen from the litany of seizing creditors that preceded the respondent, that the seizures carried out by Kensington have caused them "*considerable harm*", for which they are claiming indemnification. These companies do not hesitate to claim that such seizures "*place them in serious peril*".

This claim is not serious, considering that the accounts of these companies are negative, unavailable or very poorly financed. They cannot therefore claim any damages relating to the freezing of their assets.

In addition, these companies are suddenly concerned with their reputation as "good payers", but are not convincing in this role due to the fact that they have structured their activities in order avoid their creditors' suits.

In this regard,  BNP sent a letter dated April 12, 2005 to the bailiff, providing a dizzying list of seizures filed prior to Kensington's.  No less than 19 seizures allocating assets, for amounts between 159,000 euros and more than 142,000,000 euros, were made against SNCP; The Congo Republic was the subject of more than 25 seizures allocating assets for similar amounts!  These repeated attachments establish, were it necessary, that the claimants' reputation as a "good payer", had any such reputation ever existed, has long been in tatters.

Consequently, Kensington requests that SNPC's claims be simply and totally dismissed.

## E) The need for an expert investigation to determine the extent of the debts that could be seized

On November 24, 2004, BNP drew up a summary of the extraordinary entanglement of financial obligations benefiting SNPC:

- a prepayment contract for USD 80,000,000, and a oil guarantee option agreement made with SNPC on September 9, 2002 under which "*in the event that the monies return to SNPC under the exercise of this option, such monies shall be allocated to the reimbursement of amounts due by SNPC to BNP Paribas under the option agreement itself, and under the above-cited prepayment agreement, as well as any prepayment contract to be made now or in the future*", rendering the receivable at the date of the attachment invulnerable to return to SNPC under the exercise of the option.  The outstanding balance under the prepayment contract for USD 80,000,000 of November 24, 2004 is USD 26,668,674.16.

- a pledge agreement in favor of BNP Paribas for future receivables that might eventually return to SNPC under the option;

- a cash pledge, for USD 4,000,000 as of the date of the seizure, signed on September 2, 2002, as guarantee for the full execution of SNPC's undertakings under the prepayment contracts and option agreements cited above.

BNP concludes: *"Consequently, you will understand that our bank has no available receivable or securities in favor of the Congo Republic, SNPC, COTRADE, FININCO or CORAF, which could be seized as per the above-mentioned seizures."*

With regard to the cash pledge cited by BNP, this covers *"**all present and future undertakings and obligations** of SNPC towards BNP Paribas under the general conditions, prepayment contract No 7 and prepayment contract No 8, **and all other prepayment contracts made under the general conditions**."*

This pledge constitutes a reversion receivable conditioned by the maturity of the secured obligations. Such receivable can be the subject of a seizure allocating assets under Article 13 of the law of July 9, 1991 (Dalloz Action – *Droit et Pratique des Voies d'exécution*, Tony Moussa and Serge Guinchard, No 4917, p 579).

Kensington has rights to this conditional receivable for 4,000,000 dollars.

Such secured obligations are about to mature. Indeed, under the terms of prepayment contract No 8, SNPC must repay the sums lent by September 30, 2005, as the contract comes to term on December 31, 2005. In addition, following the controversy surrounding the prepayment agreements, based on the future sales of Congolese resources, SNPC promised the IMF on several occasions that it would no longer use prepayment agreements.

**Nevertheless, Kensington has learned from BNP (letter dated April 20, 2005) that the balance of the cash pledge was allocated to several payments of USD 1,616,960 on December 6, 2004, USD 1,616,960 on January 7, 2005, and to the partial payment of USD 1,816,080 on January 7, 2005. In this same letter, BNP indicated that the outstanding balance of the prepayment agreement between SNCP and BNP was USD 26,668,674.16.**

This is nothing less than the allocation of sums to BNP in breach of the creditors' rights as it constitutes a breach of contracts made between BNP and SNPC.

Indeed, while the outstanding balance of the prepayment contract that the cash pledge was intended to guarantee did not change between November 24, 2004 and April 20, 2005, specific sums were disbursed from the amount pledged in order to bring the latter to zero (!).

In addition, the pledge agreement stipulates in Article 1.1, Paragraph 3, that the amount of the cash pledge must be a minimum of USD 3,000,000 as long as the obligations are in effect under a prepayment contract.

The coincidence is disturbing, as are the nebula and schemes put in place by the Congo Republic and SNPC.

It is even more astonishing that the execution of the cash pledge arose independently, in spite of the many guarantees benefiting BNP.

For these reasons, an expert investigation should be ordered as per the proposed mandate described herein below in order to shed some light on the seized receivable.

## F) On the abusive character of the suits introduced by SNPC, CORAF, COTRADE, and FININCO

The claims by SNPC, CORAF, COTRADE, and FININCO were made in bad faith.

