UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x---------------------------------------------------------x

Kensington International Limited,

## 05 CV 5101

                Plaintiff,

05 Civ. _____ ( )

          v.

**REDACTED COMPLAINT**

Société Nationale des Pétroles du Congo,
Bruno Jean-Richard Itoua,
BNP Paribas S.A.,

              Defendants.

x---------------------------------------------------------x

RECEIVED
MAY 27 2005
U.S.D.C. S.      .Y.
CASHIERS

## I.   INTRODUCTION

This action is brought by Kensington International Limited, a creditor of the Republic of Congo ("Congo"), to recover damages in excess of US $100 million under the RICO statute. The action is based on defendants' establishment and conduct of corrupt organizations to enrich themselves at the expense of the people of Congo and at the expense of legitimate creditors of Congo, like Kensington. Specifically, defendants conspired to divert oil revenues from the Republic of Congo into the pockets of powerful Congolese public officials, while at the same time protecting both the oil and oil revenues from seizure by legitimate creditors. Starting with the initial creation of a new national oil company for Congo in 1998, Congolese officials, along with certain international financial institutions and oil traders, have conspired through schemes of increasing complexity to loot the Congolese national economy.[1]

One of these schemes involved the creation of a series of "Prepayment Agreements" utilizing "straw men," sham intermediaries, the only purpose of which was to facilitate,

complicate and hide the underlying financial transactions involved in the sales of Congo's oil and to divert significant portions of oil revenues into the hands of public officials rather than into the public fisc.

The funneling of Congo's oil sales through these Prepayment Agreements has several deliberate effects: (i) it insulates Congo's oil and oil revenues from seizure by legitimate creditors; (ii) it conceals the defendants' illegal activities so those activities might continue without interruption, public censure or possible prosecution; and (iii) it provides a steady stream of unaccounted for cash to enrich the defendants and their allies.  This scheme was carried out through a pattern of racketeering activities conducted by two different RICO enterprises, Société Nationale des Pétroles du Congo ("SNPC") and an association-in-fact composed of SNPC, the other defendants and certain other entities named herein, but not included as defendants.

The consequences of these racketeering activities have been the impoverishment of the people of Congo, a total and continuing default on all pre-existing unsecured Congo debt, the destruction of Congo's access to credit through legitimate sources and consequent dependence upon the defendants' costly Prepayment Agreements, an increased burden upon the world community to aid Congo through debt forgiveness and the Heavily Indebted Poor Countries program,  the enrichment of each of the defendants, the debasement of the nation's institutions and the entrenchment of a corrupt and predatory regime.

---

[1]    Only one scheme and one set of possible defendants are currently included in this Complaint.

The defendants have perpetrated their schemes in violation of United States laws against money laundering, 18 U.S.C. §1956, and against the transfer and receipt of stolen property which has crossed a United States border, 18 U.S.C. §§2314-2315.

II.     JURISDICTION AND VENUE

1.      This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 because the action involves a federal question under the RICO statute, 18 U.S.C. §1961 et. seq., and pursuant to the money laundering statute, 18 U.S.C. §1956(f).

2.      Defendants' actions have had a significant impact on United States commerce through losses of hundreds of millions of dollars from the United States economy due to the non-payment of legitimate debts.

3.      Significant actions by defendants in furtherance of their RICO scheme have occurred in the United States:

        a.      Substantial volumes of Congo's oil were sold in the United States;

        b.      premiums were paid to the New York branch of defendant BNP Paribas S.A. ("BNP Paribas");

        c.      the Prepayment Agreements involving BNP Paribas' New York branch and SNPC governed the transactions at issue in this Complaint; and

        d.      at least one U.C.C. Financing Statement was filed in the United States to protect BNP Paribas' interest in collateral backing the Prepayment Agreements.

4.      Personal jurisdiction over the defendants exists pursuant to 18 U.S.C. §1965 of the RICO statute, over foreign persons pursuant to 18 U.S.C. §1956(b)(2) of the money laundering statute and, in addition, over SNPC pursuant to 28 U.S.C. §§1605(a)(2) and 1330(b).

- 3 -

5.   Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b)(3) because it is a district in which a defendant may be found and there is no district in which the action may otherwise be brought.  In addition, venue is appropriate in this district pursuant to 18 U.S.C. §1965.

III.   THE PARTIES

6.   Plaintiff, Kensington International Limited ("Kensington"), is a corporation organized and existing under the laws of the Cayman Islands.  Plaintiff is in the business of, among other things purchasing and selling debt and equity instruments issued by domestic U.S. and foreign entities.  Kensington is managed by Elliott International Capital Advisors, Inc. a Delaware corporation with its principal place of business in New York City.  Kensington is the holder of judgments against Congo in excess of US $100 million based on Congo's non-payment of its debts.

7.   Defendant Société Nationale des Pétroles du Congo ("SNPC") was created by Congolese statute in April 1998.  SNPC is Congo's principal state oil company.

8.   SNPC officials regularly visit the United States for business purposes.

9.   Defendant Bruno Jean-Richard Itoua ("Itoua") until recently was SNPC's chief executive and is a citizen and resident of Congo.  He is a close protégé of Congolese President Sassou-Nguesso's, sharing the same ethnic and familial affiliations.

10.   Itoua has regularly visited the United States in connection with SNPC's business:

a.   In other litigation, Itoua declared that he visited Washington D.C. on SNPC business seven times from 1998 to 2002.

- 4 -

    b.  Itoua is listed as a participant in the annual West Africa Oil & Gas conference in Houston in November 2002, May 2003 and May 2004.

    c.  Itoua has made several visits to Chevron Texaco Corporation in San Ramon, California.

   11.  Defendant BNP Paribas is a bank organized and existing under the laws of France with its principal place of business in Paris. Defendant BNP Paribas maintains a substantial full-service branch office in this jurisdiction at 787 Seventh Avenue, New York, New York, and is authorized to do business in New York State by the New York State Banking Department. BNP Paribas is a financial institution which is engaged in, or the activities of which, affect interstate and/or foreign commerce.

<u>Other Relevant Entities</u>

   12.  Elliott Associates, L.P. ("Elliott") is a Delaware limited partnership with its principal place of business in New York City. Elliott has an approximate 40% participation interest in the Congolese debt held by Kensington. Elliott has thereby suffered a loss in excess of US $40 million as a result of defendants' schemes.

   13.  Other United States companies have suffered similar injury as a result of defendants' activities. For example, the National Union Fire Insurance Co., a unit of New York-based American International Group, Inc., paid approximately US $60 million in insurance claims arising from Congo's failure to honor legitimate payment obligations, while FG Hemisphere Associates LLC of New York holds approximately US $150 million of overdue and unpaid Congo debt.

14.    The loss of hundreds of millions of dollars from the United States economy has a significant negative impact on interstate and foreign commerce. The schemes at issue in this Complaint undermine the most fundamental bases of legitimate international trade and commerce.

15.    Denis Sassou-Nguesso ("President Sassou-Nguesso") has been the President of Congo since seizing power from its democratically-elected government through the actions of his personal militia in 1997.

16.    Elidovo Properties, Inc. ("Elidovo") is a corporation organized in 1997 and existing under the laws of the British Virgin Islands with its only identifiable place of business in a private residence in Monaco. Elidovo is capitalized at only $10,000 and it has no discernable personnel, expertise in oil trading nor technical capabilities. Elidovo acts as a purported oil trader and intermediary in many of the transactions at issue in this Complaint, yet serves no legitimate purpose in the sale of Congo's oil.

17.    Quantic Limited BVI ("Quantic") is a corporation organized in 1997 and existing under the laws of the British Virgin Islands. Quantic has an authorized share capital of US $2 million, an insubstantial amount in comparison to the size of the transactions at issue. Like Elidovo, Quantic acts as a purported oil trader and intermediary in certain transactions at issue in this Complaint, yet serves no legitimate purpose in the sale of Congo's oil.

18.    Notwithstanding Quantic's and Elidovo's lack of substance, these entities purportedly functioned as principals and sometimes borrowers and lenders in a series of financial transactions, the Prepayment Agreements, for which the collateral pledged individually ranged from US $60 million to US $225 million and in the aggregate totaled in excess of US $1 billion.

- 6 -

19.     Sami Maroun ("Maroun") is the principal owner and operator of both Elidovo and Quantic.  He is a Lebanese citizen, a resident of Monaco and a long-time associate of President Sassou-Nguesso.

20.     Tacoma Trading Ltd. ("Tacoma") is a corporation organized and existing under the laws of Great Britain with its principal place of business in Geneva and its registered office in London.  Tacoma is a small oil trader.  Upon information and belief, Tacoma, like Elidovo and Quantic, served no legitimate purpose in the sale of Congo oil at issue in this Complaint.

