UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

...........................................................................X

KENSINGTON INTERNATIONAL LIMITED

                                                05 Civ. 5101

            Plaintiff,

              v.

SOCIETE NATIONALES DES PETROLES DU CONGO
BRUNO JEAN-RICHARD ITOUA
BNP PARIBAS SA

           Defendants.

...........................................................................X

## DECLARATION OF STEPHEN PHILIP MOVERLEY SMITH, Q.C

Pursuant to 28 U.S.C. §1746, **STEPHEN PHILIP MOVERLEY SMITH, Q.C.,** declares the following:

1. I am a barrister practising at the Bar of England and Wales from chambers at 24 Old Buildings, Lincoln's Inn, London, WC2A 3UP. I have been instructed by Messrs. Dechert LLP, attorneys for the Plaintiff ("Kensington"), to provide my opinion on:

    (a) what recourse Kensington might have against the Defendants in England to deal with the subject matter of the complaint filed by Kensington in the above-captioned action;

    (b) the ability of litigants in English proceedings to obtain evidence from witnesses abroad and how the English Court treats letters of request from foreign courts.

    In dealing with the first of these issues I have considered by reference to the pleaded facts the various types of potential claim set out below.

2. For convenience this affidavit is divided into the following sections:

*Preliminary*

| | | |
|---|---|---:|
| (a) | My Qualifications | §§3-4 |
| (b) | Documentation Supplied to Me | §5 |
| (c) | Summary of Claims advanced in the Complaint | §§6-10 |
| (d) | Summary of Conclusions | §11 |

*Potential Causes of Action*

| | | |
|---|---|---:|
| (e) | Statutory Claims | §§12-19 |
| (f) | Contractual Claims | §§20-23 |
| (g) | Derivative Claims | §24 |
| (h) | Fiduciary Claims | §25-27 |
| (i) | Restitutionary Claims | §§28-29 |
| (j) | Tracing Claims | §30 |
| (k) | Tort Claims | §§31-43 |
| (l) | Conclusion | §44 |

*Obtaining Evidence*

| | | |
|---|---|---:|
| (m) | Issuing Letters of Request to Foreign Courts | §45-46 |
| (n) | Responding to Letters of Request from Foreign Courts | §47-48 |

## *Preliminary*

**(a) Qualifications**

3. I am a barrister practising from chambers at 24 Old Buildings, Lincoln's Inn, London. I was called to the Bar of England and Wales by Middle Temple in 1985 and have since that time specialised in English company, commercial and

insolvency litigation. In 1993 I was appointed as Junior Counsel to the Crown (Chancery). In 2002 I was appointed Queen's Counsel.

4. The issues of English law I am asked to opine upon I am familiar with and consider to be within my field of expertise.

**(b) Documentation Supplied to Me**

5. I have been supplied with and considered:

   (a) a redacted version of Kensington's complaint in this action ("the Complaint");

   (b) the memorandum of law in support of the motion of the first defendant, Société Nationale des Pétroles du Congo ("SNPC"), to dismiss the Complaint;

   (c) the memorandum of law in support of the motion of the second defendant, Mr. Bruno Jean-Richard Itoua ("Mr. Itoua"), to dismiss the Complaint;

   (d) the memorandum of law in support of the motion of the third defendant BNP Paribas ("the Bank") to dismiss the Complaint together with certain of the annexures referred to therein ("the BNP Memorandum").

**(c) Summary of Claims Advanced in Complaint**

6. Kensington complains that it is the victim of a conspiratorial racketeering scheme operated by the first defendant, SNPC (the state oil company of the Republic of Congo ("Congo")), Mr. Itoua, the former managing director of SNPC, and the Bank (the third defendant).

7. In essence the subject matter of the complaint is an alleged conspiracy between the Bank, Mr. Itoua and SNPC to divert oil revenues belonging to Congo into the personal coffers of Congolese public officials and put such revenues beyond the reach of Congo's creditors, who include Kensington.

8. Under the scheme as described ("the Scheme") the Bank entered into "pre-payment" agreements with SNPC under which loans were made to it collateralised by oil cargos. The cargoes were assigned or pledged to the Bank by SNPC whilst the oil remained in Congo's territorial waters. The aggregate amount of collateral provided greatly exceeded in value the amount of the loans. The oil was subsequently sold to the international market through a complex web of transactions involving "straw" intermediaries. Some or all of the balance of the oil proceeds,

after repayment of the loans and deduction of the Bank's exorbitant fees, was then misappropriated.

9. The Scheme was allegedly devised to conceal the amount of revenue received by SNPC and the location and disposition of Congo's oil and oil proceeds. SNPC has failed to account to Congo for the oil proceeds.

10. Kensington is a legitimate creditor of Congo. The Scheme has prevented it and other legitimate creditors from access to Congo's oil and its oil revenues. It has thereby been caused injury.

