UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KENSINGTON INTERNATIONAL LIMITED

    Plaintiff,

v.

SOCIÉTÉ NATIONALE DES PÉTROLES DU CONGO, BRUNO JEAN-RICHARD ITOUA, BNP PARIBAS S.A.,

    Defendants.

---

05 Civ. 5101 (LAP)

DECLARATION OF DONALD S. SCHWARZKOPF

  Pursuant to 28 U.S.C. § 1746, I, Donald S. Schwarzkopf, make this Declaration in support of Plaintiff's Memorandum of Law in Opposition to Defendant BNP Paribas', Defendant Bruno Jean-Richard Itoua's and Defendant Société Nationale des Pétroles du Congo's Motions to Dismiss the Redacted Complaint (hereinafter "BNP", "Itoua" and "SPNC", respectively, and the "Complaint").

  1. I am a consultant engaged by Dechert LLP to assist in the recovery of monies due to Plaintiff, Kensington International Limited ("Kensington") from the Republic of Congo ("Congo"). My experience in international finance extends over twenty-seven years, including (in overlapping periods) nine years as managing director of the trade finance unit of a major financial institution, eighteen years resolving impaired and defaulted international debts, six years responsible for a diversified investment portfolio exceeding US$ 1 billion spread through more than eighty countries, and three years as an international commercial banking officer with specific responsibility for originating and structuring international commodity pre-export financing transactions

such as those underlying the Complaint. My work in the settlement and recovery of international debts includes extensive experience with Congo.

2. The Memorandum of Law in Support of Defendant BNP Paribas' Motion to Dismiss the Complaint asserts on page 2 that "if the goal of government officials of Congo was to surreptitiously conceal oil revenues from international bodies such as the International Monetary Fund, or creditors of Congo, as Kensington alleges, they would hardly have enlisted the services of a major western European bank, such as BNP-P, which is subject to extensive governmental regulatory oversight and record keeping requirements." This conclusory statement is undermined by a report released on October 27, 2005 by the Independent Inquiry Committee into the United Nations Oil-for-Food Programme entitled "Manipulation of the Oil-for-Food Programme by the Iraqi Regime" (http://www.iic-offp.org/story27oct05.htm). The introductory summary for Chapter Four of this report states:

> . . . BNP's loyalties were divided between serving the interests of the United Nations to promote the transparency of transactions conducted under the Programme and serving the interests of its private clients to maintain the confidentiality of their business and financing arrangements. These competing interests clashed with the advent of Iraq's oil surcharge scheme and the scheme's reliance on financing arrangements to conceal the true nature of oil purchase transactions.
>
> The United Nations and its overseers were aware in a general sense of the prevalence of shell company purchase arrangements. BNP, however, had unique access to such information through its privity with parties engaged in such transactions. . . . such transactions were not called to the attention of the United Nations, conflicting with provisions of the banking services agreement and SOMO's [the Iraqi State Oil Marketing Organization] approved standard sales contract that prohibited unapproved assignments of rights and the resale of oil.

> In the midst of well-publicized allegations of payments of illicit surcharges, BNP was inhibited from taking steps to review its practices to prevent such payments. Customer accounts were used by some of its more thinly capitalized customers, often entities with little history with the Bank, to make more than $10 million in illegal surcharge payments. Such entities included . . . [at least one] known by the bank to be suspected of money laundering activity. Although there is no evidence that BNP knew of or approved the use of its own facilities to pay illegal surcharges, BNP was uniquely positioned to probe such payments — and failed to do so.

The financing arrangements underlying Kensington's Complaint were subject to considerably less third-party oversight and record-keeping requirements than the United Nations program for Iraq, and BNP had far greater discretion and control over the structures benefiting Congolese officials.

3. Over the last several years I have utilized a multitude of sources to track shipments of Congo's oil, which yield approximately 80% of government revenues and thus constitute the only practical means available for the country to meet its external obligations. Although fragmented, the data I have collected demonstrate:

- During the entire history of SNPC and its mandate to market Congo's oil entitlements from 1999 to the present, approximately 40% of the crude oil cargos allocated to Congo were utilized as collateral under the Prepayment Agreements. Approximately 70% of natural gas and fuel oil cargos were similarly pledged to BNP.

- During the same period approximately 20% of Congo's petroleum cargos were exported to the United States, only slightly less than China, the primary importer of Congo's oil.

Less than 5% of Congo's entitlements went to France, and none to the United Kingdom.

- New sources and information continuously emerge, but at present the following shipments utilized as collateral under the Prepayment Agreements are known to have come to the United States under the title and control of BNP:

| bill of lading date | vessel | cargo | quantity | destination |
|---|---|---|---|---|
| 30 April 1999 | Searacer (?) | Djeno crude | 906,414 barrels | U.S. Gulf Coast |
| 13 October 2000 | Golden Destiny | Yombo fuel oil | 545,222 barrels | Riverhead, NY |
| 10 February 2002 | Genmar Spirit | Yombo fuel oil | 550,003 barrels | New York |
| 16 June 2004 | Genmar Constantine | Yombo fuel oil | 560,222 barrels | U.S. East Coast |
| 12 July 2004 | Atlantic Prosperity | N'Kossa crude | 906,651 barrels | U.S. Gulf Coast |
| 18 November 2004 | not yet known | N'Kossa crude | 952,018 barrels | United States |
| 24 November 2004 | not yet known | Djeno crude | 895,395 barrels | U.S. Gulf Coast |
| 8 December 2004 | Sifnos | N'Kossa crude | 951,351 barrels | United States |
| 17 January 2005 | Genmar Spartiate | N'Kossa crude | 999,748 barrels | Philadelphia |
| 5 March 2005 | Limitless | N'Kossa crude | 991,997 barrels | Galveston |
| 8 April 2005 | Luxembourg | N'Kossa crude | 951,200 barrels | U.S. Gulf Coast |

Bills of lading that have become available to Kensington for certain of these shipments are attached (Exhibit **A**).

