# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------x
                          :

**KENSINGTON INTERNATIONAL LIMITED,**    :  **Index No. 03/602569**

                **Plaintiff,**    :

                          :

                **v.**        :  **AFFIDAVIT OF**
                          :  **STEPHEN PHILIP**

**BNP PARISBAS S.A.,**    :  **MOVERLEY SMITH, Q.C.**
                          :

                **Defendant.**    :

                          :
------------------------------------------------------------x

**I, STEPHEN PHILIP MOVERLEY SMITH, Q.C.,** of 24 Old Buildings, Lincoln's
Inn, London, WC2A 3UP, **MAKE OATH** and **SAY** as follows:

1.    I am a barrister practising at the Bar of England and Wales.   I have been instructed
by Messrs. Dechert LLP, attorneys for the Plaintiff ("Kensington"), to provide my
opinion on a number of issues of English law which arise in relation to this action.

2.    For convenience this affidavit is divided into the following sections:

*Preliminary*

(a)   My Qualifications                       §§3-4

(b)   Documentation Supplied to Me          §5

*Issues*

(c)   The Fiduciary Duties Of Agents : General Principles    §§

(d)   The Terms of the Agreements             §§

(e)   Elements of the Tort of Inducing Breach of Contract   §§

(e)   The Availability of Damages Assessed on a Restitutionary Basis   §§

*Preliminary*

**(a)   Qualifications**

3.   I am a barrister practising from chambers at 24 Old Buildings, Lincoln's Inn, London.   I was called to the Bar of England and Wales by Middle Temple in 1985 and have since that time specialised in English company, commercial and insolvency litigation.   In 1993 I was appointed as Junior Counsel to the Crown (Chancery).   In 2002 I was appointed Queen's Counsel.

4.   The issues of English law I am asked to opine upon I am familiar with and consider to be within my field of expertise.

**(b)   Documentation Supplied to Me**

5.   I have been supplied with and considered the copy documentation listed in Annex 1. Such documentation includes:

   (a)   a loan agreement dated 18 April 1984 and made between (1) the People's Republic of Congo ("Congo") (2) Banque Paribas (London) and others ("the Lead-Managers") (3) B.A.I.I. plc, Banque Paribas (London) and others ("the Banks") and (4) Banque Paribas (London) ("BNP") ("the Loan Agreement");

   (b)   an agency agreement made between (1) the Banks (2) the Lead-Managers and (3) BNP ("the Agency Agreement");

   (c)   Kensington's complaint in this action ("the Complaint").

   (d)   the first affidavit of Robert Hildyard QC ("the Affidavit").

*The Issues*

**(b)   The Fiduciary Duties of Agents : General Principles**

6.   If a person is an agent, properly so called, he will owe his principal fiduciary duties. It is for this reason that the leading textbook on agency, *Bowstead & Reynolds(17th Ed.)*, states, as Article 45 of the Principles of Agency (§6-032): *"An agent owes to his principal fiduciary duties (duties of loyalty)"*.   It is of course possible for someone to be called an "agent" who does not in fact have the characteristics of a true agent.   A true agent holds a power to affect the legal relations of his principal[1].

---

[1]   *Bowstead: Article 1*

It is because he has such a power that it is " *appropriate and salutary to regard the fiduciary duty as a typical feature of the paradigm agency relationship.* "[2]

7.  *Chitty on Contracts (28th Ed.)* (the leading textbook on contract) at §32-116, adopts a broader view, viz: "*An agent, where he undertakes to act for another in circumstances giving rise to a relationship of trust and confidence, owes fiduciary duties to prefer his principal's interests to his own*".

8.  In the same vein is the judgment of Millett LJ in *Bristol & West Building Society v Mothew* [1998] Ch 1 at p. 18:

    "*A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence.*"

9.  If an agent has been given the power to affect the legal relations of his principal a relationship of trust and confidence inevitably arises: such an agent is accordingly a fiduciary[3].

10. The duties of a fiduciary were explained by Millet LJ explained in *Bristol & West Building Society v Mothew* in the following terms:

    "*The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations.*"

11. It is to be noted that the obligations of a fiduciary, such as an agent, arise independently of the contract creating that relationship.  In *Yasuda Ltd. v. Orion Underwriting Ltd.* [1985] QB 174 at 185 Coleman J analyzed the position as follows:

---

[2]  *Bowstead §6-036*
[3]  whether, if there is a relationship of trust and confidence but no power to affect legal relations, fiduciary duties are owed, is not something that for present purposes needs to be explored; as explained below, under the Loan Agreement BNP, as agent, is given the power to affect the legal relations of the lenders (see §§17-18)

*"Although in modern commercial transactions agencies are almost invariably founded upon a contract between principal and agent, there is no necessity for such a contract to exist. It is sufficient if there is consent by the principal to the exercise by the agent of authority and consent by the agent to his exercising such authority on behalf of the principal ...The rights and obligations arising as a matter of law from the existence of duty-creating relationships....are not in principle displaced by contractual rights and obligations unless the contract provides that such rights and obligations are to be excluded or includes terms which are inconsistent with the duties attributable as a matter of law to the relationships."*

12.   The contract between principal and agent thus serves not to create fiduciary duties but (if appropriate) to modify the general duties that arise on the relationship of trust and confidence being established[4].

