UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

KENSINGTON INTERNATIONAL LIMITED,

        Plaintiff,

        v.                                          05 Civ. 5101 (LAP)

SOCIÉTÉ NATIONALES DES PÉTROLES DU CONGO,
BRUNO JEAN- RICHARD ITOUA,
BNP PARIBAS S.A.,

        Defendants.

---------------------------------------------------------------X


**Supplemental Legal Opinion of Chantal Cutajar (Translation)**

Chantal CUTAJAR
Université Robert Schuman - Strasbourg

# SUPPLEMENTAL LEGAL OPINION

1. In the case between Kensington International Limited (Kensington), on the one hand, and BNP PARIBAS (BNPP), Société Nationale des Pétroles Congolais (SNPC), and Bruno ITOUA, on the other, the undersigned submitted, on July 30, 2005, a legal opinion, in which she concluded that "the tools of French law, both civil and criminal, offer all guarantees for an individual or a legal entity claiming to be a victim of corruption, racketeering, or misappropriation of public funds linked to organized crime and money laundering, to obtain full compensation further to a fair civil or criminal trial" (§ 52). In his declaration of November 14, 2005, Mr. Olivier Schnerb, Esq., asserts in his opinion that "the tools of French law do not offer satisfactory guarantees to Kensington of adequate legal actions for compensation for its damages" (§ 29). In her legal opinion of November 23, 2005, Professor Catherine Kessedjian deems that "it is well known that French rules of evidence do not offer the same possibilities as American rules of evidence" (§17) and that "we may still doubt whether French courts have realized all the measures necessary to effectively carry out this fight at both the international and domestic levels" (§ 14.2).

2. The allegations of the declarants are meant to convince the American court that:

    - Kensington is legally unable to bring an action before the civil court.

    - Kensington is unable to bring an action, by itself, before the criminal court.

    - If the criminal action were brought on the Public Prosecutor's initiative, Kensington could not, in any case, be granted damages.

    - Kensington would be, in the framework of a legal proceeding before a French court, without any means to obtain evidence.

    - France is a lawless place where it is possible to commit the most reprehensible acts with impunity and where victims lack all legal recourse.

3. The assertions and allegations found in these declarations are particularly incomplete and intentionally biased to the extent that they ignore a large number of procedural and substantive rules of the French legal system. The undersigned will demonstrate that these statements cannot stand up to an analysis of French law as construed by the courts, and that, in reality, (I) Kensington can bring an action before a civil court on its own initiative and without having to initiate a criminal prosecution; (II) Kensington can initiate a criminal prosecution even in the event of inaction by the Public Prosecutor; (III) Kensington can obtain damages for the harm suffered; (IV) French rules of criminal procedure offer all guarantees necessary for the collection of evidence; and (V) France is not a lawless place.

## I. – KENSINGTON CAN BRING AN ACTION BEFORE A CIVIL COURT ON ITS OWN INITIATIVE, WITHOUT HAVING TO INITIATE A CRIMINAL PROSECUTION.

4. Mr. Olivier Schnerb states that "the French civil courts (…) will be inadequate to the extent that the damages suffered by Kensington result from the defendants' activities, which are a matter of criminal law" (§ (A)). In his opinion, an action based on Article 1382 of the Civil Code "cannot go forward without a criminal proceeding, since the facts on which Kensington's complaint is based are criminal in nature" (§ 9). Thus, according to Mr. Schnerb, a claimant seeking damages for harm resulting from a criminal offense would have no other solution but to submit its claim within the context of a criminal proceeding.

**This allegation does not correspond to the reality of French applicable law: this allegation is therefore false.**

5. Indeed, pursuant to a general and fundamental principle of French law, articulated in Article 1382 of the Civil Code, "Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it." Article 1382 allows a victim to obtain full compensation for the harm from the person who caused it, through a legal action for civil liability. Such an action can always be brought before the civil courts, regardless of the nature of the facts having caused the harm – that is, even when the damages result from an action likely to constitute a criminal offense.

6. Should Kensington decide to bring its action for compensation before a civil court pursuant to Article 1382 of the Civil Code, the civil court will render its decision without considering the criminal laws likely to apply, which lie in any event outside its jurisdiction.

7. Mr. Schnerb's allegation that "an action before a civil court cannot go forward as long as a criminal court has not ruled" (B) is true only when a proceeding has been initiated before a criminal court or when a public prosecution has been set in motion according to the law. This principle, adopted in 1910,[1] is so well established that it no longer gives rise to dispute.

