UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/06

------------------------------------x

KENSINGTON INTERNATIONAL LIMITED,     :

              Plaintiff,     :     05 Civ. 5101 (LAP)

              -against-     :     OPINION

                            :

SOCIÉTÉ NATIONALE DES PÉTROLES DU     :
CONGO, BRUNO JEAN-RICHARD ITOUA,      :
BNP PARNIBAS S.A.,                    :

              Defendants.     :

------------------------------------x

LORETTA A. PRESKA, United States District Judge:

    Kensington International Limited ("Plaintiff") brings this
action against Société Nationale Des Pétroles Du Congo, Bruno
Jean-Richard Itoua, BNP Parnibas S.A. (collectively,
"Defendants") under the civil RICO statute alleging a conspiracy
to misappropriate the resources, including oil, of the Republic
of Congo ("Congo") for the private use of allegedly corrupt
public officials and to facilitate and conceal that
misappropriation, all at the expense of the Congolese people and
of legitimate creditors like Kensington.  Defendants now move to
dismiss for, inter alia, failure to state a RICO claim and a
variety of jurisdictional infirmities.  For the reasons set forth
below, Defendants' motions are denied.

## BACKGROUND

    Plaintiff, a corporation organized and existing under the
laws of the Cayman Islands, purchases foreign debt instruments

issued by U.S. and foreign entities. Compl. ¶ 6.[1]  Kensington is

managed by Elliott International Capital Advisors, Inc., a

Delaware corporation with its principal place of business in New

York City. Id.  From 1996 to 2001, Plaintiff obtained the "right,

title and interest" as lender under various Congo loan agreements

of which Congo is in default. Compl. ¶¶ 59, 61.  Defendant

Société Nationale Des Pétroles Du Congo ("SNPC"), which was

created by statute in 1998, is Congo's principal state oil

company. Compl. ¶ 7.  Defendant Bruno Jean-Richard Itoua

("Itoua") was SNPC's Chief Executive during the relevant time

period. Compl. ¶ 9.  Defendant BNP Parnibas S.A. ("BNP") is a

French bank with a branch office in New York City. Compl. ¶ 11.

Following its investigation, Plaintiff alleges that it discovered

a money laundering scheme by Defendants to keep funds earned from

oil revenues from creditors through the management of SNPC and

through "complex, convoluted and unconventionally structured"

Prepayment Agreements. Compl. ¶¶ 71, 74, 93-97.

Plaintiff alleges that it has been unable to collect on its

rights as a creditor because Defendants have transported stolen

oil in foreign commerce and sold those goods in the United States

in violation of 18 U.S.C. §§ 2314, 2315.  Plaintiff alleges that

Defendants worked through the SNPC and Prepayment Enterprises,

---

[1] "Compl." refers to the Redacted Complaint, dated May 27, 2005.

2

Compl. ¶¶ 98-128, to create a system of Prepayment Agreements using "straw men," or sham intermediaries, to misappropriate Congo's oil and oil revenues. Compl. at 1-2. According to the Complaint, BNP loaned Congo about $650 million, and SNPC pledged about $1.4 billion in oil sales in an "excessive over collateralization [that] served to shield a substantial portion of Congo's oil revenues from both oversight and attachment by creditors." Compl. ¶ 85. Plaintiff alleges that Defendants sold at least eleven shipments of stolen oil totaling 9,210,221 barrels to United States purchasers. Schwarzkopf Decl. ¶ 3.[2] After the oil was sold, proceeds from at least one sale were deposited into BNP's New York branch. Compl. ¶ 130(b), (c).

Defendants move to dismiss the complaints against them on several grounds. First, SNPC and BNP contend that this Court does not have subject matter jurisdiction over RICO claims. Second, Itoua and SNPC contend that the Court does not have personal jurisdiction over them. Further, Itoua contends--in his reply brief--that he was improperly served. See Itoua Reply Memo. at 4-6.[3] Third, BNP and Itoua argue forum non conveniens.

---

[2] "Schwarzkopf Decl." refers to the Declaration of Donald S. Schwarzkopf in support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss, sworn to on December 2, 2005.

[3] "Itoua Reply Memo." refers to the Reply in Support of Defendant Bruno Jean-Richard Itoua's Motion to Dismiss the Complaint filed on February 1, 2006.

3

Fourth, SNPC, BNP, and Itoua argue that Plaintiff has failed to state a RICO claim, including that Plaintiff lacks standing to maintain a RICO claim. Fifth, SNPC and Itoua contend that they are immune under the Foreign Sovereign Immunities Act.

## DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires dismissal of complaints that are not legally sufficient. Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Rule 12(b)(1) requires dismissal when "the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)). Under both rules, this Court must accept the allegations of the complaints as true and construe all reasonable inferences in favor of Plaintiffs. See Karedes v. Ackerly Group, 423 F.3d 107, 113 (2d Cir. 2005); Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000). It is well settled that a case may not be dismissed "unless the court is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief." Miller v. Wolpoff & Abramson, 321 F.3d 292, 300 (2d Cir. 2002) (citing Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001)). In considering challenges to

4

subject matter jurisdiction under Rule 12(b)(1), a court may consider evidence extrinsic to the pleadings, such as affidavits. See Antares Aircraft, L.P. v. Fed. Republic of Nig., 948 F.2d 90, 96 (2d Cir. 1991), vacated for reconsideration on other grounds, 505 U.S. 1215 (1992), reaff'd on remand, 999 F.2d 33 (2d Cir. 1993).

Because federal courts are courts of limited jurisdiction, whether a court has jurisdiction is an issue generally to be addressed first. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95 (1998). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Id. at 94-95 (quoting Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan et al., 111 U.S. 379, 382 (1884)).