Indeed, although the seizure affidavit clearly targeted these entities in their capacity as emanations of the Congo Republic, they claim to ignore the legal grounds for the seizure.

In addition, the very existence of damages is not founded in the sense that most of the accounts held by these entities were negative or not available due to legal stratagems. The claimants do not bother to explain how the amount of damages claimed, which amount is fantastical, was calculated.

SNPC's claims, as well as those of CORAF, COTRADE, and FININCO, are obviously only intended to harm Kensington by obstructing it in the exercise of its right to recover under the writ of execution.

Consequently, Kensington claims damages and interest for the amount of 20,000 Euros from each of the Claimants.

It would be unfair to burden Kensington with trial fees it incurred to enforce its rights before this Court. Consequently, the Execution Judge is requested to order SNCP, CORAF, COTRADE, and FININCO each to pay 20,000 Euros under article 700 of the New Code of Civil Procedure.

### FOR THESE REASONS

After consideration of articles 42 *et seq* and 59 *et seq* of the Law of July 9, 1991, 55 *et seq.* and 178 *et seq.* of the Decree of July 31, 1992,

After consideration of the decision of December 20, 2002 by the High Court of Justice of London, Queen's Bench Division Commercial Court, rendered enforceable in France on May 13, 2003,

The Execution Magistrate is hereby requested to

    - RULE IN FAVOR of the joinder of the suits filed by SNPC, CORAF, COTRADE, and FININCO against Kensington;

    - FIND that Kensington holds a writ of execution;

And Consequently,

    - FIND that the seizures carried out by Kensington against SNPC, CORAF, COTRADE, and FININCO are valid;

    - FIND that Kensington has taken no wrongful action;

    - FIND that SNPC, CORAF, COTRADE, and FININCO have suffered no damages;

    - DISMISS all of the claims made by SNPC;

As a counterclaim,

- APPOINT an expert to determine SNPC's seizable debts towards BNP at the time of Kensington's seizures, in order to:

- hear each party in a contradictory manner, to go to the site and if necessary to be aided by the police;

- request copies of, receive and study all contractual, legal or commercial documents held by SNPC, to be communicated to such expert in conformity with Article 243 of the New Code of Civil Procedure;

- review and determine whether, as of November 24, 2004, BNP held in whatever form, and particularly through accounts held in its name or in third parties' names, sums belonging to the Congo Republic or its emanations SNPC, CORAF, COTRADE, and FININCO, or to be attributed to them at maturity or subject to any conditions, the amounts and terms and conditions of such receivables to be specified as the case may be, as well as set their amount;

- respond, within the limits of this mandate, in a preliminary report to be submitted within three months from the service of the decision and to submit a final report within six months of such service.

And in any event,

-FIND that the suits filed by SNPC, CORAF, COTRADE, and FININCO against Kensington are abusive and order each of these entities to pay to Kensington an indemnity for damages of 20,000 Euros;

- ORDER each of the claimants jointly to pay to Kensington the amount of 20,000 Euros in conformity with article 700 of the New Code of Civil Procedure;

- ORDER SNPC to pay all tribunal expenses incurred in connection with this suit.

**LIST OF DOCUMENTS**

| | |
|---|---|
| Document No 1 | Response letters of the banks further to the seizures |
| Document No 2 | Decision of December 20, 2002 by the High Court of Justice of London |
| Document No 3 | Decision of May 13, 2003 ruling that the High Court's decision is enforceable (exequatur) |
| Document No 4 | Four Decisions by the Paris Court of Appeals, dated January 23 and July 3, 2003 |
| Document No 5 | Article, entitled "How to Fool Your Creditors?" ("*Comment feinter ses créanciers?*"), appearing in *La Lettre du Continent*, January 2003 |
| Document No 6 | Global Witness report dated March 2004 |
| Document No 7 | International Human Rights Federation report dated May 19, 2004 |
| Document No 8 | IMF Report dated 2004 |
| Document No 9 | Cash Pledge between SNPC and BNP dated September 2, 2002 |
| Document No 10 | Prepayment Contract No 7 |
| Document No 11 | Prepayment Contract No 8 |
| Document No 12 | Letter from Cabinet Dechert dated March 18, 2005 to the Execution Magistrate |
| Document No 13 | Letter from KPMG dated August 1, 2003 |
| Document No 14 | Excerpts from KPMG's report |
| Document No 15 | Agreement on the Holding and Management by Société Nationale des Pétroles du Congo of Rights, Assets and Holdings of the State in the Hydrocarbon Industry |
| Document No 16 | Memorandum by Cleary Gottlieb dated May 16, 2002 |
| Document No 17 | Excerpts from the auditor's report on FININCO |
| Document No 18 | Court of Appeals Versailles, [Decision] dated September 25, 2003 |

NEWYORK 4993510 v3 (2K)