21.     SNPC UK Limited ("SNPC (UK)") is a corporation organized and existing under the laws of Great Britain, created nearly simultaneously with SNPC as the latter's marketing arm.  SNPC (UK) is presently in liquidation due to actions by Congo's creditors, but prior to the liquidation, Bruno Itoua was its chairman.  The primary function of SNPC (UK) was to physically isolate the documentation for SNPC's oil sales activity and financial transactions from oversight within the Congo.

IV.     BACKGROUND FACTS

**Congo and Oil**

22.     The Republic of Congo, Brazzaville, formerly the French Congo, is one of the most well-endowed countries in Africa in its wealth of natural resources -- minerals, forestry, agriculture and, most importantly, oil.  *The Time for Transparency:  A Report by Global Witness* ("*Global Witness*"), March 2004 at 18.[2]

---

[2]     Global Witness is a non-governmental investigative organization focusing on the link between the exploitation of natural resources and human rights abuses.

- 7 -

23.     Congo is currently the fourth largest oil producer in sub-Saharan Africa, with output of approximately 270,000 barrels per day, yielding at today's prices, an annual income of more than US $4 billion. *Global Witness* at 27. *Congo-Brazzaville Country Analysis Brief, U.S. Department of Energy*, July 2003. The value of Congo's oil reserves by conservative estimates (SNPC's estimates are many times larger) is more than ten times the country's external debt. *Selected Issues and Statistical Appendix, International Monetary Fund*, May 2004 at 43.

24.     International oil companies developed Congo's oilfields and now operate them pursuant to Production Sharing Agreements. Under the terms of these agreements, Congo receives royalties and a share of the profit oil, as defined under the agreements, which it may take in cash or "in kind," *i.e.*, in oil. For more than forty years following the beginning of oil production in 1957, the oilfield operators sold all of Congo's oil entitlement and remitted all amounts due to the government in cash with a full and detailed accounting.

25.     Before 1998, the state petroleum company, Société Nationale de Recherches et d'Exploitation Petroliere ("Hydro-Congo") was the exclusive vehicle through which Congo participated in the oil industry. Payments to Hydro-Congo and Congo during that period were made through these documented cash transfers which were intrinsically traceable and auditable.

26.     Congo achieved independence in 1960, but by the 1970s, it had succumbed to a Marxist-Leninist military dictatorship. President Sassou-Nguesso rose to preeminent power within the dictatorship by 1979. Democratic elections were held in 1991 following the collapse of the regime's patron, the Soviet Union, and President Sassou-Nguesso was stripped of his powers. In 1997, however, President Sassou-Nguesso returned from exile at the head of his personal militia, seizing power from the elected government in a bloody coup.

- 8 -

27.     President Sassou-Nguesso's regime has concentrated power in the hands of the president and he rules by decree. *Global Witness* at 26; *Country Report on Human Rights Pratices-2002, U.S. Department of State ("Country Report"),* March 31, 2003. "[M]ost of the day-to-day responsibility for government operations was in the hands of the executive branch." *Country Report* at Section 3. "The judiciary was corrupt, overburdened, under-financed, and subject to political influence." *Country Report* at 1.

28.     Members of the President's family hold significant governmental positions and run the key sectors of the economy in Congo. *Nepotists' Nirvana, Africa Confidential*, April 30, 2004, Vol. 45 No. 9; *Congo-Brazzaville Under Heavy Pressure Part II:  The French Banks' Bad Pledges*, Lindell, Henrik, *Temoignage Chrétien* ("*French Banks*"), September 16, 2004.

29.     To facilitate his ability to engage in schemes to divert Congo's national income and resources, President Sassou-Nguesso established a new national oil company, SNPC, just a few months after seizing power, despite the prior existence and expertise of Hydro-Congo.

30.     The presidential decrees establishing SNPC during the course of 1998 granted it the exclusive right to take and sell all the country's oil entitlements, appointed SNPC the state's sole representative in the oil sector and transferred to SNPC the most valuable assets of Hydro-Congo without compensation.

31.     SNPC's chief executive officer since its inception until very recently was Bruno Itoua. Itoua wielded absolute power over SNPC in accordance with Article 16 of the company's by-laws and in practice reported exclusively to President Sassou-Nguesso.  In October 1999, Itoua granted himself sole signatory power over SNPC's transactions with BNP Paribas.  Itoua

was promoted to Minister of Energy and Hydroelectricity by President Sassou-Nguesso in January 2005.

32.     Once SNPC was established, Itoua informed the companies operating Congo's oilfields that henceforth SNPC would take the oil entitlements of Congo in kind, although no one in the regime had any discernable experience in or knowledge of oil trading.

33.     The new policy to take Congo's entitlements in kind rather than in cash rendered it virtually impossible for anyone outside SNPC, even Congo's Ministers for Hydrocarbons and for the Economy Finance and the Budget, to determine the true amounts received by Congo and the terms under which such oil had been divested. "Petroleum industry in Congo-Brazzaville needs transparency," *Afrol News,* June 6, 2001.

34.     In contrast to the traceable and intrinsically transparent cash payments of the past, SNPC's transactions are carried on in secret, beyond government and independent auditing control. *IMF Country Report No. 04/232*, July 2004 ("*IMF Report*") at 26, 28, 47, 52, 56, and 59-60. "Société Nationales des Pétroles du Congo (SNPC) . . . appears to be managed without any transparency.*" Global Witness* at 29.

35.     This lack of transparency is of grave concern to multilateral financial institutions like the International Monetary Fund ("IMF") charged with exercising financial oversight of sovereign governments. "[I]t will be critical for the national oil company to fully contribute to ongoing efforts to improve transparency and accountability in the oil sector." *IMF Report* at 26.

36.     At the IMF's insistence, SNPC has twice engaged external auditors, yet on both occasions the auditors reported that SNPC refused to reveal marketing and sales information and that the financial relationship between SNPC and the state is undocumented and not verifiable.

- 10 -

*International Monetary Fund Public Information Notice No. 04/72*, July 22, 2004; *Report on the Audit of SNPC, KMPG,* August 1, 2003 at 3.

37.    To further obscure its oil sales transactions, SNPC has maintained the relevant documents off-site in England in the possession of SNPC (UK) rather than keeping records in Congo.  Itoua has consistently refused to make these records available to the company's auditors. *General Auditors' Report, Société National Des Pétroles Du Congo, Annual Accounts - Year Ended on 31 December 2000*, Ernst & Young at Section 2.1.2; *Final Report of Review of Financial Statements of Société Nationale des Pétroles du Congo,* KMPG, August 1, 2003 at 4.

38.    After seven years of prevarication by the Sassou-Nguesso regime, in the spring of 2004, the IMF finally persuaded Sassou-Nguesso's regime to disclose rudimentary statistics about oil production and the Congo's oil entitlements.  This action prompted the IMF to grant the Congo a Poverty Reduction and Growth Facility in December 2004.  These disclosures, however, reveal nothing about where or how Congo oil is sold, or for what price, or how SNPC allocates and accounts for its proceeds.  Indeed, as reported in *Africa Confidential*, the government has refused to release chapter 6 of the KPMG audit which highlights suspicious transactions. *Id.* at 8, Vol. 45 No. 25, December 17, 2004.  Consequently the IMF remains concerned about the absence of accountability in Congo's oil revenues. *IMF Report* at 9, 28.

39.    In March 2005, the United Nations Office for Coordination of Humanitarian Affairs reported continuing problems with transparency in the Congo.  "The government deliberately does not publish certain figures. 'We cannot fill the population with numbers and other facts that they don't understand,' Serge Ndeko, consultant in the ministry for hydrocarbons, said. 'The oil money belongs to the Congolese.  The problem is to know what is being done with

it, without stuffing the people unnecessarily with figures.'" *Invest oil revenues in public sector, NGOs tell government,* IRIN, March 2, 2005.

40.     The regime's continued secrecy about the details of oil sales and revenues has enabled Itoua, President Sassou-Nguesso and their allies to freely plunder Congo's national income.