### (d) Summary of Conclusions on Potential Causes of Action

11. As explained below, there is no equivalent to the Racketeering Influenced and Corrupt Organisation Act 1970 ("RICO") in English law. In this affidavit I have examined by reference to the types of claim available to litigants, what, if any, claims Kensington can advance in England. Leaving aside tort claims, which would be governed by foreign law, upon which I cannot express a concluded opinion for the reasons explained in paragraph 31 to 43 below, I am of the opinion that the facts pleaded in the Complaint do not disclose any claim actionable in the English courts. Even if a tort claim is actionable (and leaving to one side the question of voluntary submission to the jurisdiction), permission would not be given to serve the proceedings on the defendants, who are out of the jurisdiction.

### (e) Statutory Claims

*Legislation Relating to Criminal Conduct*

12. The claims advanced in the Complaint are made under the provisions of RICO. RICO gives victims injured by racketeering activity a statutory civil remedy in damages. In England there is no equivalent of RICO and statutory remedies for victims of criminal activity are limited.

13. Part 7 of the Proceeds of Crime Act 2002 deals with money-laundering offences. This Part contains no provisions enabling any civil recovery.

14. More generally, only where a defendant has been convicted of a crime does the (criminal) court have power to order him to pay compensation to the victim (see Powers of Criminal Courts (Sentencing) Act 2000 ss. 130-132, 148). Even then, whilst the sentencing judge may be willing to accept evidence of the victim's losses

in determining the level of compensation, the victim does not himself have any *locus* in the criminal court to advance a claim.

15. Under Part 2 of the Proceeds of Crime Act 2002 the criminal court also has power to order the confiscation of assets of a convicted defendant, but <u>only</u> at the instance of the Assets Recovery Agency (a state agency created by the 2002 Act). Equally, whilst orders can be obtained under Part 5 of the Proceeds of Crime Act 2002 for the recovery of property obtained through unlawful conduct, they can <u>only</u> be made at the instance of the Agency.

### (f) Contractual Claims

16. It is axiomatic that in order to advance a claim in contract it is necessary to establish a contractual relationship between plaintiff and defendant.

17. A contractual relationship between the Bank and a group of lenders under a loan agreement dated April 18, 1984 ("the Loan Agreement") is pleaded in §50 of the Complaint. At §59 of the Complaint Kensington pleads that it is the assignee of the lenders' rights under the Loan Agreement. However, this contractual relationship it is not the subject matter of the dispute as articulated in the Complaint: the allegation that the Defendants established and operated corrupt organisations to enrich themselves at the expense of the people and the legitimate creditors of Congo does not arise out of the contractual relationship between the Bank and Kensington.

18. Moreover, I note that even if Kensington has actionable contractual claims against the Bank in England, it would not appear to have any such claims against SNPC or Mr. Itoua.

19. It therefore appears that no contractual claim provides Kensington with a means to redress the wrongs identified in the Complaint.

### (g) Derivative Claims

20. Shareholders of a company can bring a derivative action in the company's name to recover the company's property or institute proceedings against its defaulting officers. Thus if SNPC were an English company its shareholders would be able to bring a claim against Mr. Itoua and the Bank. No such remedy is however available to mere creditors, such as Kensington (see e.g. *Birch v Sullivan* [1957] 1 WLR 1247).

### (h) Fiduciary Claims

21. English law recognises and enforces fiduciary obligations owed between those in a fiduciary relationship. While the agency relationship between the Bank and Kensington may be characterised as fiduciary, a breach of fiduciary obligation is not the subject matter of the dispute set out in the Complaint. The allegation that the Defendants established and operated corrupt organisations to enrich themselves at the expense of the people and legitimate creditors of Congo does not arise out of the fiduciary relationship between the Bank and Kensington, any more than it does out of a contractual relationship.

22. Even if such a claim could be advanced against the Bank, there is nothing to suggest that it could be advanced against SNPC or Mr. Itoua.

23. It therefore appears that claims for breach of fiduciary duty do not provide Kensington with a means to redress the wrongs identified in the Complaint.

### (i) Restitutionary Claims

24. A restitutionary claim lies where a defendant has been unjustly enriched at the expense of the plaintiff (see *Goff & Jones: The Law of Restitution* (6th Ed.) 1-044). "At the expense of the plaintiff" means that the immediate source of unjust enrichment must be the plaintiff e.g. the plaintiff's money was used to pay the payee (see *Kleinwort Benson Ltd v Birmingham City Council* [1996] 4 All ER 733).

25. In the present case the immediate source of any unjust enrichment is SNPC or Congo, not Kensington.

### (j) Tracing Claims

26. As was recently observed in the House of Lords' decision of *Foskett v McKeown* [2001] 1 AC 102 tracing is in fact neither a claim nor a remedy. It is simply a process to identify *"the proceeds of the claimant's property."* (*per* Lord Millett at p. 128). As Kensington is not seeking to identify the proceeds of its property tracing has no relevance to its claim.