4. The payment arrangements for such shipments involve fewer parties than the transport of physical oil, making evidence difficult to obtain. However, documents produced in March 2005 by Trafigura AG, in response to a subpoena by Kensington, include instructions to the ultimate buyers of Congo's oil to make payment to BNP in New York (Exhibit **B**). The vessels mentioned in these documents, "Petrozavosk" and "Tsunami", are lighters that conveyed to buyers onshore in Texas the cargo of Congo's

4

oil delivered aboard the "Atlantic Prosperity", listed above. The dates of these sales suggest that they are connected with the Prepayment Agreement of January 30, 2004, described in the Complaint at paragraphs 83 to 90.

5. New York is well known as one of the world's premier centers of oil trading expertise. Because virtually all oil trades are denominated in U.S. dollars, a large proportion of payments relating to such sales are routed through New York banks.

6. The significance of New York in oil trading and in the operation of the Prepayment Agreements is underscored by the decision of BNP and SNPC to operate their so-called Covered Oil Options directly out of BNP's branch in New York. The two such agreements of which Kensington has knowledge (Exhibit C) affect nearly half of the total sums advanced by BNP directly to SNPC against shipments of crude oil under the Prepayment Agreements. The Covered Oil Options are of fundamental importance to the lending arrangements because they establish a stable collateral value in the face of volatile oil prices. They are an integral part of the overall lending scheme, as is reflected within Article 3 of each document ("The parties to these presents expressly acknowledge the link of relatedness between these sums [i.e. the Covered Oil Option and the Prepayment Agreements], which are acknowledged to be part of a single global economic transaction."). Operation of the Covered Oil Options results in both regular payments between BNP New York and SNPC in settlement of each monthly Hedged Period (per Article 2(a)) and the maintenance by SNPC of significant deposits as a cash pledge at or for the benefit of BNP New York (per Article 6.2 of the 9 September 2002 agreement).

7. The August 4, 2005 Declaration of Jean Talbot lists fifteen Prepayment Agreements, although BNP previously admitted that one agreement ("No. 6") was never

consummated. Substantially all documentation for the fourteen Prepayment Agreements that were consummated was disclosed by Congo in June 2004 in response to discovery requests from Kensington. The documents disclosed by Congo have all been translated into English to meet Kensington's disclosure obligations in the litigation in London described below. Because of the predominant use of English or multilingual documents in international trade and the U.S. dollar basis for oil trading, an English speaker will be able to comprehend the shipping, money transfer and other transaction documents relating to operation of the Prepayment Agreements in their original form.

8.  Kensington recently succeeded, after years of investigation and considerable effort and expense, in attaching the proceeds of a single cargo of Congo's oil through a judgment enforcement action in London. This asset of Congo, a third-party payment obligation in London, was attachable by Kensington expressly because this one particular shipment of oil was not part of any Prepayment Agreement, unlike the many shipments listed above and alleged in the RICO Complaint. When the attached sums are eventually received, they will be the first and only recovery of any portion of the judgment amounts due from Congo to Kensington.

9.  Kensington succeeded in proving that notwithstanding the Congo's use of sham intermediaries, the proceeds of the oil sale belonged to Congo and were therefore attachable by Kensington. Judgment was handed down by the High Court of Justice, Queen's Bench Division, Commercial Court in London on November 25, 2005 (Exhibit D) after a trial of nine days, at which I was present throughout. The Court specifically found:

- that the intermediary oil trading companies were shams;

- that use of these companies was a deliberate and dishonest attempt to conceal the true facts of the sale of oil and payment of proceeds, in the hope of preventing the Congo's creditors from attaching these assets;

- that the senior Congolese officials who appeared and gave testimony, in particular the present Director General of SNPC Denis Gokana, were dishonest; and

- that documents were both falsified and intentionally withheld by the defendants.

10. The issue before the English Court was very narrow, "Whether the monies due from the First Third Party [Glencore] in respect of the cargo of Crude Oil shipped on board "NORDIC HAWK" at Djeno on or about 26 March 2005 ("the Cargo") are or should be treated as a debt or debts accrued or accruing due to the Defendant [Congo] for the purposes of CPR [the English Civil Procedure Rules] Part 72.". Although the Court noted in passing within its judgment that "there may have been room for personal benefit", evidence was not presented in that regard and the Court made no findings regarding the possible misappropriation of Congo's resources for the private use of public officials.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2nd day of December, 2005.

*Donald S. Schwarzkopf*