13.   Mr. Hildyard starts from the proposition that to establish whether a person is a fiduciary what needs to be examined is the relationship between "principal" and "agent" (see §12 of the Affidavit).    I agree with this as far as it goes: the label "agent" does not establish that a person is in fact an agent[5].    However, as indicated above, once it is established that the "agent" has the power to affect his principal's legal relations, then a fiduciary relationship is established.

14.   I do not accept that *Mothew* supports Mr. Hildyard's proposition (at §15 of the Affidavit) that the starting point is the ascertainment of fiduciary obligations.  On the contrary, as Millett LJ makes clear, the starting point is whether or not there is a relationship of trust and confidence.    From this all else follows.

15.   Mr. Hildyard suggests that the Courts of England and Australia have repeatedly emphasized the importance of not imposing fiduciary duties on parties to a purely commercial relationship; however the only case he cites in support of this proposition is the Australian decision of *Hospital Products Limited v United States Surgical Corporation* [1984] CLR 41[6].    That case dealt with a type of relationship very different from that of principal and agent, namely manufacturer and sole distributor (see p. 118).  Of the five judges, only three determined that there was no fiduciary duty between the parties.    Of these three, two relied on the fact that the relationship was not of the type to which fiduciary obligations attached (see Wilson J. at p. 118 and Dawson J. at 147).    Thus the Australian Court was not saying that because the parties were in a purely commercial relationship no fiduciary duty

---

4   per Lord Browne-Wilkinson in *Henderson v Meritt Sydicates Ltd* [1995] 2 AC 145 at 206
5   *Bowstead on Agency (17th ed.) §6-036*
6   it should be noted that the English courts readily consider and regularly follow decisions from other common law jurisdictions such as Australia

should be imposed, but simply that the type of relationship in question (unlike that of principal and agent) did not ordinarily import fiduciary obligations.

16. In construing the contract between principal and agent to discern whether or not the latter's fiduciary duties have been modified, the ordinary canons of construction apply. A clause which purports to limit or reduce what would otherwise be a party's duty is an exemption clause[7]. Exemption clauses are under English law construed strictly.[8] Further, the party seeking to rely upon an exemption clause bears the burden of proving that the case falls within its provisions, and any doubt will be resolved against him and in favour of the other party.[9]

(c)  **The Terms of the Agreements**

17. The Loan Agreement inter alia gives BNP the following express powers:

(a)  to determine the acceptability of the documentation required as a condition precedent to the Loan being made (clause 7);

(b)  to determine the redistribution of payments received by the Banks (clause 11(v));

(c)  to require Congo to remedy remediable breaches of the Loan Agreement (clause 10(d));

(d)  to determine the account to which payments should be made (clause 11(ii));

(e)  to receive from Congo on behalf of each Bank an amount sufficient to indemnify that Bank against any loss the Bank determines it has sustained (clause 12) or any increased costs it has had to pay (clause 14).

Further, any determination made by BNP is conclusive, in the absence of manifest error (clause 13(ii)).

18. In granting BNP the powers identified above and in providing that BNP's determination should be conclusive in the absence of manifest error, each of the Banks plainly gave BNP the power to affect its legal relations. In my opinion equally plainly, they intended that their relationship with BNP would be a relationship of trust and confidence.

---

[7] *Chitty on Contracts* (28th Ed.) §14-003
[8] see e.g. *Szymonowski & Co. v Beck & Co.* [1923] 1 KB 457
[9] *Chitty on Contracts* (28th ed.) §14-009

- 5 -

19. In the circumstances, in my opinion the Loan Agreement, taken alone, does impose fiduciary duties on BNP.    However, I have considerable doubt as to whether it should be read alone.  By clause 20 of the Loan Agreement each of the Banks acknowledges that by the Agency Agreement it has authorized BNP:

> "*to take such action on its behalf and to exercise such powers as were specifically mentioned in the Loan Agreement together with all such powers as were reasonably incidental thereto.*"

By providing that the exercise of BNP's powers as agent under the Loan Agreement is governed by the Agency Agreement, in my view the parties to the Loan Agreement have effectively incorporated the terms of the Agency Agreement into the Loan Agreement.

20. The Agency Agreement contains provisions which (a) acknowledge the existence of fiduciary duties owed by BNP; and (b) seek to modify those duties.  Thus we see at Clause 6:

> "*Faculties for* [BNP] – [BNP may]:
>
> ...
>
> (ii)  *without being liable to account to the Banks, make any other loans to, accept deposits from and generally engage in any kind of banking business with* [Congo] *as though it were not an agent for the Banks under the Loan Agreement and this Agreement*"

while clause 8 provides:

> "*Agent to be regarded also as a Bank*- *The Agent shall be under the same obligations and be entitled to the same rights and powers in relation to any sums advanced by it under the Loan Agreement in its capacity as a Bank as if it were not the Agent and shall not be obliged by reason of its position as Agent to account to any Bank for any sum paid to it for its own account under the Loan Agreement or the profit element thereof.*"

[emphasis supplied]

The passages emphasized clearly recognize that as an agent BNP has a general fiduciary duty not to promote its self-interest over the interests of its principals, the Banks, and that if it does so it will be liable to account to them.   It is this general duty which clauses 6(ii) and 8 seek to modify.