8. Thus, contrary to Mr. Schnerb's assertions, the victim of a criminal offense is never forced to submit its claim for compensation to a criminal court and can go directly before a civil court. Kensington has the right to bring an action for compensation, which can be heard before a civil court pursuant to Article 1382 of the Civil Code, outside the context of any criminal proceeding.

---

[1] Req. November 9, 1910: DP 1911. 1. 476.

## II. – KENSINGTON CAN INITIATE A CRIMINAL ACTION EVEN IN THE EVENT OF INACTION BY THE PUBLIC PROSECUTOR.

9. If Kensington chooses to seek compensation before a criminal court, Mr. Schnerb alleges that "the criminal action can go forward only if the Public Prosecutor decides himself to initiate the prosecution, which is left to his discretion" (§ (C)).

**This allegation does not correspond to the reality of applicable French law: this allegation is therefore false.**

10. Indeed, Article 1 of the Code of Criminal Procedure[2] allows the victim of a criminal offense itself to initiate a public prosecution.[3] When the victim has initiated the public prosecution, the Public Prosecutor can no longer file away the matter raised in the complaint without taking any action.[4] Thus, Mr. Schnerb's argument pursuant to Article 40 of the Code of Criminal Procedure,[5] which establishes the principle that the Public Prosecutor can decide whether to initiate a public prosecution, is correct only when the victim does not elect to be a civil plaintiff. This is a hypothesis that is not realistic in Kensington's case.

11. Consequently, the investigating magistrate duly put in charge of an investigation further to a complaint by a civil plaintiff "has the duty to investigate regardless of the directions of the Public Prosecutor."[6] The magistrate will open a preliminary investigation, a procedure during which he will verify whether the facts alleged by the victim are authentic, whether such facts constitute a criminal offense, and whether they fall within the jurisdiction of the French courts. The Public Prosecutor cannot oppose the opening of this preliminary investigation. Indeed, even if the investigating magistrate were to receive directions from the Public Prosecutor not to investigate, he could go ahead with an investigation.

12. **In conclusion, should Kensington choose to submit its claim before a criminal court, it could, on its own initiative, initiate a public prosecution by electing to be a civil plaintiff before an investigating magistrate.**

## III. - KENSINGTON COULD OBTAIN DAMAGES AS COMPENSATION FOR THE HARM SUSTAINED.

13. Mr. Schnerb alleges that, "even if a criminal action were initiated, Kensington's claim for damages would not be admitted" (§ (D)). In support of his argument, Mr. Schnerb

---

[2] Annex 1.
[3] In order to initiate a public prosecution, the victim must file with the investigating magistrate a complaint as a civil plaintiff in accordance with the terms and conditions provided in Articles 85 through 91 of the Code of Criminal Procedure. According to well-established jurisprudence, a civil plaintiff's complaint sets in motion a public prosecution in the same manner as directions to investigate given by a Public Prosecutor: Crim. September 21, 1999, Bull. crim. n° 188 – Annex 2.
[4] Crim. November 1, 1989 – Annex 3.
[5] Further to this principle, the Public Prosecutor "receives the complaints and allegations and determines what to do with them."
[6] Crim. September 21, 1999; Crim. January 30, 2001; Crim. January 4, 2005 – Annex 4.

affirms that, on the one hand, none of the criminal offenses considered by the undersigned in her legal opinion of July 30 are likely to be applicable and that, on the other hand, even if certain were applicable, they would not provide the right to compensation. His reasoning is unconvincing.

14. In her legal opinion of July 30, 2005, the undersigned considered the main criminal offenses that could correspond to the conduct referenced in the R.I.C.O. statute (§ 45). This discussion was intended to inform the U.S. court that the actions falling under the provisions of the R.I.C.O. statute also fall under the provisions of French law, and that, indeed, important tools exist under French criminal law. Specifically, if Kensington decides to bring its action before a criminal court, it will send to the investigating magistrate a simple letter specifying that it elects to be a civil plaintiff and alleging the facts. Kensington will not have to assert that the facts it is alleging constitute a particular offense because the magistrate is in charge of examining the matter *in rem* – i.e., exclusively with respect to those facts alleged in the complaint. The complaint does not need to refer to specific offenses, as Mr. Schnerb implies (§ 29 (c)). Thus, when Kensington submits its claim, it does not need to prove the existence of a particular offense or damages. Kensington will need to convince the investigating magistrate of the mere possibility that some offense has been committed and that it might have caused damages.[7] It is the role of the investigating magistrate to determine the offense constituted by the alleged facts and to demonstrate the existence of criminal offenses, if any. Consequently, Mr. Schnerb's statements, purporting to assert that the offenses of money laundering and fraud are likely inapplicable to the facts alleged by Kensington, are not relevant.