I.   Subject Matter Jurisdiction

SNPC and BNP argue that this Court does not have subject matter jurisdiction over RICO claims. Subject matter exists in federal district court if the action involves a federal question. 28 U.S.C. § 1331. The civil RICO statute, 18 U.S.C. § 1961 et. seq., and the money laundering statute, 18 U.S.C. § 1956, invoke federal questions. Defendants urge the Court to find that the alleged fraud occurred outside the United States and thus to apply the Court of Appeals' conduct or effects test to determine

jurisdiction. See N. S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1050 (2d. Cir. 1996). "However, where racketeering activities . . . occur within the United States, it is unnecessary to apply any test for determining the extraterritorial reach of the statute." Johnson Elec. N. Am., et al. v. Mabuchi Motor Am. Corp., et al., 98 F. Supp. 2d 480, 485 (S.D.N.Y. 2000) (citing Thai Airways Int'l Ltd. v. United Aviation Leasing B.V., 842 F. Supp. 1567, 1570 (S.D.N.Y. 1994), aff'd, 59 F.3d 20 (2d Cir. 1995)). This Court has jurisdiction where there were "domestic communications or negotiations that were material to the completion of the alleged fraud," id. at 485-86 (citing C.A. Westel de Venez. v. AT&T Co., No. 90 Civ. 6665, 1992 U.S. Dist. LEXIS 12301, at *16-17 (S.D.N.Y. Aug. 17, 1992), or "RICO predicate acts occurred primarily in the United States," id. (citing Alfadda v. Fenn, 935 F.2d 475, 479 (2d Cir. 1991)).

Here, Kensington has alleged numerous predicate acts that occurred in the United States as part of Defendants' alleged money-laundering scheme, including selling eleven shipments of stolen oil totaling 9,210,221 barrels to United States purchasers, Schwarzkopf Decl. ¶ 3, and SNPC's paying multi-million dollar option premium payments to BNP's New York branch, Compl. ¶ 130(b), (c). It is not necessary to apply the Court of Appeals' conduct or effects test to determine jurisdiction because a sufficient amount of activity is alleged to have

occurred domestically. Thus, Defendants SNPC and BNP's motion to dismiss for lack of subject matter jurisdiction is denied.

II. Personal Jurisdiction

Both Itoua and SNPC argue that the Court does not have personal jurisdiction to adjudicate this action. Plaintiff bears the burden of showing that this Court has personal jurisdiction over Defendants. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). Plaintiff need only make a prima facie showing of jurisdiction at this time, however, because I decide the question of personal jurisdiction solely on the basis of affidavits and documentary material. Catalyst Energy Dev. Corp. v. Iron Mountain Mines, Inc., 630 F. Supp. 1314, 1315 (S.D.N.Y. 1986) (citing Mayes v. Leipziger, 674 F.2d 178, 182 n.3 (2d Cir. 1982); Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)).

I must analyze personal jurisdiction in two parts: First, whether Defendant is amenable to service and, second, whether jurisdiction "comports with the requirements of due process." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999) (quoting Metro. Life, 84 F.3d at 567).

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); see also

Asahi Metal Indus. Col, Ltd. V. Superior Ct. Of Cal., 480 U.S.

102, 108 (1987) (O'Connor, J., plurality). A defendant must

"purposefully avail itself of the privilege of conducting

activities within the forum State." Hanson v. Denckla, 357 U.S.

235, 253 (1958); see also Asahi Metal, 480 U.S. at 110. Further,

"the defendant's conduct and connection within the forum State

[must be] such that he should reasonably anticipate being haled

into court there," World-Wide Volkswagen Corp. v. Woodson, 444

U.S. 286, 297 (1980); see also Asahi Metal, 480 U.S. at 109.

A. Itoua

As to Defendant Itoua, Plaintiff invokes New York's long-arm

statute, pursuant to Section 302(a)(1) of the New York Civil

Practice Law and Rules, which, in pertinent part, provides:

> (a) As to a cause of action arising from any of the
> acts enumerated in this section, a court may exercise
> personal jurisdiction over any non-domiciliary . . .
> who in person or through an agent:
>> 1. transacts any business within the state or
>> contracts anywhere to supply goods or services in
>> the state. . . .

While Defendant argues that "RICO does not provide for

international service of process," see, e.g., First Capital Asset

Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 392

(S.D.N.Y. 2002), that merely means that "[p]laintiffs asserting

RICO claims against foreign defendants must rely on the long-arm

statute of the state in which they filed suit," see id.

8

Plaintiff does not allege that Itoua was in New York but argues

that Itoua's contacts satisfy New York's long-arm statute

because: Itoua signed two covered oil options that required

payment of a premium to BNP in New York, Compl. ¶ 74(f), (g),

(h); SNPC shipped 545,222 barrels of oil to Riverhead, N.Y., on

October 13, 2000, and 560,222 barrels to New York on February 10,

2002, Schwarzkopf Decl. ¶ 3; and SNPC made the required premium

payments to BNP in New York, Compl. ¶ 130(b), (c). The clear

inference to be drawn from the Complaint is that these shipments

were of "stolen oil" and that the shipments were authorized by

Itoua in his capacity as SNPC's Chief Executive. Kensington Memo.

in Opp. at 37-38, 37 n.39;[4] Compl. ¶ 91(a). Because, under these

allegations, SNPC, through Itoua, contracted to make payments in

New York and later made additional agreements that should have

made Itoua aware of an ongoing relationship in New York, see,

e.g., First City Fed. Sav. Bank v. Dennis, 680 F. Supp. 579, 584,

586 (S.D.N.Y. 1988), Itoua has transacted business in New York.