41.     Press reports of high level corruption in the second Sassou-Nguesso regime began as early as 1999:

        a.      A 1999 French Parliamentary Report, reprinted on the world-wide web, quoted a letter about President Sassou-Nguesso from several journalists and non-profit investigators. "In parallel he organizes a return to totalitarianism, and usurps the oil revenue." The report was referenced two days later in an article in *Le Monde. Des Parlementaires appellant à un plus strict contrôle des compagnies pétrolieres*, October 15, 1999.

        b.      A July 2000 article in *La Lettre du Continent* reported how President Sassou-Nguesso and Itoua rapidly organized substantial oil-backed Prepayment Agreements with Paribas, the agreements at issue in this Complaint, concluding that "[t]he great mystery of Congo is the destination of all these oil pre-financings. Many strategic projects for the country lie idle without explanation whereas the money is there."

        c.      The IMF specifically found "abuses" in the management of public funds. *Economy: Congo disqualified for Debt Relief by the IMF,* Panapress, November 2001.

        d.      Rigobert Roger Andély, until recently Congo's Minister of the Economy, Finance and the Budget, took responsibility for the IMF's conclusion that Congo completely disregarded the Convention signed by Congo and SNPC which required SNPC to transfer oil

revenues to the Congo within eight days of receipt. *Rigobert Andely, Minister of Finance takes Responsibility for IMF's Negative Conclusion,* l'Agence France-Presse, November 7, 2002.

        e.      Dan Ghuran, head of the IMF's Africa department, reported that SNPC held onto revenues that belonged to the state and failed to transfer a part of the revenues to the state treasury in a timely manner. *Poor performance in the Congo: The IMF cancels planned negotiations* l'Agence France-Presse, October 27, 2003.

        f.      In November 2003, a journalist from *L'Observateur*, a Congolese weekly, alluded to the wealth and corruption of "the family [of Sassou-Nguesso]" and highlighted Itoua's excessive salary of 115,000 euro/month (currently US $1.8 million per year) in a country where more than 70% of the population lives on less than US $1 per day. The newspaper was fined so heavily it was forced to close. *French Banks* at 16.

        g.      On February 19, 2004, *La Lettre du Continent* reported that the IMF would oblige Congo to regularly publish its oil production and oil revenues. "Up until today, the Congolese President has been resisting. He's not so interested in scores of creditors finding out how many hundreds of millions of dollars he's got up his sleeve. . . ."

        h.      Criticism of "high-level racketeering and corruption" and the sale of state assets to insiders at "knockdown prices" is also growing within Congo. *Africa Confidential*, April 30, 2004, Vol. 45 No. 9 at 6.

        i.      In December 2004, *Africa Confidential* reported, "[a] further issue is SNPC's trading activities. Up to 13 per cent of each oil cargo has gone missing, swallowed up in advance payment loans from oil traders involving annual interest charges of 140 per cent, as well

as other costs related to 'layering' – adding complex, untraceable transactions involving offshore accounts, shadowy traders and front companies." *Id.* at 8, Vol. 45 No. 25, December 17, 2004.

      j.     Speaking before a session of Congo's legislature in December 2004, former Minister of the Economy, Finance and the Budget Andély admitted that despite the oversight and disclosure required by the IMF, the regime recently failed to declare two oil cargos sold into the international markets, an irregularity of approximately US $100 million at current oil prices. *IZF net,* January 30, 2005.

42.     Transparency International has consistently rated Congo as exhibiting one of the highest levels of corruption. *Transparency International Corruption Perceptions Index 2003 and 2004.*

43.     Oil-backed, offshore Prepayment Agreements present vast opportunities for misappropriation and malfeasance, and the IMF has accordingly insisted that such borrowing by Congo should cease. The Sassou-Nguesso regime repeatedly pledged to do so and even asserted its success in avoiding such financing in 2003, while at the same time continuing to surreptitiously undertake new Prepayment Agreements with the defendants, albeit in more complex and less detectable forms. *IMF Report* at 59 and 68. *International Monetary Fund, Republic of Congo, Staff Report for The 2004 Article IV Consultation and a New Staff-Monitored Program,* May 12, 2004 at 59 and 68; *Letter of Intent,* Mathias Dizon, Minister of the Economy, Finance and the Budget to Hörst Kohler, Managing Director, IMF, May 3, 2002; *Letter of Intent*, Rigobert Andely, Minister of Economy, Finance and the Budget to Hörst Kohler, Managing Director, IMF, April 11, 2003; *Letter of Intent*, Rigobert Andely, Minister of Economy, Finance

- 14 -

and the Budget to Anne O. Krueger, Managing Director, IMF, March 31, 2004. See paragraph 84 *infra*.

44.     Large amounts of oil revenues are not reflected in Congo's national budget. From 1999 to 2002, the IMF estimated that government accounts underreported the amount of oil revenues received by at least US $248 million. *Global Witness* at 26. None of SNPC's after tax income has been transferred to the budget. *IMF Country Report 03/193*, June 2003 at 20. "Where are the sums going? Many Congolese. . ., point their fingers at the opulence in which the ruling class lives." *French Banks* at 15.

45.     Congo today has among the highest per capita debt burdens in the world and nearly 60% of that debt, the older, unsecured debt the repayment of which has been subverted by the creation of SNPC and the implementation of Prepayment Agreements, is in default. *IMF Report* at 36.

46.     Seventy percent of Congo's three million people live on less than a dollar a day, notwithstanding that the government's annual share of oil field production should yield, at today's prices, more than US $1 billion. *Global Witness* at 27.

47.     Congo's dismal economic performance, despite substantially increasing petroleum exports and prices, is strong evidence of corruption on a massive scale.

48.     While the citizens of Congo live in abject poverty, and the nation sinks deeper into debt, the rulers of Congo live in opulent luxury.

49.     Sassou-Nguesso and Itoua have lavish lifestyles that are not consistent with their official positions or any known legitimate private activities. Indeed, in October 1997, the *New*

*York Times* reported that Sassou-Nguesso had become known as a "Pierre Cardin Marxist" because of his fondness for luxury.

### The 1984 and other Loans To Congo:

50.     By a loan agreement dated April 18, 1984 (the "Loan Agreement"), Congo borrowed US $13,500,000 from a group of lenders, led by Banque Paribas, which later became BNP Paribas, in order to finance construction of the Brazzaville-Mayama-Kindamba Highway in Congo. Under the terms of this Loan Agreement, Banque Paribas assumed a variety of responsibilities towards the lenders, by virtue of its role as Agent, including monitoring Congo's performance and financial condition. Banque Paribas and later BNP Paribas has therefore, at all times, been fully apprised of the payments Congo has made, or failed to make, pursuant to the Loan Agreement and remains responsible for monitoring Congo's financial condition in general.

51.     Upon information and belief, BNP Paribas also acts as reconciliation agent to Congo with respect to its debt. In that capacity, BNP Paribas has long assisted Congo in tracking the buyers and sellers of Congolese debt and maintaining an accurate database of Congo's creditors and the amounts due to each creditor and the overall performance of Congo in honoring its debts.

52.     BNP Paribas has also served as President of an informal committee of commercial bank creditors known as the London Club, for the purpose of negotiating a settlement of the Congolese government's outstanding and unpaid debt to commercial banks.

53.     In its capacities as Agent under the Loan Agreement, as reconciliation agent for Congo, and as President of the creditors' committee, BNP Paribas has had unparalleled and continuous contact with the Congolese government and has thus enjoyed privileged access to

- 16 -

significant information about Congo's repayment of its debts and about its financial condition in general.

54.     Pursuant to §(9)(d) of the Loan Agreement, Congo also agreed with the lenders that the claims of each of the lenders under the Loan Agreement would rank as general obligations of Congo at least *pari passu* in right and priority of payment with the claims of all other creditors of Congo.

55.     Pursuant to §(9)(d) of the Loan Agreement, Congo agreed not to create or allow to subsist any preferential arrangement in favor of any creditor over any of the assets or revenues of Congo or of any Congolese Public Entity in favor of any creditor.

56.     "Congolese Public Entity" was defined in §1 of the Loan Agreement to mean Congo or any agency, authority, department, ministry or instrumentality of Congo and any person directly or indirectly controlled or wholly-owned by Congo or by a Congolese Public Entity.  According to this definition, SNPC is undoubtedly a Congolese Public Entity.

57.     Courts in France, England and the Cayman Islands have found that SNPC is the alter ego of Congo.  In those cases and in other litigation, however, Congo and SNPC have consistently argued that SNPC is not an alter ego of Congo, but is a "distinct entity."

58.     Congo is in default of its commitments under the terms of the Loan Agreement having failed to repay any portion of the principal amount loaned to it and interest due on such amount since October 1985.  Congo has ignored repeated demands by lenders and refused to comply with its obligations due under the Loan Agreement.

59.     Through assignments occurring between 1996 and 2001, Plaintiff obtained all of the "right, title and interest" as lender under the Loan Agreement, including the right to receive

- 17 -

payments of principal due under the Loan Agreement, together with all past and future unpaid and accrued interest.

60. During this same period, Plaintiff also obtained all of the "right, title and interest" as lender under a March 8, 1983 loan to Congo of U.S. $10 million, a May 12, 1983 loan of US $4.28 million to the Congolese Ministry of Transport, guaranteed by Congo, and a December 21, 1983 loan to Congo of US $4.8 million. Agreements for each of these loans contained fundamentally identical negative pledge and/or *pari passu* provisions. Banque Paribas is the Agent for the lenders in the May 12, 1983 loan.

61. Congo is in default of its commitments under the terms of each of the March 8, 1983, May 12, 1983 and December 21, 1983 loan agreements, having failed to repay any portion of the principal amounts owed by it and interest due on such amounts since October 1985. Congo has ignored repeated demands and refused to comply with its obligations under these loan agreements.