**(k) Tort Claims**

27. Prior to 1 May 1996, when Part III of the Private International Law (Miscellaneous Provisions) Act 1995 ("the 1995 Act") came into force, in general a tort claim could only be pursued in England if it was actionable both in England and in the forum where the acts in question took place (the so-called rule of "double actionability"). This rule has now been replaced by the statutory rules to be found in Part III of the 1995 Act (see ss. 9(1) and 10).

28. Under the new rules the court is required to apply the "applicable law" to determine the issues arising in a tort claim and in particular whether an actionable tort has occurred (see s. 9(4)). For these purposes "applicable law" does not include choice of law rules of the country concerned (see s. 9(5))

29. Applying Part III of the 1995 Act, whether Kensington has a tort claim actionable in England will accordingly depend upon whether such a claim is actionable under the applicable law.

30. Section 11(1) of the 1995 Act provides that the general rule is that the "applicable law" is the law of the country in which the events constituting the tort occur. Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being the law of the country in which the most significant element or elements of those events occurred (s. 11(2)(c)).

31. The Complaint identifies one potential tort that Kensington could assert against the three defendants, namely the tort of conspiracy. There is nothing pleaded in the Complaint or the defendants' memoranda to suggest that the events constituting the elements of the tort - namely the conspiratorial acts, the use of unlawful means and the injury suffered - occurred in England. It would appear that the most significant elements - the misappropriation and sale of oil, the unlawful diversion of oil revenues and the loss suffered in consequence - occurred in Congo, the US and possibly elsewhere in the world.

32. The general rule may be displaced if it appears, in all the circumstances, from a comparison of -

    (a)    the significance of the factors which connect the tort with the country whose law would be the applicable law under the general rule, and

    (b)    the significance of any factors connecting the tort with another country,

that it is substantially more appropriate for the applicable law for determining the issues arising in the case, or any of those issues, to be the law of the other country. In such circumstances the applicable law for determining those issue(s) is the law of that other country (s. 12(1).

33. The factors which may be taken into account as connecting a tort with a country for the purposes of s. 12 include, in particular, factors relating to the parties, to any of the events which constitute the tort or to any of the circumstances or consequences of those events (s. 12(2)).

34. On the pleaded facts there would not appear to be any reason to dis-apply the general rule in s. 11 of the 1995 Act. Thus the applicable law would not be English law but would appear to be either Congolese law or US law.

35. Accordingly, whether or not Kensington can advance a conspiracy claim in the English courts will depend upon whether such a claim is actionable in Congo or the US. I am not qualified to opine on either Congolese or US law and so cannot comment upon whether Kensington could bring such a claim.

36. Even if a tort claim were actionable in England, (leaving to one side the question of voluntary submission to the jurisdiction) proceedings can only be served out of the jurisdiction if CPR 6.20(8) is satisfied. This requires that either damage has been sustained within the jurisdiction or that the damage sustained resulted from an act committed within the jurisdiction. On the pleaded facts it does not appear that either of these is satisfied.

(l) **Conclusion**

37. For the reasons explained above, leaving aside tort claims governed by foreign law, upon which I cannot express a concluded view, I am of the opinion that the facts pleaded in the Complaint do not disclose:

  - any statutory claim
  - any contractual claim
  - any derivative claim
  - any fiduciary claim
  - any restitutionary claim
  - any tracing claim

actionable in the English courts.

*Obtaining Evidence*

**(m) Issuing Letters of Request to Foreign Courts**

38. A party to English proceedings cannot compel a witness in a foreign country to give evidence at trial. CPR 34.13 seeks to alleviate this difficulty by giving the English High Court the power to order the issue of a letter of request to the judicial authorities of the country in which the proposed witness is, requesting them to take the evidence of that person, or arrange for it to be taken. Where the government of the country in question permits, the High Court may also appoint a special examiner to carry out the examination (see CPR 34.13(4)).

39. The jurisdiction of the Court under CPR 34.13 is discretionary. However, where the court is satisfied that the witness is unwilling or unable to be present at the trial, the application is *bona fide* and has been made promptly and the evidence the witness can give is substantial and material to the issue, it will often make an order (see e.g. *Ehrmann v Ehrmann* [1896] 2 Ch. 611).

**(n) Responding to Letters of Request from Foreign Courts**

40. The Evidence (Proceedings in Other Jurisdictions) Act 1975 ("the 1975 Act") (which implemented the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters 1970) has conferred on the Court the power to render assistance to a foreign court to obtain evidence in England and Wales for civil proceedings in that court. This power is reflected in the provisions of CPR34.16 to 34.20, which provides a procedure for obtaining an order for the examination of witnesses pursuant to the foreign court's request.

41. The English Court will always seek to give assistance to the foreign court where it can, and will exercise its discretion to make the order sought unless it is satisfied that the application would be regarded as frivolous, vexatious or an abuse of the process of the court (see e.g. *Rio Tinto Zinc Corporation v Westinghouse Electric Corporation* [1978] AC 547).

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct**

Signed _____

**STEPHEN MOVERLEY SMITH QC**