21.  The question raised by Clause 6(ii) [10] is whether the parties intended to include by the expression *"banking business with* [Congo]*"* business which the Loan Agreement prohibited, viz: financing secured on Congo's assets involving payment to BNP ahead of other creditors; and thus exclude such business from the ambit of BNP's fiduciary duty not to compete.  This is an issue of construction, applying the principles identified in paragraph 16 above, requiring a consideration of the factual matrix in which the Loan and Agency Agreements were entered into and the terms of the financing agreements BNP has subsequently effected.

22.  Mr. Hildyard suggests in §24 of the Affidavit:

(a)  that the functions of BNP under the Loan and Agency and Loan Agreements are limited and substantially ministerial in nature;

(b)  that clause 2 of the Agency Agreement defines the relationship between BNP and the Banks in purely contractual terms and expressly excludes any other duties or obligations;

(c)  that clause 6(ii) confirms that the parties intended the relationship to be purely contractual;

and that in consequence there is no room for the superimposition of fiduciary obligations.  I disagree with all three of these propositions and with the conclusion he seeks to draw from them.

23.  First, whilst BNP does of course have ministerial functions to perform, there are other functions, identified in paragraph 17 above, which do require BNP to exercise far more than a mere ministerial function as agent.  Surprisingly (and in my view erroneously), Mr. Hildyard makes reference only to clauses 9(a) and 20 of the Loan Agreement in analyzing what functions BNP is required to perform.

24.  Further, Mr. Hildyard states, in paragraph 23 ii of the Affidavit, that BNP has no power to bind, yet appears to give no consideration to the terms of clause 13(ii) of the Loan Agreement that expressly state that any determination by BNP shall be conclusive in the absence of manifest error.

25.  Mr. Hildyard seeks to pray in aid a number of provisions in the Agency Agreement which, he says, indicate a restrictively defined and purely contractual relationship. On analysis however, these provisions are either neutral or tend to support the opposite conclusion.

---

[10]  Clause 8 would appear to have no application to receipts by BNP arising other than under the Loan Agreement.

26. Thus, clause 2 of the Agency Agreement, which requires BNP to obtain written authorization to **initiate** legal proceedings in the name of any Bank, carries with it the implication that the Agent is given the discretion, if written authorization is given, to conduct the proceedings thereafter.

27. Clause 4 of the Agency Agreement, which provides that "it is agreed" that no notice requiring the loan to be repaid shall be given otherwise than at the request or with the consent of the "Instructing Group" reflects an agreement between the major and minor lenders that only the former can require immediate repayment, rather than an agreement directed towards cutting down the agent's powers.  Further, the statement that BNP is not obliged to take steps to ascertain whether a default has occurred carries with it the implication that BNP has the discretion to make such an investigation[11].

28. Clause 6(iv) expressly gives BNP the discretion to decide not to exercise any right or power vested in it under the Loan and Agency Agreements unless and until directed to do so by an "Instructing Group".  A discretion not to exercise a power e.g. to give notice in respect of a remediable default under clause 10(d) of the Loan Agreement, is not a ministerial function.

29. The fact that the Banks warrant in clause 11 of the Agency Agreement (inadvertently referred to by Mr. Hildyard as clause 12) that they will be solely responsible for investigating the financial position of Congo takes the matter no further forward.  Mr. Hildyard seeks to suggest that this provision undermines the significance of clause 9(a) of the Loan Agreement, which requires Congo to supply BNP with such information relevant to the Loan Agreement, or the project for which the loan was required, as BNP might reasonably request.  However, as has been pointed out above, BNP has a number of discretionary tasks to perform under the Loan Agreement (not adverted to by Mr. Hildyard) which require it to be provided with information e.g. clause 10(d) (giving notice of remediable default) or clause 11(v) (redistribution of payments).

30. Clause 20 of the Loan Agreement is in the following terms:

    *"Each Bank acknowledges that by* [the Agency Agreement] *it has authorised* [BNP] *to take such action on its behalf and to exercise such powers as are*

---

[11] This ties in with BNP's role under clause 10(d) of the Loan Agreement in determining that a default is remediable and requiring Congo to effect a remedy.

*specifically mentioned in the Loan Agreement together with all such powers as are reasonably incidental thereto."*

It will be seen that by clause 20 the Banks expressly acknowledge that BNP has powers in addition to those expressly given by the terms of the Loan Agreement. If the parties intended that BNP's powers should arise by implication outside the express terms of the Loan Agreement, it is difficult to see why the parties should not also have intended to arise by implication the fiduciary duties ordinarily incident to a principal-agency relationship. In any event, what cannot be said in the light of Clause 20 is that the parties intended their relationship to be governed purely by the express terms of the contract between them.

31. Clause 2 of the Agency Agreement is in the following terms:

*"Relationship between [BNP] and the Banks - Each Bank authorises [BNP] to take such action on its behalf and to exercise such powers as are specifically delegated to it by the terms of the Loan Agreement and [the Agency Agreement], together with all such powers as are reasonably incidental thereto. The relationship between [BNP] and the Banks is that of agent and principal only and [BNP] shall not be a trustee for any Bank. [BNP] shall have no duties or obligations other than those for which express provision is made in the Loan Agreement and [the Agency Agreement]..."*

32. Mr. Hildyard contends that clause 2 is intended to negate not only any other source of obligation but also the creation of any obligations of a different character from those deriving from the contract itself (see §23 i. of the Affidavit). I disagree. Clause 2 seeks to emphasise that the relationship between BNP and the Banks is a relationship of agency not a relationship between trustee and beneficiary. This distinction has particular significance in relation to the receipt of money. A trustee is required to keep trust money separate from his own funds. An agent on the other hand usually is not required to keep money separate: he simply has an obligation to account for money received as a contract debtor[12].