15. With respect to other mentioned offenses, Mr. Schnerb affirms that the offenses of corruption (Article 453-3 of the Criminal Code), embezzlement of public funds (Article 432-15 of the Criminal Code), and criminal association (Article 450-1 of the Criminal Code) "do not give rise to payment of damages to civil plaintiffs" (§ 18) and that, with respect to the embezzlement of public funds, "case law is settled: the courts have established that harm caused by the embezzlement of public funds can only be indirect for any person wishing to be a civil plaintiff, thereby rendering inadmissible complaints by civil plaintiffs (…)" (§ 24).

**These allegations do not correspond to the reality of French applicable law: these allegations are therefore false.**

16. Indeed, Article 2 of the Code of Criminal Procedure opens civil indemnification actions to "all those who have personally suffered harm directly caused by the offense."[8] According to Article 3, such a civil action is admissible "for all types of damages, pecuniary as well as bodily or intangible."

17. Furthermore, an analysis of case law reveals that the courts hear complaints of civil plaintiffs in matters of corruption,[9] criminal association,[10] and embezzlement of public funds.[11]

---

[7] Crim. February 18, 2002, Bull. crim. n° 34 – Annex 5.
[8] Annex 6.
[9] Crim. December 1, 1992: This offense "principally established for the public interest also aims to protect private individuals." Annex 7.

18. The argument raised by Mr. Schnerb, drawn from the theory of general interest offenses, whereby offenses that pertain only to the general interest are unable to protect private interests at the same time, is irrelevant. He denies that the Criminal Chamber has abandoned this theory. Yet Mr. Schnerb cannot be unaware of an important decision of the Criminal Chamber dated March 10, 2004,[12] that recognizes, for the first time, that the French State itself can elect to be a civil plaintiff in criminal proceedings brought against certain of its public officers for influence peddling and favoritism, on the grounds that the State suffers "intangible harm resulting from the discredit to all civil servants that the behavior of the accused has caused and the weakening of the State's authority resulting therefrom."[13] This jurisprudential change of course as to the admissibility of a civil action submitted by the State itself marks a break with the theory of general interest offenses to which Mr. Schnerb refers. If the theory no longer applies to the State itself, which embodies the public interest, it is difficult to see, *a fortiori*, how this theory could apply to private victims.

19. **In conclusion, contrary to Mr. Schnerb's affirmations, Kensington could obtain compensation for the damages it suffered as a result of the defendants' alleged conduct.**

## IV. FRENCH CRIMINAL PROCEDURE OFFERS KENSINGTON ALL GUARANTEES TO OBTAIN EVIDENCE.

20. Ms. Kessedjian deems that "it is common knowledge that French rules of evidence do not offer the same possibilities as American rules of evidence" (§ 17).

**This allegation must be strongly qualified for it does not correspond to the reality of applicable French law with respect to criminal procedure.**

21. Ms. Kessedjian submits a legal opinion particularly silent on the issue of evidence in criminal law, especially with respect to preliminary investigations. However, this issue constitutes an essential element since the goal of this preliminary phase is for the investigating magistrate to gather evidence that an infraction has occurred and to determine who committed it. In order to carry out his mission, the investigating magistrate has very broad powers, acting as both criminal investigator and judge.

---

[10] Only when a civil party does not invoke any distinct harm arising from the proposed infraction is it deemed inadmissible: Crim. February 8, 1979. The victim's civil action is admissible if the harm arises from the arrangement itself constituting the element of the infraction: Limoges, December 31, 1993 - Annex 8.

[11] Annex 9.

[12] Annex 10.

[13] It is true that, in the past, the Criminal Chamber clearly excluded civil actions. Considering that these actions were not distinct from public prosecution, the Criminal Chamber considered, based on the theory of general interest offenses, that, since the State represented society, the sentence resulting from a public prosecution assured compensation for the harm caused to society. The Criminal Chamber today considers that intangible harm to individual interests and harm to society can be distinct; for example, theft or homicide causes harm to all of society, to the community, and to flesh-and-blood citizens, whereas an offense committed by a State public officer harms first and foremost the abstract entity that is the State, the image of which has been tarnished. Moreover, the decision of March 10, 2004 speaks of "the existence of intangible damages distinct from the harm to the public interest."