Further, section 302(a)(1) "is a 'single act statute' and proof

of one transaction in New York is sufficient to invoke

jurisdiction, even though the defendant never enters New York, so

long as the defendant's activities here were purposeful and there

---

[4] "Kensington Memo. in Opp." refers to Kensington
International Limited's Memorandum of Law in Opposition to the
Motions of Defendants BNP Paribas, Bruno Jean-Richard Itoua and
Société Nationale Des Pétroles du Congo to Dismiss the Complaint
filed on December 2, 2005.

9

is a substantial relationship between the transaction and the claim asserted." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988). Thus, Plaintiff has shown the required substantial relationship.

Defendant Itoua raises a claim of improper service of process pursuant to Federal Rule of Civil Procedure 4(f)(2)(a) in his reply papers. Improper service of process claims must be made in the first instance; otherwise, they are deemed waived. See, e.g., First Capital, 218 F. Supp. 2d at 393 n.16; Sassower v. City of White Plains, County of Westchester, No. 89 Civ. 1267, 1993 WL 378862, at *6 (S.D.N.Y. Sept. 24, 1993). The Court need not consider such claims when raised for the first time in reply papers. See Landau v. New Horizon Partners, Inc., No. 02 Civ. 6802, 2003 U.S. Dist. LEXIS 15999, at *32 (S.D.N.Y. Sept. 8, 2003) (citing Friends of Gateway v. Slater, 257 F.3d 74, 78 n.3 (2d Cir. 2001)). Due to the untimeliness of this claim, the Court declines to consider it.

Finally, the Court must determine whether assertion of personal jurisdiction "under these laws comports with the requirements of due process," Kernan, 175 F.3d at 240. This due process test requires two inquiries: "minimum contacts" and "reasonableness." Metro. Life, 84 F.3d at 567. In Asahi Metal, the Justices separately noted that minimum contacts could have been established had the defendants had "additional conduct" that

10

"indicate[d] an intent or purpose to serve the market in the
forum State," along with having placed their product into the
international stream of commerce. 480 U.S. at 112 (O'Connor, J.,
plurality), 117-21 (Brennan, J., concurring), 121-22 (Stevens,
J., concurring). As described supra, Plaintiff has made a prima
facie showing that Itoua deliberately engaged in a significant
business transaction in New York by signing the covered oil
options and, thus, adequately alleged "minimum contacts." As to
reasonableness, five factors are relevant to the inquiry:

> (1) the burden that the exercise of jurisdiction will
> impose on the defendant; (2) the interests of the forum
> state in adjudicating the case; (3) the plaintiff's
> interest in obtaining convenient and effective relief;
> (4) the interstate judicial[] system's interest in
> obtaining the most efficient resolution of the
> controversy; and (5) the shared interest of the states
> in furthering social substantive policies.

Kernan, 175 F.3d at 244. Here, the first factor cuts against
reasonableness because Itoua is a citizen and resident of Congo,
but the other four factors favor reasonableness because Plaintiff
alleges that several states were involved in the oil shipments
with New York as one of the largest receivers. Schwarzkopf
Decl. ¶ 3. The forum state, New York, has a substantial interest
in adjudicating this controversy regarding the shipment of stolen
oil by foreign defendants into the United States. That the
United States has a substantial interest in adjudication of this
controversy is clear from Congress' passing legislation
proscribing money laundering, e.g., 18 U.S.C. § 1956(a)(1) and

11

(2), transport of stolen goods in foreign commerce, e.g., 18
U.S.C. §§ 2314 and 2315, and the Uniting and Strengthening
America by Providing Appropriate Tools Required to Intercept and
Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56,
115 Stat. 272 (the "PATRIOT Act"). Also, both the Plaintiff's
and the interstate judicial system's interests in efficient
adjudication will be served by resolution in this Court.
Finally, the substantive social policies of curbing transport of
stolen goods in foreign commerce and, in the case of the PATRIOT
Act, curbing leaders who "loot their countries, or accept bribes,
or steal from their people," 147 Cong. Rec. S10581 (Oct. 11,
2001) (statement of Sen. Levin), will further substantive
international social policies. "On balance, and taking into
consideration the presumption in favor of an exercise of
jurisdiction once minimum contacts have been established," see
First Capital, 218 F. Supp. 2d at 403, exercising personal
jurisdiction over Itoua is reasonable for purposes of due
process. Therefore, Plaintiff has satisfied its burden of making
a prima facie showing of personal jurisdiction over Itoua at this
time.

B.    SNPC

As to Defendant SNPC, Plaintiff invokes 28 U.S.C. § 1330(b),
which provides that "[p]ersonal jurisdiction over a foreign state
shall exist as to every claim for relief over which the district

12

courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." Subsection (a) provides that

> [t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

Here, neither party contends that SNPC is not an instrumentality of a foreign sovereign, as described in section 1603(a). See SNPC Memo. at 24.[5] Further, neither party contends that SNPC was not properly served, as described in section 1608. That SNPC is not immune under sections 1605-1607 will be discussed in a later section of this opinion.

The question at issue is whether a due process analysis for SNPC is necessary because SNPC is not a "person" under the Fifth Amendment. The Supreme Court has held that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union . . . ." South Carolina v. Katzenbach, 383 U.S. 301, 323 (1966). By analogy, it would appear that foreign sovereigns are not "persons," but subsequent

---

[5] "SNPC Memo." refers to Defendant Société Nationale Des Pétroles Du Congo's Memorandum of Law in Support of its Motion to Dismiss the Redacted Complaint filed on October 17, 2005.

Supreme Court and Court of Appeals cases have specifically
avoided addressing the issue, finding it unnecessary to decide
because due process requirements were met. See Republic of Arg.
v. Weltover, Inc., 504 U.S. 607, 619-20 (1992); Hanil Bank v. Pt.
Bank Negara Indon. (Persero), 148 F.3d 127, 134 (2d Cir. 1998).
Thus, I will address the due process issue.