## Judgments Against Congo

62. On December 20, 2002, pursuant to Plaintiff's request, the Commercial Court, Queen's Bench Division of the High Court of Justice, in London, England ("the Commercial Court") granted judgment in favor of Plaintiff and against Congo regarding the first Loan Agreement (the "English Judgment"). Under the English Judgment, the Commercial Court ordered Congo to pay Kensington US $56,911,991.47, plus interest at the rate of 8% per annum from the date of the English Judgment and costs to be assessed. A true and correct copy of the English Judgment is annexed hereto as Exhibit A.

63.     On April 21, 2003, two months after Kensington's service of the English Judgment upon Congo, this judgment became final.

64.     On January 21, 2003, the Commercial Court granted two additional judgments relating to the other loan agreements, one for US $22,438,606.91 and another for US $19,795,970.89, both together with interest at 8% per annum from the date of the judgment and costs to be assessed. True and correct copies of each judgment are annexed as Exhibits B and C.

65.     On January 28, 2003 the Commercial Court granted judgment for US $1,316,027.48, relating to the fourth loan agreement, together with interest at 8% per annum from the date of the judgment and costs to be assessed. A true and correct copy of this judgment is annexed as Exhibit D.

66.     The three judgments rendered in January 2003 were served together on Congo on May 28, 2003 and became final two months thereafter.

67.     Congo has failed to repay any portion of these judgments and has not demonstrated any intention to do so.

68.     Plaintiff has been unable to execute on any of these judgments because of the collusion and racketeering activities of the defendants.

**Defendants' Illicit Transactions**

69.     Paribas, which merged in 2000 with Banque Nationale de Paris to form BNP Paribas, made its first oil-backed loans to the regime of President Sassou-Nguesso through SNPC in February 1999, shortly after SNPC's formation and barely a year after Sassou-Nguesso overthrew Congo's elected government. The merged bank subsequently organized not fewer than a dozen Prepayment Agreements in which funds were advanced against deliveries of oil that

- 19 -

were scheduled to take place at future dates, channeling in total more than a billion dollars of Congo's oil revenues through its accounts.

70.     To standardize the terms and conditions of these loans, on or about October 14, 1999, SNPC entered into a General Conditions Agreement with BNP Paribas that provided the framework for a series of at least nine separate, but related loans.

71.     The Prepayment Agreements were increasingly complex, convoluted and unconventionally structured financial transactions based upon simultaneously executed contractual arrangements between defendants and others through which BNP Paribas made oil-collateralized pre-financing loans to SNPC, which SNPC sold Congo's oil to repay.  When legal actions by Congo's creditors threatened to disrupt the Prepayment Agreements, these arrangements were deliberately modified to provide greater obscurity for the transactions and greater protection from attachment for SNPC's assets.  Each defendant played a role in the structuring and operation of these Prepayment Agreements.

72.     Several of the participants in these Agreements were not credible or commercially viable entities, yet they assumed key roles in transactions totaling hundreds of millions of dollars.

73.     Each Prepayment Agreement and its ancillary components encompasses cross-border transactions and events in Congo, France, the United States and elsewhere.  The signatories to the General Conditions Agreement and to the individual Prepayment Agreements explicitly acknowledged that the entirety of these arrangements comprise "a single global economic transaction."

74.    Much of the workings of the Prepayment Agreements were jealously guarded and religiously hidden from creditors, the international financial community and the people of Congo.  The following facts, however, are presently known:

a.    All the arrangements necessary to carry out the Prepayment Agreements were simultaneously executed.

b.    SNPC sold Congo's oil without providing full compensation to Congo in violation of Article 5.3 of the Convention between Congo and SNPC, which required that all oil revenues be forwarded to the Congo within eight days.

c.    SNPC received cash as prepayment for oil to be delivered at future dates.

d.    As collateral for the prepayment, SNPC assigned and pledged Congo's rights in its oil cargos to BNP Paribas, before the oil left Congo's territorial waters.  These assignments protected the oil from attachment by creditors like the Plaintiff.

e.    An established international bank, BNP Paribas demonstrated obvious disregard for basic principles of lending and due diligence in regard to these transactions:

(1)    BNP Paribas did not identify the purposes for these loans or place any normal restrictions upon the use and disposition of the funds.

(2)    BNP Paribas allowed SNPC to borrow money against Congo's assets.

(3)    BNP Paribas did not verify that the loan proceeds were transferred to Congo.

(4)     BNP Paribas disregarded obvious indicia of the lack of

creditworthiness of Congo, SNPC, Elidovo, Quantic and Tacoma,

including:

(i)     public reports of high-level corruption within the regime

from as early as 1999;

(ii)    Congo's existing default upon at least 60% of its total debt

to external creditors, much of it under loan agreements for

which BNP Paribas or its predecessor institutions were the

originator, agent, reconciliation agent or designated

settlement negotiator;

(iii)   the obscurity and lack of substance of the "straw men"

Elidovo and Quantic, notwithstanding their central position

in the Prepayment Agreements;

(iv)    the personal relationship between Maroun, who controlled

Quantic and Elidovo, and President Sassou-Nguesso,

suggesting obvious conflicts of interest and the potential for

malfeasance;

(v)     SNPC's lack of any financial statements, and its subsequent

refusal to cooperate with auditors engaged at the behest of

the IMF;

(vi)    the IMF's numerous analyses and reports of irregularities in

SNPC's handling of Congo's oil revenues;

(vii)    lack of concrete assurances from the oilfield operators that sufficient quantities of oil would be available to Congo and SNPC to service the loans and that the oil would be pledged to BNP Paribas; and

(viii)    well publicized litigation by other unpaid creditors which forced similar prepayment agreements with SNPC into default.

f.    BNP Paribas disbursed hundreds of millions of dollars against the signature and authority of one individual, Bruno Itoua.

g.    BNP Paribas arranged Covered Oil Options providing price guarantees for the oil which served as collateral under certain of the Prepayment Agreements. The Covered Oil Options were negotiated, executed on behalf of and carried on the books of the New York branch of BNP Paribas.

h.    The terms of the Covered Oil Options required SNPC to deposit and maintain a balance ranging from US $1 million to $3 million or more with the New York branch of BNP Paribas and to pay an option premium to BNP Paribas' New York branch.

i.    To protect the Congo's oil sales and their proceeds from attachment by unpaid creditors like Kensington, the defendants routed these transactions through the "straw men" Elidovo, Quantic and Tacoma, each of which allowed BNP Paribas to entirely subsume their interests through a complex web of assignments, cessions and delegations. By consigning the oil to the bank, which at all times had substantial loans outstanding to Congo through SNPC,

- 23 -

the cargos and their proceeds were protected against seizure by other creditors because of the bank's preeminent right of offset.

   j.   The Prepayment Agreements presented the façade of typical commodity lending transactions, yet they were far from conventional. BNP Paribas issued letters of credit on behalf of the "straw men" Elidovo and Quantic in favor of SNPC, and then made costly loans to SNPC secured by these, its own letters of credit. No diligent lender would extend credit to such insubstantial intermediaries, and no "arm's length" buyer would conceivably acquiesce to the extraordinary array of assignments, cessions and delegations required of the intermediaries by BNP Paribas, such that the bank could retain title to and complete control over Congo's oil.

   k.   The unusual structure and complexity of the Prepayment Agreements was explicitly intended to enable BNP Paribas to deliver Congo's oil into the hands of international buyers and deliver the sales proceeds back to the Sassou-Nguesso regime without interference from Congo's unpaid creditors and without oversight from anyone outside the regime's inner circle. Each loan's initial disbursement provided SNPC and the regime with a substantial portion of Congo's future commercial income in a single payment outside of government controls. The remaining income was protected and delivered to SNPC and the regime over time by BNP Paribas, because it constituted collateral in excess of that needed to repay the bank's loan. Upon information and belief, the substantial, above-market fees collected by BNP Paribas for the numerous elements of these complex transactions effectively constitute the premium charged for laundering both oil sales and cash revenues for the regime.

   l.   In addition to aiding BNP Paribas in laundering both oil sales and cash revenues to SNPC and the Sassou-Nguesso regime, the use of offshore intermediaries such as

Elidovo, Quantic and Tacoma provide ample opportunity for the regime to extract and divert illicit fees, commissions and pricing spreads. Elidovo and Quantic in particular are owned by Maroun and other individuals with close personal relationships with President Sassou-Nguesso.

        m.     The intermediaries, especially Quantic and Elidovo, are vastly undercapitalized relative to their purported roles as principals in the oil sales supporting the Prepayment Agreements. Quantic and Elidovo also lack any discernable capacity or experience in oil trading. By issuing letters of credit on their behalf, BNP Paribas assumed credit and performance risks entirely unsupported by any legitimate business purpose.