33. Further, by defining the relationship as one between agent and principal the parties were clearly intending to import the incidents of such a relationship. As explained above[13], where the agent is given the power to affect his principal's legal relations, those incidents include fiduciary duties.

---

[12]   see *Lewin on Trusts (17th Ed.) §1-17*
[13]   see §9

34.   It is to be noted that clause 2 adopts the same wording as clause 20 of the Loan Agreement with respect to BNP's implied powers.  The points made in paragraph 30 above are accordingly equally applicable.

35.   The last sentence of clause 2 states that BNP has no duties or obligations other than those for which express provision has been made in the Loan and Agency Agreements.  Clause 2 does make express provision for BNP to act as agent.  By the use of that term the parties have imported the ordinary duties and obligations incident to that role.  As noted above[14], such duties include fiduciary duties.

36.   I have commented on clause 6(ii) above.[15]   The importance of clause 6(ii) is that it contains an acknowledgment that, subject to the modifications it provides for, BNP does owe fiduciary duties to the Banks.

37.   In conclusion, in my opinion an analysis of the provisions of the Loan and Agency Agreements merely provides confirmation that, subject to modification, BNP owes to the Banks the fiduciary duties customarily owed in an agency relationship.

### (e) Elements of the Tort of Inducing Breach of Contract

38.   The tort of inducing breach of contract comprises four elements: (a) knowingly and intentionally (b) to induce a third party to break his contract (c) causing damage of the other contracting party (although see further §[ ] below) (d) without reasonable justification or excuse[16].   I deal with each of these elements below.

39.   **Knowledge and Intention**   The defendant must be shown to have had knowledge of the existence of the contract in question.   Such knowledge may be inferred[17]. Liability does not depend on knowledge of the precise terms[18].   Whilst it has been said that both knowledge and intention are required[19], in order for a defendant to intend to procure a breach of contract he must perforce have knowledge of the contract.   As Lindgren J. said in the Australian case of *Allstate Life Insurance Company v Australia and New Zealand Banking Group Ltd* (1995) 130 ALR 469:

*Although an alleged tortfeasor must have "a fairly good idea" that the contract benefits another in the relevant respect, knowledge of the contract*

---

[14]   see §7
[15]   see §§20-1
[16]   see *Clerk & Lindsell on Torts* (18th Ed.) §24-15
[17]   see *MIddlebrook Mushrooms Limited v TGWU* [1993] ICR 612
[18]   see *Stratford v Lindley* [1965] AC 269
[19]   see  *Merkur Island Shipping Corporation v Laughton* [1983] AC 570 at 608

*may be sufficient for the purpose of grounding the necessary intention to interfere with contractual rights although the precise term breached is not known".*

40. Intention is established objectively[20]. In this context it is a principle of English law that *"people are presumed to intend the reasonable consequences of their acts."[21]*. Thus it is sufficient if the defendant has knowledge that the doing of the act would necessarily and inevitably involve a breach of contract[22].

41. §§28 and 45 of the Complaint plead that BNP entered into a series of transactions with Congo which required the latter to provide security to BNP and prefer BNP over other creditors in breach of the provisions of clause 9(d) of the Loan Agreement ("the Oil Transactions"). Assuming that it is established that the transactions are of the type pleaded they would necessarily and inevitably involve a breach of contract.

42. Did BNP have knowledge of the Loan Agreement when it entered into the Oil Transactions? This gives rise to two questions: did BNP acquire knowledge of the Loan Agreement at the time it was entered into? If it did acquire that knowledge, can it be heard to say that it had lost it by the time it entered into the Oil Transactions?

43. It is not possible to discern from the Loan and Agency Agreements themselves precisely who signed them. However there appears to be no dispute but that they were signed by someone authorised by BNP. Accordingly, for the purposes of those transactions that person was acting as BNP and his knowledge of the contractual terms was BNP's knowledge: see *Tesco Supermarkets Ltd v Nattrass* [1972] AC 153 at 170 where Lord Reid said:

*"A living person has a mind which can have knowledge or intention to be negligent and he has hands to carry through his intentions. A corporation has none of these: it must act through living persons, though not always one or the same person. Then the person who acts is not speaking or acting for the company. He is acting as the company and his mind which directs his acts is the mind of the company."*

44. Once corporate knowledge has been obtained it is not subsequently lost because of the death or departure of the person who obtained the knowledge.[23] Thus in *El Ajou*

---

[20]    see *Greig v Insole* [1978] 1 WLR 302 at 337
[21]    see *South Wales Miners' Federation v Glamorgan Coal Co. Ltd.* [1905] AC 239;
[22]    see *Independent Oil Industries Ltd v The Shell Company of Australia Ltd* (1937) 37 SR NSW 394 at 414
[23]    see *Beach Petroleum NL v Johnson* (1993) 43 FCR 1 at 32 per von Doussa J.

*v Dollar Holdings plc*[24]   Hoffman LJ (as he then was: he is now in the House of Lords) held that once knowledge was treated as the knowledge of a company in relation to a given transaction, the company continued to be affected with that knowledge for any subsequent stages of the same transaction, whether or not that knowledge was imputed from the knowledge of a person who had in the interval left the company.