22. In the framework of his investigative duties, "the investigating magistrate employs, in accordance with the law, all the means of investigation that he judges useful to uncover the truth."[14] Moreover, the Public Prosecutor and the parties may also request the magistrate to carry out an investigation. Generally, the parties may request from the investigating magistrate "that all other actions, which they deem necessary to uncover the truth, be carried out."[15]

23. Thus, the investigating magistrate can directly make physical findings and visit the premises.[16] The magistrate may question any person;[17] subpoena witnesses;[18] hear statements from the civil plaintiffs, as well as charges;[19] appoint experts;[20] carry out searches[21] and seizures;[22] order wiretappings;[23] issue summonses, orders to appear, or arrest warrants;[24] extend the time of preliminary detention up to 4 days; request provisional detention[25] or security in amounts equivalent only to the damages claimed by the civil plaintiffs; arrest any person, anywhere in the world, suspected of participating in the infractions under investigation; and order the confiscation of all assets of a person suspected of having participated in the infraction under investigation. At the conclusion of the investigation, the investigating magistrate decides if there is *sufficient proof of criminal charges* to refer them to a trial court.

24. **In conclusion, French Criminal Procedure, especially with respect to preliminary investigations, is particularly advantageous for victims of a criminal infraction who wish to obtain compensation for damages caused by the infraction, insofar as the investigating magistrate, not the victim, conducts the investigation that will determine if there is sufficient proof of the charges against the accused.**

## V. – FRANCE IS NOT A LAWLESS PLACE

25. Both Ms. Kessedjian and Mr. Schnerb portray France as a lawless place where it is possible to commit the most reprehensible acts with impunity, leaving the alleged victims bereft of any recourse. According to Ms. Kessedjian, "we may still doubt whether French courts have realized all the measures necessary to effectively carry out this fight at both the international and domestic levels" (§ 14.2). Similarly, Mr. Schnerb considers that "in the framework of a dispute opposing a foreign company

---

[14] Article 81 paragraph 1 of the Code of Criminal Procedure – Annex 11.
[15] Article 82-1 of the Code of Criminal Procedure – Annex 12.
[16] Article 92 of the Code of Criminal Procedure – Annex 13.
[17] Articles 101 et seq. on witness examinations – Annex 14.
[18] When the witness is subpoenaed or summoned, he is notified that the public authorities may force him to appear, should he not appear or refuse to do so. The failure to appear before the investigating magistrate without a legitimate excuse or justification is punishable by a fine of 3,750 euros: Article 434-15-1 of the Criminal Code – Annex 15.
[19] Articles 114 et seq. on interrogations and confrontations – Annex 16.
[20] An expert can be appointed upon a party's request.
[21] A search is the right to enter the domicile of a citizen, to impose upon him, and to search for elements proving that an infraction has occurred.
[22] A seizure is the right to place in the hands of the authorities objects and documents, to establish an inventory, and to affix thereto an official seal.
[23] Articles 100 et seq. of the Code of Criminal Procedure – Annex 17.
[24] Article 122 et seq. of the Code of Criminal Procedure on warrants and their execution – Annex 18.
[25] Article 143-1 et seq. of the Code of Criminal Procedure on provisional detention – Annex 19.

and a large French bank, it is probable that, based on the lack of precedents in this domain, the French Public Prosecutor is ill-suited to initiate such a procedure" (§ 16).

**These allegations do not correspond to the reality of applicable French law: these allegations are therefore false.**

26. For example, the Public Prosecutor of Paris decided to begin a preliminary investigation into corruption of foreign public officials, misappropriation of corporate funds, collusion, and receiving illegally obtained property, in relation, notably, to the French company, Technip, but also to the American company, Halliburton. In this case, the challenge is to identify the recipients of approximately $ 180 million in secret commissions paid, beginning in the 1990s, during the construction of a gas producing complex on Bonny Island in Nigeria between 1995 and 2002. The French and American judges are examining, in their respective jurisdictions, the same case of corruption, involving both Halliburton and the French company Technip. The French investigation has been entrusted to an investigating magistrate, Renaud Van Ruymbeke, who is conducting it in close collaboration with the American judges. In this way, a number of international letters rogatory have been delivered, and particularly efficient methods of cooperation have been implemented by the French judge and the head of the anticorruption unit in Washington.