As stated above, I must analyze "minimum contacts" and
"reasonableness" to determine whether personal jurisdiction
comports with due process as to SNPC. See Metro. Life, 84 F.3d at
567. Itoua acted in his capacity as SNPC's Chief Executive
during the relevant time period. Compl. ¶ 9. Thus, for the
reasons stated in subsection A, Plaintiff has alleged sufficient
minimum contacts for SNPC, and, for the same reasons, the
reasonableness factors favor exercising personal jurisdiction
over SNPC. Therefore, Plaintiff has satisfied the burden of
making a prima facie showing of personal jurisdiction over SNPC
at this time.

III. Forum Non Conveniens

Both BNP and Itoua argue forum non conveniens. "The central
purpose of any forum non conveniens inquiry is to ensure that the
trial is convenient." Piper Aircraft Co. v. Reyno, 454 U.S. 235,
256 (1981). At the outset, I note that "a plaintiff's choice of
forum should rarely be disturbed," id. at 241, and that there is
a "strong presumption in favor of plaintiff's choice of forum,"

14

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 154
(2d Cir. 2005). The Court of Appeals has prescribed a three-step
process to guide a district court's exercise of discretion on
forum non conveniens motions: first, determine the degree of
deference for Plaintiff's choice of forum; second, establish
whether an alternative forum proposed by the defendant would
adequately adjudicate the dispute; and third, if there is such an
adequate forum, balance the private and public interest factors
implicated by the choice of forum. Id. at 153.

First, as to the degree of deference due Plaintiff's choice
of forum, a foreign plaintiff is entitled to less deference than
a U.S. party would be entitled to. Id. at 154 (citing Piper
Aircraft, 454 U.S. at 255-56). Here, Kensington is a corporation
organized and existing under the laws of the Cayman Islands,
Compl. ¶ 6; thus, as a foreign party, Plaintiff is entitled to
less deference than a U.S. party. Nevertheless, there is still
"a strong presumption in favor of the plaintiff's choice of
forum." Id. (quoting Piper Aircraft, 454 U.S. at 255). I must
consider the "totality of circumstances supporting a plaintiff's
choice of forum" to determine whether Plaintiff has a "bona fide"
connection to the United States that would make the forum
convenient or whether Plaintiff has chosen this forum "motivated
by forum-shopping reasons." Id. Here, Defendant BNP asserts that
Plaintiff is motivated by forum shopping because U.S. laws

15

provide "access to treble damages and liberal discovery" and because Plaintiff is a foreign corporation. BNP Reply Memo. at 3-4.[6] Plaintiff, however, alleges that (1) the profits of defendants' activity were realized via the sale of oil into the United States, which was coordinated by BNP through its New York Office, Compl. ¶¶ 3, 14, 39, 40, 118; (2) United States' civil RICO and money laundering statutes form the basis of this lawsuit, Compl. ¶¶ 129, 130, 133; (3) Kensington is managed by Elliott Associates, L.P., a Delaware limited partnership, which has its principal place of business in New York, and Elliott Associates has about forty percent participation interest in the Congolese debt Kensington holds, Compl. ¶¶ 6, 12; (4) Plaintiff has three related pending cases against Congo in this Court, Kensington Int'l Ltd. v. Congo, 03 Civ. 4578, 05 Civ. 7537, 05 Civ. 7538 (S.D.N.Y.) with overlapping witnesses and sources of evidence; and (5) witnesses and evidence will come from numerous countries, including the United States. Thus, while Plaintiff is not due the greatest deference in its choice of forum, Plaintiff's choice is still due a substantial amount of deference because the totality of the circumstances demonstrates that Plaintiff has a bona fide connection to the United States.

---

[6] "BNP Reply Memo." refers to the Reply in Support of Defendant BNP Paribas' Motion to Dismiss the Complaint filed on February 1, 2006.

Second, I must determine whether an alternative forum proposed by the defendant would adequately adjudicate the dispute. An alternative forum is generally adequate when a defendant is amenable to process in the other jurisdiction, unless "the remedy offered by the other forum is clearly unsatisfactory." Piper Aircraft, 454 U.S. at 255 n.22. Defendant BNP proposes that France and England are adequate alternative fora. Def. BNP Memo. at 14-16;[7] BNP Reply Memo. at 4-8. BNP explains that it is "unquestionably amenable to suit in France," Def. BNP Memo. at 14, but makes no similar statement about suit in England. Defendant Itoua "affirmatively consents to service of process in France," Itoua Reply Memo. at 26, and makes no mention of England as a forum, except to say that he joins BNP's arguments, id. at 25. SNPC has not argued specifically on this ground, but it joins in the other Defendants' arguments and did not object to BNP's statement that "SNPC is also subject to jurisdiction in France," Def. BNP Memo. at 14, yet no such statement was made in connection with SNPC's amenability to suit in England. Thus, because Defendants appear only to be amenable to suit in France, I only will consider France as an alternative forum proposed by Defendants BNP and Itoua. As to the remedy offered by France, Chantal Cutajar's legal opinion explains

---

[7] "Def. BNP Memo." refers to BNP Paribas' Memorandum of law in support of its motion to dismiss the complaint filed on August 8, 2005.

17

various remedies Kensington could pursue in France to obtain compensation for its losses. See BNP's Notice of Motion, dated August 8, 2005, with Cutajar's opinion, dated July 30, 2005, annexed. While the remedies offered in France may not be the same--or as favorable--as they are in the United States, that does not defeat the adequacy of the alternative forum. See Piper Aircraft, 454 U.S. at 247; Capital Currency Exch. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 609-10 (2d Cir. 1998) ("[F]orum non conveniens dismissal is not trumped simply because the foreign forum will apply different substantive law than an American court."). Thus, it appears that in the alternative forum of France, as proposed by Defendants, this dispute could be adequately adjudicated.