        n.     When the ultimate buyer of the oil was in the United States, BNP Paribas delivered oil to the United States as consignee and title was transferred to that buyer within the United States. Oil shipments to the United States pursuant to the Prepayment Agreements continued at least into April 2005.

        o.     Upon receipt of the oil, the ultimate buyer made payment, or sent approval of payment, from the United States.

        p.     Upon information and belief, loan disbursements and oil sales proceeds relating to the Prepayment Agreements were paid by BNP Paribas into Banque Gabonaise et Française Internationale ("BGFI"), a small Gabonese bank reportedly owned and/or controlled by the president of Gabon who is the son-in-law of President Sassou-Nguesso.

        q.     The Prepayment Agreements concealed the amount of revenue received by SNPC as well as the location and disposition of Congo's oil.

        r.     SNPC's sales of Congo's oil have been administered by SNPC (UK), and detailed records relating to such sales are maintained only in London. SNPC has refused to

make these documents available to its own auditors, making it impossible for anyone outside the regime's inner circle to reconcile the financial relationship between Congo and SNPC.

s.     In the course of the Prepayment Agreements, BNP Paribas has taken loan repayments for itself alone, in violation of *pari passu* provisions of the loan agreements and its fiduciary duty as Agent for the other creditors.

t.     The control over the Congo's oil sales enjoyed by the racketeering enterprises has deprived existing creditors of repayment, virtually eliminated Congo's access to new credit through legitimate channels, excluded competition and solidified the ability of BNP Paribas and its allies to extract exorbitant fees.

75.     Upon information and belief, the following oil sales were made pursuant to the Prepayment Agreements. In each of these transactions, the value of the oil used as collateral far exceeded the maximum loan amount. The disposition of the revenue above the loan repayment amounts has not been fully accounted for by SNPC and significant opportunities existed for the diversion of these public funds for private use.

a.     On February 15, 1999, amended on March 23 and May 11, 1999, Quantic was the purported purchaser of 7,800,000 barrels of oil with a true value of approximately US $125 million. The loan backed by this oil sale was a maximum of US $58.5 million. This sale pre-dated the General Conditions Agreement, but contained comparable provisions.

b.     On October 14, 1999, Elidovo was the purported purchaser of 2,825,000 barrels of oil with a true value of approximately US $62 million. The loan backed by this oil sale was for a maximum of US $35 million.

- 26 -

c.    On November 25, 1999, Elidovo was the purported purchaser of three cargos of oil with a true value of approximately US $76 million. The loan backed by this oil sale was for a maximum of US $31.5 million.

d.    On March 1, 2000, Elidovo was the purported purchaser of two cargos of oil with a true value of approximately US $60 million. The loan backed by this oil sale was for a maximum of US $30 million.

e.    On October 24, 2000, amended on December 7, 2000 and on May 11, 2001, Elidovo was the purported purchaser of a total of eight cargos of oil with a true value of approximately US $225 million. The loan backed by this oil sale was for a maximum of US $120 million.

f.    On September 18, 2001, Elidovo was the purported purchaser of six cargos of oil with a true value of approximately US $152 million. The loan backed by this oil sale was for a maximum of US $75 million. It is unclear whether this particular loan was ever disbursed.

g.    On November 23, 2001, Tacoma was the purported purchaser of butane, propane, and 550,000 barrels of oil with a true value of approximately US $20 million. The loan backed by this oil sale was for a maximum of US $13 million.

h.    On February 15, 2002, Tacoma was the purported purchaser of propane, butane and 1,100,000 barrels of oil with a true value of approximately US $26 million. The loan backed by this oil sale was for a maximum of US $20 million.

   i.      On June 18, 2002, Quantic was the purported purchaser of seven cargos of oil with a true value of approximately US $177 million. The loan backed by this oil sale was for a maximum of US $70 million.

   j.      On September 2, 2002, Quantic was the purported purchaser of seven cargos of oil with a true value of approximately US $191 million. The loan backed by this oil sale was for a maximum of US $80 million.

   76.    Each transaction in paragraph 75 followed the general pattern described in paragraph 74.

   77.    In August 2002, certain unpaid creditors of Congo, (not including the Plaintiff) obtained a preliminary injunction in the Grand Court of the Cayman Islands against the release of excess collateral pledged in support of a different, but similar oil-collateralized prepayment agreement to SNPC and Congo. The lending banks, lacking BNP Paribas' intimate relationship with the Sassou-Nguesso regime, immediately declared the facility in default. SNPC thereafter ceased to provide oil cargos for repayment, resulting in significant losses for the bank syndicate. One of the strongest indications of the existence and nature of the association-in-fact among the defendants is their adaptation and continuation of the Prepayment Agreements following this Cayman legal action.

   78.    The Cayman court's decision was reported in industry publications, and the proceedings highlighted Congo's and SNPC's lack of reliability and creditworthiness. Had the relationship among the defendants been "arm's length" and based upon legitimate business objectives and standards, there can be little doubt that BNP Paribas would have at least sought to

progressively reduce its lending exposure. Instead, the defendants reshaped their relationship to perpetuate and further protect their money laundering scheme.

79.     In October 2002, BNP Paribas, SNPC, and their lawyers met to consider ways of restructuring the Prepayments Agreements to evade creditor's legal actions.

80.     In December 2002, BNP Paribas granted a new Prepayment Agreement to SNPC, with modifications explicitly intended to further shield the lending arrangement from other creditors. For example, the connection to the General Conditions Agreement was severed, the use of a letter of credit was eliminated, and a "hair trigger" default clause was inserted to give BNP Paribas full control over the collateral in the event of litigation by other creditors. The new loan was utilized to prematurely repay an existing Prepayment Agreement without such protections.

81.     Even more significant, in June 2003 the structure of yet another new loan by BNP Paribas was recast as a back-to-back lending arrangement between BNP Paribas and Elidovo, and then Elidovo and SNPC. The linkages between the two halves of the lending arrangement leave no doubt that in the aggregate this is fundamentally a loan from BNP Paribas to SNPC, yet the greater involvement of the intermediary Elidovo provides the bank with "plausible deniability" regarding its continuing relationship with SNPC, as well as increased protection for the cash flow and collateral. Because this new structure of lending to such an insubstantial intermediary presents even greater risks for the bank, BNP Paribas had no legitimate motivation for entering into such an arrangement.

82.     The close cooperation between the bank, the intermediaries and SNPC and their ability to promptly achieve changes of this high level of creativity and complexity evidences

their clear collective intent to evade creditors, avoid oversight and perpetuate their corrupt enterprises. The promptness and efficiency of the adjustment to new risks is a product of defendants' longstanding cooperative behavior and highlights the existence of their corrupt organizations.

83.     Upon information and belief, the following sales took place pursuant to amended agreements and new back-to-back structures.

a.     On December 6, 2002, Tacoma was the purported purchaser of butane, propane and 3 cargos of oil with a true value of approximately US $80 million. The loan backed by this oil sale was for a maximum of US $30 million.

b.     On June 23, 2003, Elidovo was the purported purchaser of 2,760,000 barrels of oil with a true value of approximately US $83 million. The loan backed by this oil sale was for a maximum of US $40 million.

c.     In January 2004, Elidovo was the purported purchaser of oil with a true value of approximately US $75 million. The loan backed by this oil sale was for a maximum of US $45.5 million.

84.     Each transaction in paragraphs 75 and 83 was carried out in secret. In each instance, SNPC sold Congo's oil without providing full compensation to Congo; BNP Paribas provided oil-collateralized financing; the value of the oil pledged as collateral far exceeded the amounts of the loans; a small and obscure oil trader was the purported purchaser of the oil; loan repayments made were for the benefit of BNP Paribas only; Congo did not receive the full revenue from these oil sales; upon information and belief, lending and oil sale proceeds were

channeled into a bank in Gabon; and the revenue passing through the schemes far exceeded the loan amounts.

85.    In the transactions described in paragraphs 75 and 83, approximately US $1.4 billion dollars in oil sales was pledged to support approximately US $650 million in loans. This excessive over collateralization served to shield a substantial portion of Congo's oil revenues from both oversight and attachment by creditors. The diversion of the country's principal source of commercial income through superfluous and unaccountable third parties and maximized the opportunities to divert public funds for private use.

86.    In each of the transactions described in paragraphs 75 and 83, it was the explicit intention of the defendants to preserve the oil revenues for themselves and to deny legitimate creditors any access to those revenues. A confidential memorandum prepared by SNPC's lawyers relating to the similar prepayment agreement in Cayman states:

> The choice of the legal structure was made as a result of the following considerations. In order to protect their rights to the petrol, whose sales revenues by SNPC will be used to repay the loan, the lenders have suggested to place between them and SNPC an independent legal entity that would be the owner of these rights, the SPV. The creditors of the Republic of Congo and/or SNPC would thus in principle be prevented from seizing this petrol from the hands of SNPC, given that the SPV, benefiting from an independent status with respect to SNPC and the Republic of Congo, could assert its right of ownership on said petrol to prevent their attempts of a seizure.