45.   **Inducing a breach of contract**   As Mr. Hildyard correctly states, this requirement is satisfied if a third party, with knowledge of a contract between the contract breaker and another, has dealings with the contract breaker which the third party knows to be inconsistent with the contract[25].   This is the case,[26] even if the contract breaker is a willing party to the breach.

46.   **Causing Damage to the Other Contracting Party**   Prior to *Attorney-General v Blake*[27] it had been well established that the claimant needed to prove that he has been damaged by the breach of contract procured by the defendant[28]; albeit that where the breach had been such as must in the ordinary course of business inflict damage upon the claimant, it is unnecessary for him to prove particular damage[29].

47.   However, as discussed below, following *Blake* it may well now be the case that damages for procuring a breach of contract can be recovered on a restitutionary basis.   If this is correct, then the "requirement" of showing damage will be satisfied either (a) by the claimant proving it has suffered loss or (b) establishing that the defendant has obtained a profit from its tortious acts which it should be required to disgorge[30].

48.   Assuming that the claimant does need to prove it has suffered damage, what Kensington needs to show is that BNP's actions have caused it to lose something of value[31].   I have not been asked to consider whether, as a matter of fact, Kensington is able to show such a loss.   I note that Mr. Hildyard speculates on Congo's apparent track record of non-payment of debts as a possible reason why Kensington would not be able to succeed in this exercise.   However, one can as easily speculate that Congo would have been forced to deal with its outstanding debt obligations had it not been for the financial assistance it obtained from BNP; or

---

[24]   [1994] 2 All ER 685 at 706
[25]   see *D.C. Thompson & Co. Ltd v Deakin* [1952] Ch. 646 at 694
[26]   see *British Motor Trade Association v Salvadori* [1949] Ch. 556
[27]   [2001] 1 AC 268
[28]   see *Exchange Telegraph Co. v Gregory* [1896] 1 QB 147
[29]   see *Goldsoll v Goldman* [1914] 2 CH. 603 at 615
[30]   see *Goff & Jones on Restitution* (6th Ed.) §36-009
[31]   see *Hatswell v Goldbergs (A Firm)* (Court of Appeal)[2001] EWCA Civ 2084 at §48 applying the House of Lords' decision of *Allied Maples Group Ltd v Simmons & Simmons* [1995] 1 WLR 1602

- 12 -

that the arrangements entered into between Congo and BNP made Congo's assets less available for attachment.

49.   **No Reasonable Justification or Excuse**

The only possible justification or excuse that could be proffered would be ignorance of the terms of the Loan Agreement. However, even if the person who procures the breach of contract does so in ignorance that his actions have this effect, that will provide his company with no defence if another of its officers (or former officers)[32] knows that that belief is wrong[33]. Accordingly I agree with Mr. Hildyard (at §31 of the Affidavit) that this defence can be presumed not to be available to BNP.

(e)   **The Availability of Damages Assessed on a Restitutionary Basis**

50.   Damages calculated on a restitutionary basis are, as Mr. Hildyard correctly observes, a relatively recent phenomenon in contract. Prior to the House of Lords' decision of *Attorney-General v Blake* [2001] AC 268 it was generally believed that damages in contract could only be compensatory, the court being concerned only with the claimant's loss, the defendant's profit being wholly irrelevant[34].

51.   In tort damages calculated on a restitutionary basis have long been recognized. Thus damages have been awarded on this basis in cases relating to infringement of intellectual property rights, conversion, trespass to land, nuisance and breach of confidence[35]. Whether the remedy is available for torts generally has been the topic of some debate. The editors of *Clerk & Lindsell* summarise the current position as follows:[36]

*"Now that restitutionary damages have been accepted, the focus of attention switches to the difficult question of the criteria for determining whether a tort triggers restitutionary damages. Three main views can be distilled from the academic literature. The first, and widest view, is that restitutionary damages should be available for any tort provided a gain has been acquired by (i.e. has been factually caused by) the tort. A second is that proprietary torts only should trigger restitution. A third view is that any tort deliberately committed with a view to gain (i.e. cynically committed) should enable the courts to award restitutionary damages. It remains to be seen how this area of law will be developed by the courts and which, if any, of those three views finds favour."*

---

[32]   see *Tszyu v Fightvision Pty Ltd* [1999] NSWCA 323
[33]   see *Brambles Holdings Ltd v Carey* (1976) 15 SASR 270 at 280
[34]   see e.g. *Surrey County Council v Bredero Homes Ltd* [1993] 1 WLR 1361 (CA)
[35]   see *Clerk & Lindsell* (18th Ed.) at §29-133
[36]   see §29-134

52. The leading textbook on restitution, *Goff & Jones*[37], which espouses the first view identified by *Clerk & Lindsell*, considers that restitutionary damages may possibly be available for the tort of inducing a breach of contract. This view is based on the US decision of Judge Mayer in *Federal Sugar Refining Co. v United States Sugar Equalisation Board*[38], an inducement to breach of contract case, who stated:

> "...The point is whether defendant unjustly enriched himself by doing a wrong to plaintiff in such manner and in such circumstances that in equity and good conscience defendant should not be permitted to retain that by which he has been enriched..."

53. Causation in the context of damages claimed on a restitutionary basis requires the court to consider the question "would the defendant have gained the benefit but for the tort?"[39].   As BNP would not have gained the profits it made from the Oil Transactions unless it had induced Congo to treat it as a preferred creditor and provide it with security it is difficult to see how this question could be answered other than in the negative.