27. Moreover, Transparency International, in its 2005 report, notes a decrease in the perception of corruption in France, which moved from 22nd place to 18th place with an integrity index of 7.5/10, just behind the United States, positioned 17th with an integrity index of 7.6/10.[26] According to Transparency International France,[27] "the improvement of France's position results from a number of factors: 'The ratification of the United Nations Convention against Corruption, Parliament's authorization to ratify the civil and criminal conventions of the Council of Europe on the fight against corruption, the transposition into domestic law of the European Union framework agreement on private corruption, the creation of the Central Brigade in the Fight against Corruption (*Brigade centrale de lutte contre la corruption*), and the implementation of regional jurisdictions specialized in the fight against financial misconduct. **France's progress also results from the success of a certain number of legal procedures in corruption cases** and increasing commitments by companies and financial institutions to fight corruption, money laundering, and fraud."

28. Thus, the extract from the OCDE report of January 22, 2004, to which both Ms. Kessedjian and Mr. Schnerb refer[28] and which notes that no proceedings were initiated until 2001 against a legal entity for acts of corruption, is out of date.

29. Ms. Kessedjian refers to the decisions cited by the undersigned and to "independent research" into case law, which she claims to have undertaken, to conclude that, with respect to money laundering, "none of these decisions concern international cases; none refer to complex facts such as those alleged in Kensington's complaint;" and that

---

[26] Annex 25. The report refers to the degree of corruption perceived by business people and national analysts and extends from 10 (high integrity) to 0 (very corrupt).
[27] La Lettre de Transparence, n° 27, November 2005, Annex 20.
[28] The report concerns France's application of the convention on the fight against corruption of foreign public officials in international commercial transactions and of the 1997 recommendation on the fight against corruption in international commercial transactions.

"the published cases reveal very simple situations, essentially domestic, that do not resemble in any way the facts alleged in the Kensington case" (§ 14.2).

30. Ms. Kessedjian's argument is in no way convincing. Indeed, it ignores an essential element – namely, that it takes more than ten years before a dispute can be referred to the Court of Cassation. Yet the general offense of money laundering was created by the French legislature in 1996, thus explaining the relatively small number of decisions rendered to date. Moreover, the "independent research" into case law that she claims to have conducted with respect to money laundering is presumably limited to decisions rendered by the Criminal Chamber and a small number of Courts of Appeal, whereas complex cases of money laundering, such as the one designated "Sentier II" – in which banks were accused of acting as accomplices in a money laundering network worth one billion francs and of having received illegally obtained property, corruption, and influence peddling – are still pending before the courts; and the decisions on the merits rendered by the courts have obviously not been published, due to their volume.[29]

31. **In conclusion, it appears that an objective and verifiable presentation of the French legal system demonstrates a number of possible recourses for Kensington.**

## GENERAL CONCLUSION

32. The undersigned reasserts all conclusions made in her opinion of July 30, 2005 – namely, that **the tools provided by French civil and criminal law allow Kensington to obtain complete compensation.**

33. **Kensington may submit its case to a civil court on its own initiative, without having to have recourse to a criminal action.** Before the civil court, Kensington could first bring a civil liability action against those parties without whose misconduct such damages would not have occurred, pursuant to Article 1382 of the Civil Code. Assuming that the legal requirements are met for such an action, this action will assure complete compensation for the damages. The notion of complete compensation in respect to professional relationships allows for an extensive view of such compensation. A French judge, insofar as he has discretion to assess the extent of the damages, does not hesitate to grant very substantial damages. Before the same civil court, Kensington could also submit a fraud action and/or revocatory action. These actions aim to challenge all or part of measures taken in violation of creditor's rights and to declare such measures unenforceable or quashed. The purpose of such actions lies in the return to the *status quo ante*, with the ability to restore the assets of the debtor whose assets were fraudulently diminished. Furthermore, third parties who are alleged to have allowed, with full knowledge of the situation, the debtor to diminish his assets to the detriment of the creditors' rights, would naturally be liable, pursuant to Article 1382 of the Civil Code.

---

[29] For the record, the decision rendered by the Paris Trial Court, 11th Chamber, on November 12, 2003 concerning the Elf case is 697 pages. The decision rendered by the Paris Court of Appeal on March 31, 2005 contains 148 pages. This case concerns the misappropriation of more than 300 million euros from Elf Aquitaine by certain of its directors.

34. **Should Kensington opt for the criminal route, it will initiate a public prosecution by electing to be a civil plaintiff before the investigating magistrate and will obtain damages for the harm suffered, if the harm is proved.** The principal purpose of electing to be a civil plaintiff before a criminal court lies in transferring the burden of proof to the Public Prosecutor, the representative of civil society. The investigating magistrate responsible for establishing the truth will refer the accused to the competent jurisdiction if sufficient proof of criminal charges exists. In order to carry out his task, the magistrate is endowed with significant investigative powers.

Strasbourg, on 25 January 2006

Chantal CUTAJAR