Third, I must balance the private and public interest factors implicated by the choice of forum that the Supreme Court set forth in Gulf Oil Corp. v. Gilbert. 330 U.S. 501, 508-9 (1947). To prevail, Defendants must demonstrate that the balance of all of these factors tilts strongly toward the foreign forum. Piper Aircraft, 454 U.S. at 255; PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998).

The private interest factors I consider in determining whether dismissal is warranted are as follows: (1) relative ease of access to sources of proof; (2) availability of compulsory process to secure the attendance of unwilling witnesses; (3) cost

18

of obtaining the attendance of witnesses; (4) possibility of viewing the premises, if relevant to the action; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive. HSBC USA, Inc. v. Prosegur Para., S.A., No. 03 Civ. 3336, 2004 U.S. Dist. LEXIS 19750, at *5-6 (S.D.N.Y. Sept. 30, 2004) (citing Gulf Oil, 330 U.S. at 508-9; PT United, 138 F.3d at 73). In this action, the fourth factor is irrelevant because there is no premises to be viewed. The other factors all do not weigh in favor of either forum because the case likely will involve witnesses, documents, and other evidence from several countries--not merely the United States and France.

The public interest factors I weigh are as follows: (1) court administrative difficulties; (2) burdens on the jury pool; (3) the interest of fora in having local disputes decided at home; and (4) the appropriateness of trying a case in a forum familiar with the governing law of the case. Gulf Oil, 330 U.S. at 508-9; PT United, 138 F.3d at 74; R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991)). Here, Defendants have not cited any administrative difficulties in this court or burdens on the jury pool that make this case different from other cases in which courts have refused to dismiss on grounds of forum non conveniens. See, e.g., HSBC USA, 2004 U.S. Dist. LEXIS 19750, at *15. The third factor weighs slightly against the United States as a forum because while Plaintiff has alleged that the

19

United States, and particularly New York, was heavily implicated by Defendants' actions, this is not solely a "local dispute," and none of the parties is a U.S. citizen. See Alfadda et al. v. Fenn et al., 159 F.3d 41, 46 (2d Cir. 1998); Europe & Overseas Commodity Traders v. Banque Paribas London, 940 F. Supp. 528, 539 (S.D.N.Y. 1996). The final factor, however, does not weigh in favor of either forum because "[i]n adjudicating plaintiffs' RICO . . . claims, an American court would apply American law. If the case is transferred to France, however, French law would apply and a consideration of American law would be unnecessary." Alfadda, 159 F.3d at 46.[8]  On considering the private and public interest factors, Defendants have not met their burden of showing that the balance of all of these factors "tilts strongly toward the foreign forum."  Thus, Defendants' motion to dismiss on the basis of forum non conveniens is denied.

## IV.  Failure to State a RICO Claim

Defendants move pursuant to 12(b)(6) of the Federal Rules of Civil Procedure on the ground that Plaintiff has failed to state a RICO claim.  "Dismissal of a civil RICO complaint for failure to state a claim is appropriate only when 'it is clear that no

---

[8] I note that Defendant BNP's Reply Memorandum cites to Alfadda as holding that "forum non conveniens dismissal is not trumped simply because the foreign forum will apply different substantive law than an American court." BNP Reply Memo. at 11. Defendant takes this quote out of context by not citing the previous sentences, quoted above in the text.

20

relief could be granted under any set of facts that could be proved consistent with [plaintiff's] allegations.'" Commer. Cleaning Servs. v. Colin Serv. Sys., 271 F.3d 374 (2d Cir. 2001) (quoting McLaughlin v. Anderson, 962 F.2d 187, 190 (2d Cir. 1992) (quoting H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 249-50 (1989)).

## A. Standing to Maintain a RICO Claim

To begin, Defendants argue that Plaintiff lacks standing to maintain a RICO claim.[9] The statute provides as follows: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). The Court of Appeals has explained the three elements that a plaintiff must plead to demonstrate standing: "'(1) the defendant's violation of [§] 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation. This third requirement is satisfied if the defendant's injurious conduct is both the

---

[9] The Court of Appeals held that "RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that [proceeding under Federal Rule of Civil Procedure 12(b)(1)] would turn the underlying merits questions into jurisdictional issues" and determined that dismissal of civil RICO claims based on standing should be effected under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and not under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 116-17 (2d Cir. 2003).

21

factual and the proximate cause of the injury alleged.'" Baisch
v. Gallina et al., 346 F.3d 366, 372 (2d Cir. 2003) (quoting
Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120-24 (2d Cir. 2003)
(citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 287-88
(1992)).

The first two standing factors were clearly pleaded; the
issue here is whether proximate cause was properly pleaded. I
must analyze a two-part test for proximate causation:

> First, the plaintiff's injury must have been
> "proximately caused by a pattern of racketeering
> activity violating [18 U.S.C. §] 1962 or by individual
> RICO predicate acts." . . . Second, the plaintiff must
> have suffered a direct injury that was foreseeable:
> "Central to the notion of proximate cause [under RICO]
> is the idea that a person is not liable to all those
> who may have been injured by his conduct, but only to
> those with respect to whom his acts were 'a substantial
> factor in the sequence of responsible causation,' and
> whose injury was 'reasonably foreseeable or anticipated
> as a natural consequence.'"

Id. at 373-74 (quoting Lerner, 318 F.3d at 122-23).