87.    The transaction of January 2004, paragraph 83(c), offers a particularly vivid demonstration of the true nature and purpose of the RICO enterprises. **REDACTED**

88. **REDACTED**

89. **REDACTED**

90.   **REDACTED**

Not long afterward, a special board of inquiry empanelled by the legislature of the Democratic Republic of Congo and backed by the United Nations uncovered serious corruption and theft relating to the settlement between SNE, SNEL and ConsultCo, resulting in dismissal of the entire senior management of SNEL by President Kabila on November 25, 2004.

91.   Upon information and belief, the defendants organized and participated in the transactions described in paragraphs 75 and 83 with clear knowledge of those transactions' illegality:

a.   Upon information and belief, Itoua, as President and General Manager of SNPC, was aware that SNPC obtained oil from Congo without full compensation and that he personally received a portion of the oil revenues. He was aware that the Prepayment Agreements were carried out in secret to facilitate those illegal transactions and to conceal the source and ultimate disposition of the proceeds. To further those objectives, he refused to provide to SNPC's auditors essential records relating to the sales of Congo's oil. He personally signed all documents comprising the Prepayment Agreements on behalf of SNPC.

b.   Upon information and belief, SNPC was aware that it received oil from Congo without compensation, that it failed to forward the full amounts due to Congo; that the transactions in which it was involved were highly unusual and outside normal and legitimate

- 33 -

business arrangements; and that it failed to provide the level of transparency for its transactions demanded by the international financial community and that the lack of transparency allowed for the diversion of Congo's wealth and income.

c.      Upon information and belief, BNP Paribas, because of its long and close association with the Sassou-Nguesso regime and the various roles it performed in relation to Congo debt, was well aware of SNPC's failure to deliver either oil revenues or loan proceeds to Congo; knew that Congo failed to repay other creditors in violation of the Loan Agreement and that other creditors had taken aggressive action which had forced similar loans into default; knew that the IMF had refused to deal with Congo because of the lack of transparency in its oil sector and its continuing participation in oil-collateralized borrowing; and knew that the Prepayment Agreements were outside normal commercial practices and standards, and that their distinctive structures served no legitimate business purpose, but were used primarily for purposes of concealment and misappropriation. Beginning in 1999, shortly after Paribas began its lending, BNP Paribas knew that the regime had been accused of massive corruption.

d.      Furthermore, the Bank Secrecy Act, 31 U.S.C. §5318(h)(1), required every financial institution to establish an anti-money laundering program by April 24, 2002. Adherence to the standards of these requirements would have informed BNP Paribas that the transactions at issue in this Complaint were suspicious, uncommon, not economically reasonable and therefore required greater scrutiny.

92.     In all relevant respects, Defendants acted in concert with each other and with others to further their scheme, with the fundamental goals of preserving oil revenues for

- 34 -

themselves, denying legitimate creditors any access to these revenues and concealing their illegal
activities.

## V.    RICO VIOLATIONS

93.    This Complaint contains a total of four claims for relief under various provisions
of the RICO statute. For the first two claims, the RICO enterprise referred to is the "SNPC
Enterprise." For the second two claims, the RICO enterprise referred to is the "Prepayment
Enterprise."

94.    The first claim for relief alleges that defendants Itoua and BNP Paribas
participated in the management and operation of the affairs of the SNPC Enterprise through a
pattern of racketeering activity, within the meaning of the 18 U.S.C. §1962(c) which included,
but was not limited to, the planning and carrying out of a scheme to misappropriate Congo public
fund for the private benefit of Congo public officials and to protect Congo oil and oil revenues
from the reach of legitimate creditors, thereby causing injury to Plaintiff.

95.    The second claim for relief alleges that these defendants, through the SNPC
Enterprise, conspired to violate subsection (c) of 18 U.S.C. §1962, in violation of 18 U.S.C.
§1962(d), which conspiracy included planning and carrying out the scheme described in the
previous paragraph with its consequent injury to Plaintiff.

96.    The third claim for relief alleges that defendants SNPC, Itoua and BNP Paribas
formed an association-in-fact, hereinafter referred to as the "Prepayment Enterprise" and
participated in the management and operation of the Prepayment Enterprise through a pattern of
racketeering activity within the meaning of 18 U.S.C. §1962(c) which included, but was not
limited to, the planning and carrying out of a scheme to misappropriate Congo public funds for

the private benefit of Congo public officials and to protect Congo oil and oil revenues from the reach of legitimate creditors, thereby causing injury to Plaintiff.

97.     The fourth claim for relief alleges that these defendants, through the Prepayment Enterprise, conspired to violate subsection (c) of 18 U.S.C. §1962 in violation of 18 U.S.C. §1962(d), which conspiracy included planning and carrying out the scheme described in the previous paragraph with its consequent injury to Plaintiff.

## The SNPC Enterprise

98.     SNPC was established in 1998 by the Sassou-Nguesso regime as a second national oil company for Congo.  SNPC was created by statute and has a board of directors and governing bylaws.

99.     Although SNPC was ostensibly created for the legitimate purpose of consolidating management of the state's petroleum interest and selling the oil to which Congo is entitled, the manner in which SNPC has actually been operated is intelligible only in the context of the Enterprise's illegal objectives.  There is no other credible explanation for the many layered and convoluted financial transactions carried out by the Enterprise.

100.    Rather than acting for the benefit of Congo and its people, SNPC operates in extraordinary secrecy to conceal the manipulation and diversion of its oil sales and related financing, to frustrate the legitimate contracts between Congo and its creditors and to misappropriate oil revenues for the personal benefit of President Sassou-Nguesso, Bruno Itoua, SNPC's former chief executive officer, and their allies.

101.    The SNPC Enterprise is, and was at all relevant times, an "enterprise" within the meaning of 18 U.S.C. §1961(4) and has engaged in unlawful activities affecting interstate and

foreign commerce including, but not limited to, the execution of the scheme to divert oil and oil revenues from the Congo and place them beyond the reach of legitimate creditors, thereby causing injury to Plaintiff and to Elliott.

102.    Shortly after its creation, SNPC, under the direction of Itoua, along with defendant BNP Paribas, SNPC (UK), Elidovo, Quantic, and Tacoma, cooperated to simultaneously execute the various documents comprising the Prepayment Agreements. Each member of the SNPC Enterprise carried out its portion of the prepayment financial transactions in secret in order to obscure both the location of Congo's oil and the revenues from its sale and to facilitate and conceal the underlying misappropriation of Congo's income and resources.

103.    The operation of the SNPC Enterprise has been continuous. SNPC came into being in 1998 and almost immediately thereafter the Enterprise began to carry out financial transactions in violation of various United States laws. Defendants' activities pursuant to the Prepayment Agreements, as alleged in paragraphs 75 and 83 of this Complaint, were first documented in February 1999, continue to the present and are likely to continue in the future, with the intent to and result of causing injury to Plaintiff.

104.    The most recent known transaction occurred in January 2004, with SNPC borrowing (through Elidovo) US $45,500,000 pursuant to a Prepayment Agreement from BNP Paribas secured by Congo's oil.

105.    Deliveries of oil to the United States pursuant to the Prepayment Agreements continued at least into April 2005.

106.    Defendant Bruno Itoua was associated with the SNPC Enterprise in his role as SNPC's chief executive officer. Itoua solely and personally signed the necessary documents for

- 37 -

the Prepayment Agreements on behalf of SNPC and other related companies and state

enterprises. Itoua is also a beneficiary of the Enterprises' illegal activities.

107.    SNPC (UK) is associated with the SNPC Enterprise through its role of reinforcing

the secrecy of the Prepayment Agreements by maintaining data regarding the sales of Congo's

oil offsite in the United Kingdom and beyond the reach of SNPC's auditors.

108.    Defendant BNP Paribas has been associated with the SNPC Enterprise since its

inception. Over the years, BNP Paribas has exercised ever greater influence and control over

SNPC. By continuing to provide loans to SNPC in excess of the value of any single oil cargo,

BNP Paribas keeps SNPC in a state of permanent indebtedness and retains management and

control over SNPC's principal assets and revenues. Furthermore, by taking all SNPC's loan

repayments in these transactions for itself at the expense of other creditors, and, upon

information and belief, by channeling the remainder of the oil proceeds outside the structures of

the Congolese government's budget, BNP Paribas has degraded Congo's and SNPC's access to

credit from legitimate sources, making it impossible for Congo to fulfill its legitimate contractual

obligations and function as an effective state.

109.    Because of the benefit BNP Paribas reaps for itself, it is a willing participant and

the originator and major facilitator of the mechanisms used by the SNPC Enterprise to carry out

its illegal activities.

110.    Elidovo is associated with the SNPC Enterprise by acting as a passive

intermediary in the Prepayment Agreements thereby increasing the complexity and secrecy of

the transactions.