54. Damages calculated on a restitutionary basis are available where the remedies otherwise available to the claimant are inadequate[40]. Usually the remedies available for breach of contract and tort are sufficient properly to compensate the claimant for the wrong suffered.  It is accordingly only in exceptional circumstances, such as those faced by the House of Lords in *Attorney-General v Blake*, that the issue arises.

55. In my opinion one circumstance that might well be considered to be exceptional would be if (contrary to the views expressed above) BNP, although an agent, owes no fiduciary duties to its principal, Kensington.

56.  One element which Lord Nicholls did not consider to be sufficient in itself[41], but which was clearly a powerful factor in the recent decision of the Vice Chancellor[42], *Esso Petroleum Company Ltd  v Niad Ltd* (22 November 2001) (unreported) was a cynical disregard by the defendant of its obligations, by doing the very thing it had contracted not to do.

---

37    6th Ed. – Lord Goff is a retired law lord
38    268 F. 575 (1920) (S.D.N.Y.)
39    see *Goff & Jones* §36-007
40    see *Attorney-General v Blake* [2001] 1 AC 268 at 287 per Lord Nicholls
41    see *Blake* at p. 286
42    the head of the Chancery Division of the High Court of Justice

57. What has been described as *"A useful general guide, although not exhaustive"*[43] is whether the claimant has a legitimate interest in preventing the defendant's profit-making activity.   Such an interest was found to exist in *Esso*, where the activities of the defendant undermined the effectiveness of the pricing scheme operated by the claimant[44].   In my opinion a creditor (or his assignee) who is party to a scheme under which he and his fellow creditors are to be treated equally by a common debtor, does have a legitimate interest in ensuring that the scheme is not destroyed by the collusive actions of the debtor and one of the creditors.

58. I do not share Mr. Hildyard's view, expressed in paragraphs 38 and 39 of the Affidavit, that Kensington would be unlikely to be entitled to damages assessed on a restitutionary basis because it is (to use Mr. Hildyard's pejorative words) *"a speculative purchaser of a distressed debt"*.   Whilst the court is required to consider all the circumstances, of far more significance in my opinion will be whether the court forms the view that BNP has acted in a cynical manner and whether it considers that Kensington has a legitimate interest (which, as explained above, I believe it does) in ensuring compliance with the debt-repayment scheme BNP had signed up to.   If these elements are established an award of damages on a restitutionary becomes far more likely.

59. Mr. Hildyard, in §35 of the Affidavit, makes reference to *Experience Hendrix LLC v Enterprises Inc. & Anr*[45] for the proposition that the court may make an award equal to a reasonable sum for the benefit wrongly obtained, rather than order an account of profits.   It is however to be noted that although reference was made to *Attorney-General v Blake*, the Court of Appeal in fact decided *Experience Hendrix* applying pre-*Blake* principles established by the 1974 decision of *Wrotham Park Estate Co. v Parkside Homes* Ltd[46].   The dispute concerned unauthorized use of recordings of the late Jimi Henrix: the court was able to assess what would have been a reasonable sum to have paid for a licence to use the recordings had permission been sought.   There is no scope for such an approach in the present case.

Dated 16 ᴿ January 2004                    _____

SWORN BEFORE ME                         STEPHEN MOVERLEY SMITH QC
4T Road Town, Tortola, British Virgin Islands

My commission is for life



---

[43]  Lord Nicholls in *Blake* at p. 285
[44]  see §64
[45]  [2003] 1 All ER (Comm) 830
[46]  [1974] 1 WLR 798

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
                                  :

KENSINGTON INTERNATIONAL LIMITED,    :

                     Plaintiff,    :      Index No. 03/602569

                     v.           :      <u>AFFIDAVIT OF</u>
                                    :      <u>CHRISTOPHER FIX</u>
BNP PARIBAS S.A.,                      :

                    Defendant.    :

------------------------------------------------------------------X

STATE OF NEW YORK   )
                       ) ss:
COUNTY OF NEW YORK )

       I, CHRISTOPHER FIX, being duly sworn, depose and state as follows:

       1.     I am a Credit Officer in Energy & Commodities, Export Finance and Project Finance Portfolio Management in the New York branch office of BNP Paribas S.A. ("BNP-P"). I have held the position of Credit Officer since 1999. (Prior to an administrative reorganization in late 2002 to early 2003, I was a Credit Officer within the Commodity Indexed Transaction Group (the "CIT Group")).

       2.     The CIT Group located at the New York branch of BNP-P serves as a booking center for commodity indexed transactions generated worldwide. The CIT Group's New York offices provide only back office services (<u>i.e.</u>, regularizing the documentation of transactions on the books, monitoring transactions, etc.). Front office services, such as the negotiation of transactions, are centered in BNP-P's London branch. The CIT Group's New York back office is not involved in negotiating transactions with customers.

       3.     I understand that Kensington contends that BNP-P's New York branch played a "substantial" role in certain transactions, including a "Covered Oil Option," between BNP-P's

Paris headquarters and Société Nationale des Pétroles du Congo ("SNPC").  In support of its

argument, I understand that Kensington has relied upon an e-mail from me dated April 28, 2003.

4.      My involvement with SNPC and Congo was extremely limited, and in fact is

confined entirely to booking aspects of the Covered Oil Option.  I did not negotiate any aspect of

any transaction with SNPC or Congo, and I have never spoken or corresponded with any of their

representatives.  I have no knowledge of, and have never been involved in, any "Prepayment

Agreements" or "General Conditions Agreements" between BNP-P and SNPC, or of the "Loan

Agreement" and "Agency Agreement" which I am told are at issue in this lawsuit.