As to the first part of the test, I must determine if
Plaintiff's injury was proximately caused by a pattern of
racketeering activity or by individual RICO predicate acts. The
Court of Appeals generally has found creditors' injuries to be
derivative and not proximately caused by the RICO violations.
Manson et al. v. Stacescu et al., 11 F.3d 1127, 1130 (2d Cir.
1993). The Court of Appeals, however, has recognized "a narrow
exception to the general rule denying creditors standing" when
the creditors of a bankrupt company sustained a "direct injury."

Id. (citing Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1100-01
(2d Cir. 1988)). This case is similar to Bankers Trust because
Plaintiff alleges a direct injury of having been defrauded as a
creditor as part of the scheme to hide proceeds of the oil
shipments. Compl. ¶ 74. As discussed below, Plaintiff has
sufficiently alleged Defendants' racketeering pattern of money
laundering through what Plaintiff calls the "SNPC Enterprise" and
the "Prepayment Enterprise." Compl. ¶¶ 94-97. Thus, Plaintiff
has met the first part of the proximate cause test to establish
standing.

As to the second part of the test,

> [t]he foreseeability component of proximate cause is
> established where the plaintiff was a "target[]" and
> "intended victim[]" of the racketeering enterprise,"
> even if he was not the primary target or victim, and
> . . . "no precedent suggests that a racketeering
> enterprise may have only one 'target,' or that only a
> primary target has standing."

Ideal Steel Supply Corp. v. Anza et al., 373 F.3d 251, 259 (2d
Cir. 2004) (quoting Baisch, 346 F.3d at 374, 375) (citation
omitted). In Baisch, the Court of Appeals held that the fraud on
the plaintiff lender and the County were intertwined and
permitted Baisch standing to pursue a RICO claim based in part on
the false vouchers submitted to the County because "[t]he
defendants specifically targeted Baisch as their victim allegedly
by taking his loans under false pretenses and consciously
creating a high risk of defaulting on those loans." 346 F.3d at

23

375-76. In this case, as in <u>Baisch</u>, the scheme that Plaintiff alleges is that the three Defendants acted intentionally to hide the oil proceeds, precisely to avoid their creditors. Compl. ¶¶ 69-75, 79, 80, 85, 86. Plaintiff alleges that BNP and SNPC were involved in an "excessive over collateralization [that] served to shield a substantial portion of Congo's oil revenues from both oversight and attachment by creditors" by pledging about "$1.4 billion in oil sales" to BNP to support about $650 million in loans. Compl. ¶ 85. Further, Plaintiff alleges that "[w]hen legal actions by Congo's creditors threatened to disrupt the Prepayment Agreements, these arrangements were deliberately modified [by Defendants] to provide greater obscurity for the transactions and greater protection from attachment for SNPC's assets." Compl. ¶ 71. Then, Plaintiff alleges, "In October 2002, BNP Paribas, SNPC, and their lawyers met to consider ways of restructuring the Prepayment Agreements to evade creditor's legal actions." Compl. ¶ 79. Also, Plaintiff alleges, "In December 2002, BNP Paribas granted a new Prepayment Agreement to SNPC, with modifications explicitly intended to further shield the lending arrangement from other creditors." Compl. ¶ 80. Thus, Plaintiff also has met the second part of the proximate cause test and has established standing, and thus Defendants' motions to dismiss for lack of standing are denied.

## B. Pleading the Elements of the Predicate Offense

Rule 8(a) of the Federal Rules of Civil Procedure requires only that pleadings must contain "a short and plain statement" of the grounds and claims and a demand for judgment. "To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" De Falco et al. v. Bernas et al., 244 F.3d 286, 305 (2d Cir. 2001) (quoting Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp., 101 F.3d 900, 904 (2d Cir. 1996)). "[T]o establish a violation of 18 U.S.C. § 1962(c), a plaintiff must establish that [1] a defendant, [2] through the commission of two or more acts[, 3] constituting a pattern [4] of racketeering activity, [5] directly or indirectly participated in [6] an enterprise, [7] the activities of which affected interstate or foreign commerce." Id. at 306. These elements need to be established as to each defendant. Id. At issue in this case is whether there was an "enterprise" and whether there was "racketeering activity."

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Court of Appeals has noted the Supreme Court's explanation of a RICO enterprise as "'a

group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). "The enterprise must be separate from the pattern of racketeering activity and distinct from the person conducting the affairs of the enterprise." Id. (citing Turkette, 452 U.S. at 583).[10] The Court of Appeals explained that RICO requirements are "most easily satisfied when the enterprise is a formal legal entity" but stated that "an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity.'" Id. (quoting United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir. 1980)). Satinwood goes on to state that the Court "further requires that a nexus exist between the enterprise

---

[10] Plaintiff argues that the Court of Appeals does not require pleading an enterprise that is sufficiently distinct from the alleged predicate acts because Moss v. Morgan Stanley Inc. did not require that the "evidence offered to prove the 'enterprise' and 'pattern of racketeering' must necessarily be distinct." 719 F.2d 5, 22-23 (2d Cir. 1983). Satinwood, however, is more recent and may not be inconsistent in that Satinwood does not say that the proof offered must be "distinct." In any event, as noted above, Plaintiff has adequately pleaded two distinct enterprises.

26

and the racketeering activity that is being conducted." Id. at 174.