111.    Quantic is associated with the SNPC Enterprise by acting as a passive intermediary in the Prepayment Agreements thereby increasing the complexity and secrecy of the transactions.

112.    Tacoma is associated with the SNPC Enterprise by acting as a passive intermediary in the Prepayment Agreements, thereby increasing the complexity and secrecy of the transactions.

113.    Defendants BNP Paribas and Itoua have participated in the conduct of the SNPC Enterprise through the pattern of racketeering activity described below in paragraphs 129 to 136.

## The "Prepayment" Enterprise

114.    The Prepayment Enterprise, an ongoing association-in-fact, is and was, at all relevant times, composed of individuals, corporations and other entities as described below having common and shared purposes.

115.    Shortly after its creation, Defendant SNPC, Defendants Itoua and BNP Paribas, along with SNPC (UK), Elidovo, Quantic and Tacoma, cooperated to form the Prepayment Enterprise. The Enterprise is a long term association of various parties for criminal purposes, including a variety of oil-collateralized prepayment schemes with the common purposes of facilitating the misappropriation of Congo funds, protecting the schemes from discovery and protecting Congo oil and revenues from attachment by legitimate creditors. The members of the Enterprise who participated in the BNP Paribas Prepayment Agreements cooperated to simultaneously execute the various contracts comprising those Prepayment Agreements and to perform the actions necessary to implement those agreements and the Enterprise's corrupt purposes. Each member of the Prepayment Enterprise knowingly carried out its portion of these

- 39 -

financial transactions in secret in order to obscure both the location of Congo's oil and the revenues from its sale and to facilitate and hide the underlying misappropriation of Congo's resources.

116.    The Prepayment Enterprise has operated as a coordinated whole since at least 1999 and continues to operate in the same manner today.

117.    The most recent known transaction occurred in January 2004, with SNPC borrowing (through Elidovo) US $45,500,000 from BNP Paribas pursuant to a Prepayment Agreement secured by Congo's oil.

118.    Deliveries of oil to the United States pursuant to the Prepayment Agreements continued at least into April 2005.

119.    The Prepayment Enterprise is, and was at all relevant times, an "Enterprise" within the meaning of 18 U.S.C. §1961(4) and has engaged in unlawful activities affecting interstate and foreign commerce, including, but not limited to the execution of the scheme to divert oil and oil revenues from the Congo for the benefit of public officials and place those assets beyond the reach of legitimate creditors, thereby causing injury to Plaintiff and to Elliott.

120.    Defendant Bruno Itoua was associated with the Prepayment Enterprise in his role as chief executive officer of SNPC.  Itoua solely and personally signed the necessary documents in the prepayment transactions on behalf of SNPC and other related companies and state enterprises.  Itoua is also a beneficiary of the Prepayment Enterprise's illegal activities.

121.    Defendant SNPC is an essential actor in the Prepayment Enterprise.  SNPC has access to Congo's oil and provides it to support the Prepayment Agreements, is a party to each Agreement and, contrary to its obligations, fails to transfer all oil revenues to Congo.  By

maintaining the transactions in secret, SNPC has facilitated the diversion of Congo resources to private parties and has enabled the transactions to continue and the Enterprise to flourish.

122.    Defendant BNP Paribas has been associated with the Prepayment Enterprise since its inception, as the originator and financier of the Prepayment Agreements. Over the years, BNP Paribas has exercised ever greater influence and control over SNPC and the Prepayment Enterprise. By continuing to provide loans to SNPC in excess of the value of any single oil cargo, BNP Paribas keeps SNPC in a state of permanent indebtedness and retains management and control over SNPC's principal assets and revenues and the operation of the Prepayment Enterprise. Furthermore, by taking all SNPC's loan repayments in these transactions for itself at the expense of other creditors and, upon information and belief, by channeling the remainder of the oil sales proceeds outside of the Congolese government's budget, BNP Paribas has materially degraded Congo's and SNPC's access to credit from legitimate sources, making it impossible for Congo to fulfill its legitimate contractual obligations and function as an effective state.

123.    Because of the benefit BNP Paribas reaps for itself, it is a willing participant and the originator and major facilitator of the mechanisms used by the Prepayment Enterprise to carry out its illegal activities.

124.    Elidovo is associated with the Prepayment Enterprise by acting as a passive intermediary in the Prepayment Agreements thereby increasing the complexity and secrecy of the transactions.

125.    Quantic is associated with the Prepayment Enterprise by acting as a passive intermediary in the Prepayment Agreements thereby increasing the complexity and secrecy of the transactions.

126.    Tacoma is associated with the Prepayment Enterprise by acting as a passive intermediary in the Prepayment Agreements thereby increasing the complexity and secrecy of the transactions.

127.    The Prepayment Enterprise has at all times had continuity, structure, common purposes, personnel and organization that it has used to carry out its illegal activities, including the scheme to misappropriate Congo resources and thereby injure plaintiff and Elliott.

128.    All of the defendants have participated in the conduct of the Prepayment Enterprise through the pattern of racketeering activity described below in paragraphs 129 to 136.

## Pattern of Racketeering Activity

129.    In executing the schemes by which defendants misappropriated Congo's oil and the revenues from its sale, thereby depriving legitimate creditors of their ability to gain access to such assets, upon information and belief, each defendant has knowingly and intentionally agreed to engage in and has engaged in violations of criminal statutes that constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1). The acts of racketeering constituting that pattern have included money laundering in violation of 18 U.S.C. §1956 and the transport and receipt of stolen goods in violation of 18 U.S.C. §§2314-2315.

130.    The following acts of racketeering, known at this time, were committed by both the SNPC and Prepayment Enterprises:

a.      On November 23, 2001, pursuant to a Prepayment Agreement, BNP Paribas provided a loan of up to US $13 million to SNPC. This loan was backed by oil with a true value of approximately US $25 million. Tacoma was the purported purchaser of this oil. A bill of lading and other shipping documents demonstrate that a portion of the oil sold in this

transaction was delivered to the United States. Upon information and belief, SNPC did not make full payment to Congo for the oil in this transaction. The at least US $12 million generated by this transaction above the loan repayment provided a steady stream of unaccounted for cash for Defendant Itoua, other defendants and other public officials.

b.    On June 18, 2002, pursuant to a Prepayment Agreement, BNP Paribas provided a loan of up to US $70 million to SNPC. This loan was backed by Congo's oil with a true value of approximately US $177 million. Quantic was the purported purchaser of this Congo oil. The New York branch of BNP Paribas retroactively entered into a Covered Oil Option with SNPC relating to this transaction, which required the payment of a premium to the New York branch and the maintenance of a substantial deposit for the benefit of the New York branch. A portion of the oil sold in this transaction and/or in the September 2, 2002 transaction was delivered in the United States in February 2005. Upon information and belief, SNPC did not make full payment to Congo for the oil in this transaction. The at least US $107 million generated by this transaction above the loan repayment provided a steady stream of unaccounted for cash for Defendant Itoua, other defendants and other public officials.

c.    On September 2, 2002, pursuant to a Prepayment Agreement, BNP Paribas provided a loan of up to US $80 million to SNPC. This loan was backed by Congo's oil with a true value of approximately US $191 million. Quantic was the purported purchaser of this Congo oil. The New York branch of BNP Paribas entered into a Covered Oil Option with SNPC relating to this transaction, which required the payment of a US $5,600,000 premium to the New York branch and the maintenance of a substantial deposit for the benefit of the New York branch. In February 2003, BNP Paribas filed a U.C.C. Financing Statement in Washington, D.C.

- 43 -

in connection with this loan to protect collateral within the United States. A portion of the oil sold in this transaction and/or in the June 18, 2002 transaction was delivered in the United States in February 2005. Upon information and belief, SNPC did not make full payment to Congo for the oil in this transaction. The at least US $111 million generated by this transaction above the loan repayment provided a steady stream of unaccounted for cash for President Sassou-Nguesso, Defendant Itoua, other defendants and other public officials.

        d.      On December 6, 2002, pursuant to a Prepayment Agreement, BNP provided a loan of up to US $30 million to SNPC. This loan was backed by Congo's oil with a true value of approximately US $80 million. Tacoma was the purported purchaser of this Congo oil. Upon information and belief, a portion of the oil sold in this transaction was delivered to the United States. Upon information and belief, SNPC did not make full payment to Congo for the oil in this transaction. The at least US $50 million generated by this transaction above the loan repayment provided a steady stream of unaccounted for cash for Defendant Itoua, other defendants and other public officials.

        e.      In January 2004, pursuant to a Prepayment Agreement, BNP provided a loan of up to US $45 million to Elidovo, which Elidovo then made available to SNPC. This loan was backed by Congo's oil with a true value of approximately US $75 million. Elidovo was the purported purchaser of this Congo oil. A portion of the oil sold in this transaction was delivered in the United States in February 2005. Upon information and belief, SNPC did not make full payment to Congo for the oil in this transaction. The at least US $30 million generated by this transaction above the loan Prepayment provided a steady stream of unaccounted for cash for Defendant Itoua, other defendants and other public officials.