5.      When I was informed of the contemplated Covered Oil Option (after its terms had

been negotiated), I attempted to compile a file of supporting information to document the risk

assessment assigned to that transaction by the London and Paris offices.  I was advised by

Vincent Chevance, who worked in the London front office of the CIT Group, that the Paris head

office would provide an inter-bank guarantee to the New York branch regarding the proposed

Covered Oil Option to cover the associated risk.  In fact, I was not able to compile a  credit risk

file on the Covered Oil Option, as my requests for supporting information were not answered.

The e-mail dated April 28, 2003 is my request for supporting information about the risk

assessment made by BNP-P personnel in London and Paris.

6.      Apart from my efforts to compile supporting credit risk information with respect

to the Covered Oil Option, I have had no involvement of any sort with Congo or SNPC.

CHRISTOPHER FIX

Sworn to before me this
19 day of March, 2004

Notary Public

JOHN C. OSTLING III
NOTARY PUBLIC, State of New York
No. 01OS5069538
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Nov. 26, 2006

3/19/2004 2:34 PM (2K)
NEWYORK 3848874 v5 [3848874_5.DOC]                    -2-

# EXHIBIT C

SHEARMAN & STERLING
Danforth Newcomb (DN 0881)
Mark S. McNeill (MM 1030)
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000
(212) 848-7179 (facsimile)

*Attorneys for Plaintiff*
*FG Hemisphere Associates, L.L.C.*

DOC # 0̸1

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

FG Hemisphere Associates, L.L.C.,

                Plaintiff,

       v.

Republique du Congo,

                Defendant.

------------------------------------------------------X

01 CV 8700

01 Civ. _____ (_____)

## COMPLAINT

Plaintiff FG Hemisphere Associates, L.L.C. ("FG Hemisphere"), by its

attorneys, Shearman & Sterling, as and for its Complaint, alleges as follows:

## PARTIES

1.    FG Hemisphere is a limited liability company organized and

existing under the laws of the State of Delaware, with its principal place of business at

150 East 58th Street, 26th Floor, New York, New York 10155.

2.  Defendant, Republique du Congo (the "Congo"), formerly known as

the Republique Populaire du Congo, is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over the subject matter of this action and jurisdiction over the person of the Congo under 28 U.S.C. § 1330, in that this is a non-jury civil action against a foreign state not entitled to immunity under 28 U.S.C. §§ 1605-1607 or any applicable international treaty, as to which service is made in accordance with 28 U.S.C. § 1608.

4.   Pursuant to the Loan Agreement dated July 7, 1982 and amended by letter agreements dated July 7, 1984 and September 16, 1985 (the Loan Agreement as so amended being hereinafter referred to as the "Loan Agreement") entered into by and between Banco do Brasil S.A., acting through its Nassau Branch (the "Bank"), and the Congo, the Congo (i) acknowledged that its incurring of indebtedness under the promissory note issued in connection with the Loan Agreement (the "Note") and the Loan Agreement constitutes a private and commercial act rather than a governmental or public act, and that neither the Congo nor any of its property enjoys any right of immunity from suit, jurisdiction of the New York courts, attachment or execution; and (ii) irrevocably waived any rights of immunity from suit, jurisdiction, judgment or execution in respect of its obligations under the Note and the Loan Agreement to the extent that the Congo or any of its assets or properties acquires any such right of immunity.

5.   Pursuant to a special arrangement between the Bank and the Congo, service of process may be made through CT Corporation System, 1633 Broadway, New York, New York  10019 or by registered or certified mail to the Ministère des Finances, Caisse Congolaise d'Amortissement, the Congo.

2

6.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

## FACTS

7.   Pursuant to the terms of the Loan Agreement, the Bank made a series of advances (herein collectively referred to as the "Loan") to the Congo in the aggregate principal amount of US $35,916,075.00 for the purpose of financing the construction of a highway, Empena-Impfondo-Dougou, in the Congo.

8.   Under the Note and the Loan Agreement, the Congo agreed to repay the principal amount of the Loan plus interest, and to pay interest at the "Post-Default Rate" (as defined therein) on any principal amount not paid when due.

9.   Section 12 of the Loan Agreement provides that an "Event of Default" occurs if, among other reasons, any principal or interest due and owing under the Note or the Loan Agreement is not paid in full when due.

10. The Loan Agreement also provides that the Bank may sell, assign or transfer all or any portion of its right, title and interest in the Loan, the Note or the Loan Agreement.

11. In connection with the disbursement of the Loan, IRB Brasil Resseguros S/A, formerly known as Instituto de Resseguros do Brasil ("IRB"), an agency of the government of Federal Republic of Brazil ("Brazil"), executed and delivered to Andrade a credit insurance policy dated January 12, 1984 (the "Credit Insurance Policy") pursuant to which IRB insured the payment to Andrade of ninety percent of all amounts owing to Andrade by the Congo.

3

12. On January 12, 1984, the Specific Conditions of the Credit Insurance Policy were amended by the addition of Special Conditions pursuant to which IRB agreed to pay Andrade 85% of each of the semi-annual repayments to be made by the Congo, together with interest thereon.