Here, Plaintiff alleges the existence of one "corporation enterprise," the "SNPC Enterprise," allegedly consisting of SNPC, Itoua, and BNP, Compl. ¶¶ 98-109, and one "association-in-fact enterprise," the "Prepayment Enterprise," consisting of SNPC, Itoua, and BNP, Compl. ¶¶ 114-123. Plaintiff alleges that BNP associated with these enterprises since their inception, Compl. ¶¶ 108, 122, and that BNP is "the originator," "major facilitator," and "financier" of the mechanisms used by the enterprises to carry out their "illegal activities," Compl. ¶¶ 109, 122. Further, Plaintiff alleges that BNP worked with SNPC to restructure and modify the Prepayment Agreements in 2002 and 2003, Compl. ¶¶ 79-82, and then to "keep[] SNPC in a state of permanent indebtedness and retain[] management and control over SNPC's principal assets and revenues" by providing loans that exceeded the value of any single oil cargo, Compl. ¶ 108. For purposes of pleading "a short and plain statement," Plaintiff's allegations of enterprise are sufficient as to each Defendant-- particularly in the case of the "SNPC Enterprise." ("The participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity." Webster v. Omnitrition Int'l, 79 F.3d 776, 786 (9th Cir. 1996); "Legal entities are

27

garden-variety "enterprises" which generally pose no problem of separateness from the predicate acts." Bennett v. Berg, 685 F.2d 1053, 1060-61 (8th Cir. 1982), adopted on reh'g en banc, 710 F.2d 1361, 1363-64 (8th Cir. 1983) (cited by Satinwood, 385 F.3d at 173)).

As to the "racketeering activity," acts of money laundering indictable under 18 U.S.C. § 1956 and transport of stolen property indictable under 18 U.S.C. §§ 2314, 2315 are among the predicate acts enumerated in 18 U.S.C. § 1961(1). Plaintiff alleges that Defendants committed acts of money laundering and transportation of stolen oil in foreign commerce, constituting the predicate acts for the RICO claims. Compl. ¶¶ 74, 84, 86, 91, 98-100, 115, 121, 129, 130, 133, 135, 136. For example, as to SNPC, Plaintiff alleges several times that "SNPC did not make full payment to Congo for the oil" in transactions in 2001, 2002, and 2004-05, Compl. ¶ 130(a), (b), (c), (d), (e), and that "the transactions in which [SNPC] was involved were highly unusual and outside normal and legitimate business arrangements," done in secrecy to help divert the funds from Congo, Compl. ¶ 91(b). As to BNP, Plaintiff alleges that

[t]he unusual structure and complexity of the Prepayment Agreements was explicitly intended to enable BNP Paribas to deliver Congo's oil into the hands of international buyers and deliver the sales proceeds back to the Sassou-Nguesso regime without interference from Congo's unpaid creditors and without oversight from anyone outside the regime's inner circle. . . . [T]he substantial, above-market fees collected by BNP

28

Paribas for the numerous elements of these complex transactions effectively constitute the premium charged for laundering both oil sales and cash revenues for the regime.

Compl. ¶ 74(k). As to Itoua, Plaintiff alleges that

Itoua, as President and General Manager of SNPC, was aware that SNPC obtained oil from Congo without full compensation and that he personally received a portion of the oil revenues. He was aware that the Prepayment Agreements were carried out in secret to facilitate those illegal transactions and to conceal the source and ultimate disposition of the proceeds. . . . He personally signed all documents comprising the Prepayment Agreements on behalf of SNPC.

Compl. ¶ 91(a). For purposes of pleading "a short and plain statement," Plaintiff's allegations of racketeering activity are sufficient as to each Defendant.

V. Immunity under the Foreign Sovereign Immunities Act

Under the Foreign Sovereign Immunities Act ("FSIA"), United States courts lack jurisdiction over foreign states and their agencies or instrumentalities "unless a specified exception applies." Saudi Arabia et al. v. Nelson, 507 U.S. 349, 355 (1993); see 28 U.S.C. § 1604.

A. SNPC

The Court of Appeals explained that "in a challenge to FSIA subject matter jurisdiction, the defendant must present a 'prima facie case that it is a foreign sovereign.' . . . Then, the plaintiff 'has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted.'" Virtual Countries, Inc. v. Republic of S. Afr., 300

F.3d 230, 241 (2d Cir. 2002) (citations omitted). SNPC argues

that Kensington has conceded that SNPC is an instrumentality of

the Congo. SNPC Memo. at 10 (citing Compl. ¶¶ 7, 98).

Kensington, however, notes that Defendants bear the burden of

establishing the affirmative defense of immunity. Kensington

Memo. in Opp. at 20 n.21. Here, it is not necessary to make that

determination because Kensington has sufficiently alleged that

SNPC's acts fall under the "commercial activity exception" to the

FSIA.

> The "commercial activity" exception provides that:

> A foreign state shall not be immune from the
> jurisdiction of courts of the United States or of the
> States in any case . . . in which the action is based
> upon a commercial activity carried on in the United
> States by the foreign state; or upon an act performed
> in the United States in connection with a commercial
> activity of the foreign state elsewhere; or upon an act
> outside the territory of the United States in
> connection with a commercial activity of the foreign
> state elsewhere and that act causes a direct effect in
> the United States.

28 U.S.C. § 1605(a)(2). "The purpose of the commercial exception

[is] to prevent foreign states from taking refuge behind their

sovereignty when they act as market participants . . . ." Nelson,

507 U.S. at 368 (White, J., concurring). I begin my "analysis by

identifying the particular conduct on which the [defendants']

action is 'based.'" Id. at 356 (Souter, J., majority). "The

commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular

transaction or act, rather than by reference to its purpose." 28
U.S.C. § 1603(d) (emphases added). "[T]he question is not
whether the foreign government is acting with a profit motive or
instead with the aim of fulfilling uniquely sovereign objectives.
Rather, the issue is whether the particular actions that the
foreign state performs (whatever the motive behind them) are the
type of actions by which a private party engages in 'trade and
traffic or commerce.'" Weltover, 504 U.S. at 614 (citation
omitted) (emphasis in original).