- 44 -

131.   Each of the racketeering acts set forth above, constituted a separate execution of defendants' scheme within the United States and thus a predicate act, and accomplished, among other things, the purposes of benefiting defendants financially and causing injury to Plaintiff and Elliott.

132.   The racketeering acts set forth above were both related and continuous. Each was related to each other as part of the overall scheme to accomplish uniform purposes. The repeated nature of the conduct for a period of over two years, together with other Prepayment Agreements that were executed regularly for at least two and half years before, with the latest such act currently known to have taken place in January 2004, make these acts both continuous and likely to continue in the future. In addition, deliveries to the United States of oil sold pursuant to the transactions comprising the pattern of racketeering continued until at least April 2005. The schemes to divert Congo's oil and the revenues from its sale for the benefit of defendants, to the deprivation of the people of Congo and of creditors like Plaintiff, has become a routine and regular way of doing business for the defendants.

133.   Each of the acts described in paragraph 130 constitutes a violation of the money laundering statute, 18 U.S.C. §1956, as amended by the Patriot Act in October 2001, as follows:

a.     Upon information and belief, each defendant, knowing that the oil and the revenues from its sale involved in each Prepayment Agreement were the proceeds of unlawful activity, participated in the Prepayment Agreements, which are financial transactions involving those proceeds, with the intent to both facilitate the unlawful activity and to conceal that activity and the source and disposition of the proceeds in violation of 18 U.S.C. § 1956(a)(1).

b.    Upon information and belief, in connection with the November 23, 2001 loan, defendants BNP Paribas and SNPC, knowing that the oil cargo involved in the Prepayment Agreement was the proceeds of unlawful activity, transported or transmitted a monetary instrument, the bill of lading, from a place outside the United States to a place within the United States with the intent to promote the unlawful activity and to conceal that activity and the source and disposition of the proceeds in violation of 18 U.S.C. 1956(a)(2).

c.    Upon information and belief, in connection with the June 18, 2002 and September 2, 2002 loans, defendants SPNC and BNP Paribas, knowing that the oil revenues involved in the prepayment agreements were the proceeds of unlawful activity, transported or transmitted funds, the premium payments, from a place outside the United States to a place with the United States with the intent to promote the unlawful activity and to conceal that activity and the source and disposition of the proceeds in violation of 18 U.S.C. § 1956(a)(2).

d.    Upon information and belief, the unlawful activity which generated these proceeds was the misappropriation of Congo's oil and the revenues from its sale, by and for the benefit of public officials including President Sassou-Nguesso and defendant Itoua in violation of 18 U.S.C. §1956(c)(7)(B)(iv).

e.    Defendants' actions violated Article 169 of the Congolese Penal Code which prohibits the dissipation, fraudulent misappropriation or theft of public funds.

f.    These proceeds were obtained pursuant to the Prepayment Agreements, financial transactions which occurred in part in the United States.

134.    BNP Paribas' receipt of the premium payments by SNPC in connection with the June 18 and September 2, 2002 loans, and its receipt and disposal of oil shipments as consignee

in connection with the November 23, 2001, June 18 and/or September 2, 2002, December 6, 2002, and the January 2004 loans, constitute the knowing receipt and disposal of stolen or unlawfully converted goods or money which has crossed a United States boundary after being unlawfully taken, in violation of 18 U.S.C. §2315.

135.    SNPC's payment of the premiums to BNP Paribas in connection with the June 18 and September 2, 2002 loans constitutes the transfer in foreign commerce of money in excess of $5,000, knowing the same to have been stolen or converted, in violation of 18 U.S.C. §2314.

136.    Upon information and belief, SNPC's shipment of oil to BNP Paribas in connection with the November 23, 2001, the June 18, 2002 and/or September 2, 2002, December 6, 2002 and the January 2004 loans constitutes the transport or transfer in foreign commerce of goods with a value in excess of $5,000, knowing the same to have been stolen or converted, in violation of 18 U.S.C. § 2314.

VI.    CLAIMS FOR RELIEF UNDER RICO - 18 U.S.C. §§1961-1965

137.    Plaintiff alleges various claims for relief under provisions of the RICO statute. The following allegations are common to all such claims for relief.

138.    The Plaintiff is a person within the meaning 18 U.S.C. §1961(3) and 1964(c).

139.    Each of the named defendants is a person within the meaning 18 U.S.C. §1961(3) and §1962.

**COUNT I - VIOLATION OF 18 U.S.C. §1962(c)**

**AGAINST DEFENDANTS ITOUA AND BNP PARIBAS**

140.    Plaintiff incorporates herein by reference the allegations of paragraph 1 through 139.

141.    The SNPC Enterprise has been and continues to be an "enterprise" within the meaning of 18 U.S.C. §1961(4) and 1962(c).  The SNPC Enterprise has been engaged in and/or affected interstate and foreign commerce.

142.    Each of the defendants named in this Count, has been associated with the SNPC Enterprise and has conducted or participated in, directly or indirectly, the management and operation of the affairs of the SNPC Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. §1962(c).

143.    With respect to each defendant, the pattern of racketeering activity included all acts described in paragraphs 129 through 136, above.

144.    Plaintiff has been injured in its business and property by reason of the violation within the meaning of 18 U.S.C. §1964(c), and seeks relief as set forth below in the Prayer for Relief.

### COUNT II - CONSPIRACY TO VIOLATE 18 U.S.C. §1962(c) IN VIOLATION OF 18 U.S.C. §1964(d)

### AGAINST DEFENDANTS ITOUA AND BNP PARIBAS

145.    The plaintiff incorporates herein by reference the allegations of paragraphs 1 through 144.

146.    Each of the defendants named in this Count has agreed to and has cooperated through the SNPC Enterprise to violate 18 U.S.C. §1962(c).

147.    Plaintiff has been injured in its business and property by reason of the violations within the meaning of 18 U.S.C. §1964(d) and seeks relief as set forth below in the Prayer For Relief.

## COUNT III - VIOLATION OF 18 U.S.C. §1962(C)

### AGAINST DEFENDANTS SNPC, ITOUA AND BNP PARIBAS

148.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 147.

149.    The Prepayment Enterprise has been and continues to be an "Enterprise" within the meaning of U.S.C. §1961(4) and 1962(c).  The Prepayment Enterprise has been engaged in and/or affected interstate and foreign commerce.

150.    Each of the defendants named in this Count has been associated with the Prepayment Enterprise and has conducted or participated in, directly or indirectly, the management and operation of the affairs of the Prepayment Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

151.    With respect to each defendant, the pattern of racketeering activity included all acts described in paragraphs 129 through 136, above.

152.    Plaintiff has been injured in its business and property by reason of the violation within the meaning of 18 U.S.C. §1964(c) and seeks relief as set forth below in the Prayer For Relief.

### COUNT IV - CONSPIRACY TO VIOLATE 18 U.S.C. §1962(c) IN VIOLATION OF 18 U.S.C. §1964(d)

### AGAINST DEFENDANTS SNPC, ITOUA AND BNP PARIBAS

153.    The plaintiff incorporates herein by reference the allegations of paragraphs 1 through 152.

154.    Each of the defendants named in this Count has agreed to and has cooperated through the Prepayment Enterprise to violate 18 U.S.C. §1962(c).

- 49 -

155.    Plaintiff has been injured in its business and property by reason of the violations within the meaning of 18 U.S.C. §1964(d) and seeks relief as set forth below in the Prayer For Relief.

VII.    PRAYER FOR RELIEF

156.    DEFENDANTS' unlawful activities have impeded Plaintiff's efforts to enforce and collect the judgments described in paragraphs 62 through 68.

WHEREFORE, Plaintiff prays for relief and judgment as follows:

157.    On each of the claims for relief, against each of the defendants, triple the damages sustained by the plaintiff, which include US $56,911,991.47 plus interest at the rate of 8% per annum from December 20, 2002, US $42,234,577.80 plus interest at the rate of 8% per annum from January 21, 2003 and US $1,316,027.48 plus interest at the rate of 8% per annum from January 28, 2003, plus the cost of this suit, including reasonable attorney's fees and investigative costs and post-judgment interest.

Dated: New York, New York
    May 27, 2005

DECHERT LLP

By: _____

Robert A. Cohen (RC-9712)
Ross L. Hirsch (RH-0605)
30 Rockefeller Plaza
New York, New York  10112
(212) 698-3500 (phone)
(212) 698-3599 (facsimile)

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Kevin S. Reed (KR-5386)
335 Madison Avenue
New York, New York  10017
(212) 702-8100 (phone)
(212) 702-8200 (facsimile)

Attorneys for Plaintiff
Kensington International Limited