13. On May 17, 1984, Andrade assigned all of its rights under the Credit Insurance Policy to the Bank.

14. By letter agreements dated July 7, 1984, and September 16, 1985 (the "Letter Agreements"), the Bank and the Congo agreed to amend the Loan Agreement by, among other things, extending the maturity dates of the Loan.

15. The Congo has failed to repay principal in the amount of US $34,416,076.00 due and owing under the Note and the Loan Agreement. As a result, the Congo is in default of its repayment obligations of that amount, plus all accrued and unpaid interest.

16. After the Congo's default, IRB satisfied its obligations under the terms of the Credit Insurance Policy. Pursuant to the subrogation provisions of the Credit Insurance Policy, IRB acquired all the right, title and interest of the Bank in and to the aggregate principal amount of US $29,253,664.60 (such amount being equal to 85% of the Outstanding Principal) owing by the Congo pursuant to the terms of the Loan Agreement, together with all accrued but unpaid interest thereon.

17. Under an assignment agreement dated April 20, 2001 between FG Hemisphere, IRB and Brazil (the "Assignment Agreement"), FG Hemisphere purchased and was assigned all of the right, title and interest of IRB and Brazil in and to the

4

aggregate principal amount of US $29,253,664.60 owing by the Congo to IRB pursuant to the terms of the Loan Agreement, all interest accrued and unpaid thereon, and all rights of IRB and Brazil under the Note and the Loan Agreement.

18. The Congo executed a refinancing agreement (the "Refinancing Credit Agreement") dated February 26, 1988 purporting to extend the maturity dates of certain loans made by foreign lenders to the Congo. Although the Refinancing Credit Agreement acknowledges the Congo's debt incurred under the Note and the Loan Agreement and lists the Loan as an obligation subject to refinancing, neither the Bank nor its assignees were or are bound by the Refinancing Credit Agreement due to a failure of a condition precedent under that agreement.

19. The Congo subsequently executed two tolling agreements dated January 27, 1993, and September 22, 1997 respectively, in which the Congo acknowledged certain foreign debts, including its debt incurred under the Note and the Loan Agreement.

20. FG Hemisphere has notified the Congo that it has purchased and been assigned all of IRB's interests under the Note and the Loan Agreement, and has requested that FG Hemisphere and the Congo discuss a resolution of the sums owed to FG Hemisphere.

21. As of the date hereof, the Congo has failed to respond to any of FG Hemisphere's communications or make any payments to FG Hemisphere under the Note or the Loan Agreement.

5



## CLAIMS FOR RELIEF

22. FG Hemisphere repeats and realleges paragraphs number 1 through 21 as though fully set forth herein.

23. The Congo has breached and is in default of its payment obligations under the Note and the Loan Agreement by failing to pay principal and interest due and owing.

24. FG Hemisphere owns all right, title and interest in and to the aggregate principal amount of US $29,253,664.60 owing by the Congo under the Note and the Loan Agreement, plus all interest accrued thereon, and is entitled to payment thereof.

25. Pursuant to the Loan Agreement, FG Hemisphere is also entitled to repayment of its attorneys' fees, court costs, and out-of-pocket expenses incurred as a result of the Congo's breach of its payment obligations under the Note and the Loan Agreement.

WHEREFORE, plaintiff FG Hemisphere demands judgment against the Congo as follows:

(i)    The principal amount of US $29,253,664.60 plus all accrued and unpaid interest, including interest accrued at the "Post-Default Rate" and interest accrued upon interest, in accordance with the terms of the Note and the Loan Agreement and in accordance with New York law;

(ii)    Attorneys' fees, costs and all other disbursements incurred by FG Hemisphere in connection with the enforcement of the Note and the Loan Agreement, in an amount to be determined at trial; and

6

      (iii)    Such other, further and different relief as the Court may deem just

and proper.

Dated: New York, New York
      September 26, 2001

                    SHEARMAN & STERLING

                    By: _____
                      Danforth Newcomb (DN 0881)
                      Mark S. McNeill (MM 1030)
                    599 Lexington Avenue
                    New York, New York 10022
                    (212) 848-4000
                    (212) 848-7280 (telefax)

                    *Attorneys for Plaintiff*
                    *FG Hemisphere Associates, L.L.C.*

© 2005 International Monetary Fund

November 2005
IMF Country Report No. 05/391

## Republic of Congo: Enhanced Heavily Indebted Poor Countries (HIPC) Initiative—Preliminary Document

This paper was prepared by staff of the International Monetary Fund and the World Bank in connection with the Executive Board's consideration of the Republic of Congo's preliminary assessment of eligibility for assistance under the enhanced Initiative for Heavily Indebted Poor Countries. It is based on the information available at the time it was completed on July 19, 2005. The views expressed in this document are those of the staff team and do not necessarily reflect the views of the government of the Republic of Congo or the Executive Board of the IMF.

The policy of publication of staff reports and other documents by the IMF allows for the deletion of market-sensitive information.

**To assist the IMF in evaluating the publication policy, reader comments are invited and may be sent by e-mail to publicationpolicy@imf.org.**

Copies of this report are available to the public from

International Monetary Fund ● Publication Services
700 19th Street, N.W. ● Washington, D.C. 20431
Telephone: (202) 623 7430 ● Telefax: (202) 623 7201
E-mail: publications@imf.org ● Internet: http://www.imf.org

Price: $15.00 a copy

**International Monetary Fund
Washington, D.C.**