SNPC argues that activity such as money laundering cannot
qualify as a commercial activity because it is criminal and the
commercial activity "must be one in which a private person can
engage lawfully." SNPC Reply Memo. at 6[11] (quoting In re
Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 793
(S.D.N.Y. 2005)). I respectfully disagree with the holding in In
re Terrorist Attacks and find instead that the acts alleged as to
SNPC constitute "either a regular course of commercial conduct or
a particular commercial transaction or act." 28 U.S.C. § 1603(d).
The Supreme Court and the Court of Appeals have made it clear
that criminal activity that is commercial in nature, such as
money laundering, is not beyond the reach of the commercial
activity exception. See Nelson, 507 U.S. at 356; De Letelier v.

_____

[11] "SNPC Reply Memo." refers to Defendant Société Nationale
Des Pétroles du Congo's Reply Memorandum of law in Support of its
Motion to Dismiss the Complaint filed on February 1, 2006.

Republic of Chile, 748 F.2d 790, 797 (2d Cir. 1984) (holding that the "purpose" of the assassination through state-sponsored terrorism was "irrelevant under the FSIA" and noting that the "court must inquire whether the activity is of the type an individual would customarily carry on for profit"). Following these cases and noting those from other circuits, I find that the criminal purpose of an act does not negate the act's commercial nature. See, e.g., Keller v. Cent. Bank of Nig., 277 F.3d 811, 816 (6th Cir. 2002); Adler v. Fed. Republic of Nig., 219 F.3d 869, 875 (9th Cir. 2000); Southway v. Cent. Bank of Nig., 198 F.3d 1210, 1217 (10th Cir. 1999). As in Adler, I find that the contract that the alleged money laundering was based on in this case was "plainly commercial in nature" and that it was used for an illegal purpose "does nothing to destroy its commercial nature." 219 F.3d at 875.

The activities here independently satisfy each of the three prongs of the commercial activity exception. The first clause, "the action is based upon a commercial activity carried on in the United States by the foreign state" is satisfied because Kensington alleges that SNPC sold at least eleven shipments of stolen oil totaling 9,210,221 barrels to United States purchasers, Schwarzkopf Decl. ¶ 3, and SNPC paid multi-million dollar option premium payments to BNP's New York branch, Compl. ¶ 130(b), (c). These acts satisfy the definition set out in 28

U.S.C. § 1603(e) of having "substantial contact" with the United States.

The second clause, "the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," is satisfied because of the Prepayment Agreements, Compl. ¶¶ 71, 74, 93-97, and the sale of at least eleven shipments of stolen oil totaling 9,210,221 barrels to United States purchasers, Schwarzkopf Decl. ¶ 3.

The third clause, "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States," is satisfied because the acts described have the direct effect in the United States of causing the transportation of stolen property and funds paid in furtherance of a money laundering scheme.[12] Compl. ¶ 130. Thus, the commercial activity exception applies to SNPC in this action.

SNPC and Itoua argue that this Court lacks jurisdiction because foreign sovereigns are immune from RICO liability as a

---

[12] SNPC argues that Int'l Housing Ltd. v. Rafidain Bank Iraq, 893 F.2d 8, 11 (2d. Cir 1989), precludes a finding that "financial losses suffered by a plaintiff incorporated abroad" satisfy the "direct effect" test, SNPC Reply Memo. At 8; however, Int'l Housing specifically did not address "whether payment to a United States branch office of a foreign sovereign's bank would involve a 'direct effect in the United States,'" 893 F.2d at 12 n.4, and I find that it does.

33

matter of law under FSIA. The district court cases that SNPC
cited in this Circuit, however, all explain that municipalities
and their employees cannot form the mens rea for RICO liability.
See Wood v. Inc. Vill. of Patchogue, et al., 311 F. Supp. 2d 344,
354 (E.D.N.Y. 2004), Frooks v. Town of Cortlandt, 997 F. Supp.
438, 457 (S.D.N.Y. 1998), aff'd, 182 F.3d 899 (2d Cir. 1999).
Neither SNPC nor Itoua is a municipality or an employee of a
municipality,[13] and thus, this immunity to RICO actions does not
apply to them. The FSIA does not carve out a specific grant of
immunity for civil RICO actions, and it particularly excepts from
immunity civil suits involving "commercial activity." See 28
U.S.C. § 1605(a)(2). Thus, I do not find SNPC or Itoua immune
because this is a civil RICO action.

B.   Itoua

Itoua argues that he is a foreign sovereign who is immune
under the FSIA, yet there is a circuit split as to whether the
FSIA even applies to individuals. Compare Enahoro et al. v.
Abubakar, 408 F.3d 877, 882 (7th Cir. 2005) (FSIA may not apply
to individuals) with Velasco v. Gov't of Indon. et al., 370 F.3d
392, 402 (4th Cir. 2004) (FSIA may apply to individuals).
Because the Court of Appeals for the Second Circuit has not

_____

[13] "Municipal" is defined as "[o]f or relating to a city,
town, or local governmental unit" or "[o]f or relating to the
internal government of a state or nation." Black's Law Dictionary
1042 (8th ed. 2004).

clearly addressed this issue, I normally would need to determine whether Itoua was acting in his official capacity to be entitled to immunity if his acts do not fall under the commercial activity exception. Here, it is not necessary to make that determination because Kensington has sufficiently alleged that Itoua's acts-- through his capacity as SNPC's Chief Executive during the relevant time period, Compl. ¶ 9--fall under the commercial activity exception in the same way that SNPC's acts do. Thus, regardless of whether he acted in his official capacity, Itoua is not immune under the FSIA because of the commercial activity exception.

## CONCLUSION

For the reasons set forth above, the motions to dismiss (docket nos. 14, 24, and 27) are denied. Counsel shall confer and inform the Court by letter no later than April 14 as to how they propose to proceed.

SO ORDERED

March 3l, 2006

*Loretta A. Preska*

Loretta A. Preska, U.S.D.J.